MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CDO PLUS MASTER FUND LTD.,                :
                                          :    **07 Civ. 11078 (LTS)(AJP)**
                       Plaintiff,         :
                                          :    **AMENDED COMPLAINT**
         - against -                      :
                                          :
WACHOVIA BANK,                            :    **ECF CASE**
NATIONAL ASSOCIATION,                     :
                                          :
                       Defendant.         :
-----------------------------------------------------------X

## Introduction

1.  This action concerns a classic "bait and switch" by the Defendant, Wachovia Bank, National Association ("Wachovia"), in which Wachovia fraudulently induced the Plaintiff, CDO Plus Master Fund Ltd.,[1] to enter into a credit derivative transaction, or "swap," through the offer of more favorable margin terms than Wachovia actually intended to honor. In reliance upon Wachovia's representations, Plaintiff entered into the trade and deposited $750,000 to collateralize the swap. Within weeks of the trade, however, Wachovia demanded unreasonably high amounts of additional margin

---

[1] On November 21, 2007, the Companies Registry of the Jersey Financial Services Commission recorded the change of Plaintiff's name to VCG Special Opportunities Master Fund Limited.

even though Plaintiff was not under an obligation to post any collateral at all after depositing the initial margin of $750,000.  Under the Confirmation Letter of the swap agreement, after the initial margin deposit Wachovia was entitled to demand payments from Plaintiff *only* upon the occurrence of an actual credit default, *i.e.*, a failure to pay principal, an interest shortfall or a "writedown" in the underlying "reference obligation" (which in this case is an investment-grade collateralized debt obligation, or "CDO").  Perhaps in a panic over recent turmoil in the debt markets connected to the sub-prime mortgage lending crisis, Wachovia purportedly determined (but without any reasonable basis) that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated in the scant weeks that had passed since it entered into the credit default swap with the Plaintiff.

        2.        In the alternative, if Wachovia had not planned to deceive Plaintiff regarding the amount of collateral it intended to extract in order to protect itself against counterparty risk, then there was no meeting of the minds regarding the subject matter of the transaction.  Relying upon the terms of the Confirmation Letter governing the swap, Plaintiff entered into the transaction with the understanding that it was selling risk protection *against a credit default only*.  Wachovia knew or should have known this fact but, in retrospect, sought to hold Plaintiff to a different set of obligations, such as a market value swap, *i.e.*, a transaction under which Plaintiff would bear the risk of daily movements in the value of the reference obligation.  When Plaintiff confirmed that no credit default had taken place, it refused to pay more money as "margin."  After Plaintiff commenced this action (originally in New York Supreme Court), Wachovia closed out the trade and converted all the money that had been deposited to date, $8,920,000.

3. Plaintiff seeks rescission of the swap transaction, the return of all sums Plaintiff deposited as collateral or otherwise, damages from the breach and/or specific performance and a permanent injunction against further violations by Wachovia.

### The Parties

4. Plaintiff is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

5. Wachovia is a national banking association with its designated main office and principal place of business in Charlotte, North Carolina.

### Jurisdiction and Venue

6. The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs. Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

7. In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

### Substantive Allegations

The Credit Default Swap

8. Plaintiff is a hedge fund with approximately $50,000,000 of funds under management.

9. On or about May 21, 2007, Plaintiff entered into a credit default swap transaction with Wachovia.

10. A credit default swap is a contract under which two financial institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this

case, a CDO. A credit default swap bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

11. In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of the Class B tranche of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007-1A, which were issued pursuant to an Indenture dated April 11, 2007.[2]

12. The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

13. By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

---

[2] Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's default risk, the amount of the debt obligation on which the fee is calculated (and for which the seller agrees to undertake credit default exposure in return) is termed the "notional" amount.

4

Initial Margin and Floating Payments

14.     When Plaintiff and Wachovia executed the swap, Plaintiff paid Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the "independent amount." For purposes of clarity, however, this Complaint instead refers to the deposit of $750,000 as the "initial margin." The purpose of the initial margin was to secure Wachovia against the credit risk of the counterparty (Plaintiff).

15.     Under the Confirmation Letter, the only payments that Wachovia may demand from Plaintiff *after* the initial margin are "Floating Payments." Wachovia may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Wachovia) that a "Floating Amount Event" had taken place: (i.) the obligor on the reference obligation (the CDO) had failed to make a required principal or scheduled interest payment or (ii) a writedown had taken place according to the method prescribed by the reference obligation's governing instrument – *not* on the basis of the perceived creditworthiness of the counterparty (Plaintiff).

16.     Apart from the initial margin and Floating Payments, the Confirmation Letter does not otherwise authorize Wachovia to demand payments of any kind to secure Wachovia against the credit risk of the counterparty or the reference obligation.

17.     On some swaps, margin may be collected after the initial margin. In such cases, the additional margin is referred to as "variation margin" and is based upon a downward movement in the mark-to-market value of the underlying obligation.

18.     In or about April 2007, before the parties entered into the swap agreement, Wachovia had originally demanded initial margin in the amount of

5

$1,500,000, but Plaintiff informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial margin were reduced to $750,000.

19. Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms, knowing at the time that it would simply contrive later to demand more collateral on the pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once Plaintiff was locked into to the trade. (The CDO matures in 2053).

20. Plaintiff wired the $750,000 of initial margin to Wachovia's account on or about May 30, 2007.

<u>Wachovia Squeezes Plaintiff for More Money</u>

21. However, less than three weeks later, Wachovia demanded an additional amount of collateral, requiring a deposit of $320,000 on or about June 18, 2007. Several days later, Wachovia requested an additional $430,000. Tellingly, the sum of the initial margin and these two latter deposits comes to a total of $1,500,000 – precisely the amount that Wachovia had wanted in the first instance and that Plaintiff had thought it had bargained down to $750,000.

22. Nor was Wachovia finished at $1,500,000. Wachovia continued to ratchet up its demands for variation margin over the weeks that followed:

| Date | Amount |
|---|---|
| May 30, 2007 | $750,000 (initial |
| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |

6

| | |
|---|---|
| July 20, 2007 | $740,000 |
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |
| October 30, 2007 | $850,000 |
| November 1, 2007 | $620,000 |

23.     In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a period of five months purportedly to secure Wachovia against a total credit risk of $10,000,000 from an investment-grade debt instrument.

24.     However, upon information and belief, during the entire period described in the table above, and as of the date of the filing of the original Complaint in this action, the reference obligation (Forge ABS High Grade CDO Ltd, 2007-1A) had not experienced any shortfall in principal or interest payments whatsoever.

25.     Also upon information and belief, during the same period, no write-down had taken place according to the reference obligation's controlling documents resulting in any reduction of the outstanding principal amount of the reference obligation, nor had any other write-down taken place such that Plaintiff could properly have been required to make a Floating Payment to Wachovia.  Upon information and belief, from the date when Wachovia and Plaintiff first entered into the credit default swap, and as of the date of this Complaint, the reference obligation has at all times been and continues to be an investment grade debt instrument.

26.     Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia *solely* upon the basis of a report of the servicer of the underlying reference obligation.[3]

27.     At first, Plaintiff delivered the additional collateral requested by Wachovia without protest.  However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over *40%* of the notional amount.

28.     While Plaintiff believed it was not obligated to pay the sums demanded by Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Wachovia did.

29.     Wachovia responded that it was entitled to require variation margin pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.

30.     Although the overall CDO market had certainly experienced considerable turmoil during the summer of 2007, no credit event had yet occurred such that Plaintiff should have been required to make a Floating Payment.  While one rating agency, Fitch, had downgraded the reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not constitute a credit event within the

---

[3]     Pursuant to the indenture of a collateralized debt obligation, a servicer performs the ministerial task of calculating payment amounts and preparing reports regarding the interest and principal due to be paid on the CDO.

meaning of the swap documents. No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

31. Moreover, even if Wachovia had been entitled to demand variation margin, *i.e.*, to secure Wachovia against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Wachovia failed even to make a good faith estimate of the required collateral. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

32. In such an event, even under Wachovia's interpretation of the swap agreements, Wachovia would have been required to *return* a portion of the collateral to Plaintiff, and certainly not to demand more. Thus, even assuming that Wachovia faced exposure on the reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of Wachovia's exposure would in every case call for a payment by Plaintiff to Wachovia.

Wachovia Admits that it Breached the Swap Agreement

33. In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

34. Wachovia admitted that it had *not* used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

35.     Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

36.     Thus, the margin calls had been expressly used by Wachovia not to satisfy Plaintiff's obligation to make a "Floating Payment," or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

37.     As of the date of this Amended Complaint, Plaintiff had delivered $8,920,000 in collateral against the notional amount of $10,000,000.

<u>Wachovia Escalates its Margin Demands</u>

38.     On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

39.     Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

40.     In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

41.     At first, Wachovia did not respond to the November 21 letter.

42.     Instead, on the next business day, which was the day after Thanksgiving, Wachovia sent a new margin call, this time in the amount of $810,000.

43.     Intriguingly, the margin call for November 23, 2007, which demanded $260,000 more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the following Collateral Movement as of Close of Business of 22 November 2007," which was Thanksgiving Day.

44.     As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved.

45.     On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000.

46.     It was not until later in the day that Wachovia finally held a conference call with Plaintiff's principals to attempt a resolution of the dispute.

47.     When asked why Wachovia had suddenly started sending daily margin calls, Wachovia's counsel responded that Wachovia marked the position to market daily (even though Wachovia had never issued daily margin calls to Plaintiff before).

48.     On November 27, 2007, Wachovia sent yet another margin call, this time calling for $1,490,000 of additional collateral, for a total of $10,410,000 – almost half a million dollars *more* than the notional amount of the swap!

49.     Wachovia also sent four market quotations of the swap, expressed in "points upfront," which purported to justify Wachovia's exorbitant margin calls, suggesting that the reference obligation's creditworthiness had deteriorated to the point that it was worth approximately five cents on the dollar.

11

50.     At the same time, Wachovia finally included a copy of the servicer's report, which revealed that *none* of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

51.     Upon reviewing the servicer's report, Plaintiff was able to confirm that Wachovia had not been collecting "Floating Payments," since no "Floating Amount Event" had taken place.

52.     Moreover, even if Wachovia were entitled to demand margin (as distinguished from Floating Payments), Wachovia had failed to calculated its "exposure" to the credit risk of the reference obligation in good faith.

53.     The creditworthiness of the reference obligation has not been impaired, at least not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

54.     Wachovia had therefore improperly demanded and collected sums that Plaintiff should never have been required to pay. The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO was commercially unreasonable – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

55.     At the same time, it allowed Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

Plaintiff Files the Lawsuit in Supreme Court and
<u>Wachovia Declares an Event of Default</u>

56. On November 28, 2007, Plaintiff commenced the instant civil action in the Supreme Court of the State of New York.  On December 7, 2007, Wachovia removed this action to the United States District Court for the Southern District of New York.

57. On December 7, 2007, Wachovia sent Plaintiff a Notice of Failure to Transfer, reciting that "*[a]s of November 28, 2007* and continuing through the date hereof, Counterparty [*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers of Eligible Collateral in an amount equal to $1,740,000 to Wachovia as required under the Credit Support Annex.  Counterparty's failure to Transfer will become an Event of Default under Paragraph 7(i) of the Credit Support Annex and Section 5(a)(iii)(1) of the Agreement if the required amount of Eligible Collateral is not delivered to Wachovia on or before the first Local Business Day after this notice is delivered to you."

58. Plaintiff declined to pay any further sums to Wachovia.

59. On or about December 10, 2007, Wachovia sent Plaintiff a Notice of Event of Default.

60. On December 13, 2007, Wachovia sent Plaintiff a Notice of Early Termination, and designated December 18, 2007 as the Early Termination Date.

61. On December 20, 2007, Wachovia notified Plaintiff that it was closing out the swap transaction.  Wachovia purported to determine its loss on the transaction as $9,990,000, based upon quotations for the reference obligation that it had obtained from market-makers.

62.     Wachovia further stated that a Writedown in the amount of $10,000,000 had occurred with respect to the Reference Obligation.  However, no such Writedown had occurred within the meaning of the Confirmation Letter.

<u>Wachovia Converts Plaintiff's Collateral</u>

63.     On or about December 27, 2007, Wachovia notified Plaintiff that it had foreclosed on the $8,920,000 of collateral, and that Plaintiff owed Wachovia the amount of the "deficiency," $1,030,861.12, together with interest and other amounts, including collection costs and legal fees.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(<u>For Rescission - Fraud</u>)**

64.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

65.     Wachovia made numerous false representations to, and concealed material existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure Wachovia against its perceived counterparty risk.

66.     In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

67.     The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

68.     But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia.  By reason of the foregoing,

14

Plaintiff is entitled to rescission of the swap and restitution by Wachovia of all sums paid by Plaintiff to date, including without limitation the initial margin and all further sums paid as collateral.

### AS AND FOR A SECOND CAUSE OF ACTION
(**For Rescission - Mistake**)

69. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

70. No meeting of the minds had been achieved at the time that the parties entered into the swap transaction. Based upon the Confirmation Letter and the negotiations leading up to it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of daily mark-to-market movements in the value of the reference obligation. Wachovia was aware that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily changes in the creditworthiness of the Forge CDO, but did not address the discrepancy until after Plaintiff had closed on the trade in May 2007. As to Plaintiff, the mistake was honest and excusable, such that enforcement of the variation margin provision would therefore be unconscionable.

71. Accordingly, Plaintiff is entitled to an equitable rescission or reformation of the swap and a return of its collateral.

### AS AND FOR A THIRD CAUSE OF ACTION
(**For Damages from Wachovia's Fraud**)

72. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

73. The misrepresentations and omissions set forth herein were engaged in by Wachovia with intent to deceive Plaintiff and constitute fraud under principles of common law entitling Plaintiff to an award of compensatory damages in an amount to be

determined at trial, as well as incidental damages incurred in connection with the negotiation, execution and consummation of the swap.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract)

74. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

75. Plaintiff has performed all of its obligations under the swap agreement.

76. Wachovia has breached the agreement, *inter alia*, by demanding the deposit of collateral far in excess of the amount actually required.

77. Plaintiff has been thereby damaged in an amount to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

79. By gradually making oppressive margin demands without justification, Wachovia acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap agreement, namely, the premium to be paid by Wachovia on the notional amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually required to secure counterparty risk and credit risk.

80. To the extent that the swap agreement gave Wachovia any discretion as calculation agent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Wachovia not to act arbitrarily or irrationally in exercising that discretion.

81. By extracting collateral from Plaintiff far in excess of what Wachovia actually required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

16

### AS AND FOR A SIXTH CAUSE OF ACTION
### (<u>Unjust Enrichment</u>)

82. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

83. By extracting an unnecessarily large amount of collateral from Plaintiff, Wachovia received money properly belonging to the Plaintiff.

84. Wachovia has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Wachovia should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (<u>For a Permanent Injunction/Specific Performance</u>)

85. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

86. Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

87. If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

88. The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

89. The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Conversion)

90.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

91.     Wachovia intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

92.     The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

93.     Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     On the Third, Fourth, Fifth and Eighth Causes of Action, damages in an amount to be determined at trial, plus interest and costs;

B.     On the First, Second, Sixth and Seventh Causes of Action, restitution of the sums paid by Plaintiff to Wachovia under the swap agreement;

C.     On the First and Second Causes of Action, an equitable rescission of the swap agreement;

D.     On the Seventh Cause of Action, an order directing specific performance of the swap according to the terms of the Confirmation Letter; declaring the obligation to pay variation margin superseded by the terms of the Confirmation Letter; directing restitution of all collateral apart from the initial margin; and permanently enjoining Wachovia from future breaches of the swap agreement;

E. On the First, Second, Third and Eighth Causes of Action, an award of punitive damages; and

F. Interest, costs, and such other and further relief as to the Court may seem proper and equitable, including an award of reasonable attorney's fees.

Dated: New York, New York
January 12, 2008

**MINTZ & GOLD LLP**

*/s/ Terence W. McCormick*

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

To: **HUNTON & WILLIAMS LLP**
Patrick L. Robson, Esq.
Bank of America Plaza, Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280

Shawn Patrick Regan, Esq.
200 Park Avenue
New York, New York 10166-0091
*Attorneys for Defendant*
*Wachovia Bank, N.A.*