UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
                                             :

CDO Plus Master Fund Ltd.,                   :
                                             :

                Plaintiff,       :     07 CV 11078 (LTS)(AJP)
                                             :          ECF Case

            -against-         :

Wachovia Bank, National Association,   :

             Defendant.     :
-----------------------------------------------------------------------x

## DECLARATION OF PATRICK L. ROBSON

Pursuant to 28 U.S.C. § 1746, Patrick L. Robson certifies as follows:

1.     I am an attorney with the law firm Hunton & Williams LLP, counsel for Defendant Wachovia Bank, National Association ("Wachovia") in the above-captioned action.

2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Amended Complaint.  (Dkt. 11.)

3.     Attached hereto as Exhibit B is a true and correct copy of Defendant's Answer and Counterclaim.  (Dkt. 13.)

4.     Attached hereto as Exhibit C is a true and correct copy of Plaintiff's Answer to Defendant's Counterclaim.  (Dkt. 15.)

5.     Attached hereto as Exhibit D is a true and correct copy of Plaintiff's Verified Initial Complaint.  (Dkt. 1.)

6.     Attached hereto as Exhibit E is a true and correct copy of an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement, dated May 4, 2007.  (Dkt. 20, Ex. 1.)

7.      Attached hereto as Exhibit F is a true and correct copy of the Schedule to the

Master Agreement, dated as of May 4, 2007.  (*Id.* Ex. 2.)

8.      Attached hereto as Exhibit G is a true and correct copy of an ISDA Credit Support

Annex, dated as of May 4, 2007, which incorporates by reference the ISDA 1994 Credit Support

Annex.  (*Id.* Ex. 3.)

9.      Attached hereto as Exhibit H is a true and correct copy of a Confirmation, dated

May 30, 2007.  (*Id.* Ex. 4.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2008.


_____/s/ Patrick L. Robson_____
Patrick L. Robson

**DECLARATION OF SERVICE**

Raymond E. Galbraith, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am a Litigation Paralegal at the law firm of Hunton & Williams LLP, attorneys for Defendant Wachovia Bank, National Association.

That on July 24, 2008, I served a true copy of the attached Declaration of Patrick L. Robson, on counsel of record listed below via the Court's ECF System and via First Class Mail, to the address listed below, by depositing the same in a duly enclosed and sealed wrapper, with the correct postage thereon, in an official letter box duly maintained by the Government of the United States of America within the State of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24th, 2008.

/s/ Raymond E. Galbraith<br>Raymond E. Galbraith

TO:  Terence W. McCormick, Esq.
     Steven Glen Mintz, Esq.
     Mintz & Gold LLP
     470 Park Avenue South
     10th Floor
     New York, NY  10016-6819

     *Attorneys  for Plaintiff*
     *CDO Plus Master Fund Ltd.*

***EXHIBIT A TO ROBSON DECLARATION***

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CDO PLUS MASTER FUND LTD.,                      :
                                                :      **07 Civ. 11078 (LTS)(AJP)**
                          Plaintiff,            :
                                                :      **AMENDED COMPLAINT**
            - against -                         :
                                                :      **ECF CASE**
WACHOVIA BANK,                                  :
NATIONAL ASSOCIATION,                           :
                                                :
                          Defendant.            :
------------------------------------------------------------X

### Introduction

1.        This action concerns a classic "bait and switch" by the Defendant,

Wachovia Bank, National Association ("Wachovia"), in which Wachovia fraudulently

induced the Plaintiff, CDO Plus Master Fund Ltd.,[1] to enter into a credit derivative

transaction, or "swap," through the offer of more favorable margin terms than Wachovia

actually intended to honor.  In reliance upon Wachovia's representations, Plaintiff

entered into the trade and deposited $750,000 to collateralize the swap.  Within weeks of

the trade, however, Wachovia demanded unreasonably high amounts of additional margin

---

[1]        On November 21, 2007, the Companies Registry of the Jersey Financial Services Commission
recorded the change of Plaintiff's name to VCG Special Opportunities Master Fund Limited.

even though Plaintiff was not under an obligation to post any collateral at all after depositing the initial margin of $750,000. Under the Confirmation Letter of the swap agreement, after the initial margin deposit Wachovia was entitled to demand payments from Plaintiff *only* upon the occurrence of an actual credit default, *i.e.*, a failure to pay principal, an interest shortfall or a "writedown" in the underlying "reference obligation" (which in this case is an investment-grade collateralized debt obligation, or "CDO"). Perhaps in a panic over recent turmoil in the debt markets connected to the sub-prime mortgage lending crisis, Wachovia purportedly determined (but without any reasonable basis) that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated in the scant weeks that had passed since it entered into the credit default swap with the Plaintiff.

2.        In the alternative, if Wachovia had not planned to deceive Plaintiff regarding the amount of collateral it intended to extract in order to protect itself against counterparty risk, then there was no meeting of the minds regarding the subject matter of the transaction. Relying upon the terms of the Confirmation Letter governing the swap, Plaintiff entered into the transaction with the understanding that it was selling risk protection *against a credit default only*. Wachovia knew or should have known this fact but, in retrospect, sought to hold Plaintiff to a different set of obligations, such as a market value swap, *i.e.*, a transaction under which Plaintiff would bear the risk of daily movements in the value of the reference obligation. When Plaintiff confirmed that no credit default had taken place, it refused to pay more money as "margin." After Plaintiff commenced this action (originally in New York Supreme Court), Wachovia closed out the trade and converted all the money that had been deposited to date, $8,920,000.

2

3.          Plaintiff seeks rescission of the swap transaction, the return of all sums

Plaintiff deposited as collateral or otherwise, damages from the breach and/or specific

performance and a permanent injunction against further violations by Wachovia.

## The Parties

4.          Plaintiff is an Isle of Jersey exempted corporation having its principal

place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

5.          Wachovia is a national banking association with its designated main

office and principal place of business in Charlotte, North Carolina.

## Jurisdiction and Venue

6.          The parties are of diverse citizenship and the amount in controversy

exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court

possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

7.          In the swap agreement, the parties agreed to submit to the jurisdiction

of the Courts of the State of New York and the United States District Court in the

Borough of Manhattan, and stipulated to the application of New York law.

## Substantive Allegations

The Credit Default Swap

8.          Plaintiff is a hedge fund with approximately $50,000,000 of funds

under management.

9.          On or about May 21, 2007, Plaintiff entered into a credit default swap

transaction with Wachovia.

10.          A credit default swap is a contract under which two financial

institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this

case, a CDO.  A credit default swap bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based.  The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

11.        In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of the Class B tranche of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007-1A, which were issued pursuant to an Indenture dated April 11, 2007.[2]

12.        The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

13.        By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

---

[2]        Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's default risk, the amount of the debt obligation on which the fee is calculated (and for which the seller agrees to undertake credit default exposure in return) is termed the "notional" amount.

Initial Margin and Floating Payments

14.        When Plaintiff and Wachovia executed the swap, Plaintiff paid Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the "independent amount." For purposes of clarity, however, this Complaint instead refers to the deposit of $750,000 as the "initial margin." The purpose of the initial margin was to secure Wachovia against the credit risk of the counterparty (Plaintiff).

15.        Under the Confirmation Letter, the only payments that Wachovia may demand from Plaintiff *after* the initial margin are "Floating Payments." Wachovia may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Wachovia) that a "Floating Amount Event" had taken place: (i.) the obligor on the reference obligation (the CDO) had failed to make a required principal or scheduled interest payment or (ii) a writedown had taken place according to the method prescribed by the reference obligation's governing instrument – *not* on the basis of the perceived creditworthiness of the counterparty (Plaintiff).

16.        Apart from the initial margin and Floating Payments, the Confirmation Letter does not otherwise authorize Wachovia to demand payments of any kind to secure Wachovia against the credit risk of the counterparty or the reference obligation.

17.        On some swaps, margin may be collected after the initial margin. In such cases, the additional margin is referred to as "variation margin" and is based upon a downward movement in the mark-to-market value of the underlying obligation.

18.        In or about April 2007, before the parties entered into the swap agreement, Wachovia had originally demanded initial margin in the amount of

$1,500,000, but Plaintiff informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial margin were reduced to $750,000.

19.    Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms, knowing at the time that it would simply contrive later to demand more collateral on the pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once Plaintiff was locked into to the trade.  (The CDO matures in 2053).

20.    Plaintiff wired the $750,000 of initial margin to Wachovia's account on or about May 30, 2007.

Wachovia Squeezes Plaintiff for More Money

21.    However, less than three weeks later, Wachovia demanded an additional amount of collateral, requiring a deposit of $320,000 on or about June 18, 2007.  Several days later, Wachovia requested an additional $430,000.  Tellingly, the sum of the initial margin and these two latter deposits comes to a total of $1,500,000 – precisely the amount that Wachovia had wanted in the first instance and that Plaintiff had thought it had bargained down to $750,000.

22.    Nor was Wachovia finished at $1,500,000.  Wachovia continued to ratchet up its demands for variation margin over the weeks that followed:

| Date | Amount |
| --- | --- |
| May 30, 2007 | $750,000 (initial |
| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |

| July 20, 2007 | $740,000 |
|---|---|
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |
| October 30, 2007 | $850,000 |
| November 1, 2007 | $620,000 |

23.     In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a period of five months purportedly to secure Wachovia against a total credit risk of $10,000,000 from an investment-grade debt instrument.

24.     However, upon information and belief, during the entire period described in the table above, and as of the date of the filing of the original Complaint in this action, the reference obligation (Forge ABS High Grade CDO Ltd, 2007-1A) had not experienced any shortfall in principal or interest payments whatsoever.

25.     Also upon information and belief, during the same period, no write-down had taken place according to the reference obligation's controlling documents resulting in any reduction of the outstanding principal amount of the reference obligation, nor had any other write-down taken place such that Plaintiff could properly have been required to make a Floating Payment to Wachovia. Upon information and belief, from the date when Wachovia and Plaintiff first entered into the credit default swap, and as of the date of this Complaint, the reference obligation has at all times been and continues to be an investment grade debt instrument.

7

26.    Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia *solely* upon the basis of a report of the servicer of the underlying reference obligation.[3]

27.    At first, Plaintiff delivered the additional collateral requested by Wachovia without protest.  However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over *40%* of the notional amount.

28.    While Plaintiff believed it was not obligated to pay the sums demanded by Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Wachovia did.

29.    Wachovia responded that it was entitled to require variation margin pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.

30.    Although the overall CDO market had certainly experienced considerable turmoil during the summer of 2007, no credit event had yet occurred such that Plaintiff should have been required to make a Floating Payment.  While one rating agency, Fitch, had downgraded the reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not constitute a credit event within the

---

[3]    Pursuant to the indenture of a collateralized debt obligation, a servicer performs the ministerial task of calculating payment amounts and preparing reports regarding the interest and principal due to be paid on the CDO.

8

meaning of the swap documents. No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

31.      Moreover, even if Wachovia had been entitled to demand variation margin, *i.e.*, to secure Wachovia against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Wachovia failed even to make a good faith estimate of the required collateral. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

32.      In such an event, even under Wachovia's interpretation of the swap agreements, Wachovia would have been required to ***return*** a portion of the collateral to Plaintiff, and certainly not to demand more. Thus, even assuming that Wachovia faced exposure on the reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of Wachovia's exposure would in every case call for a payment by Plaintiff to Wachovia.

Wachovia Admits that it Breached the Swap Agreement

33.      In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

34.      Wachovia admitted that it had ***not*** used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

9

35.    Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

36.    Thus, the margin calls had been expressly used by Wachovia not to satisfy Plaintiff's obligation to make a "Floating Payment," or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

37.    As of the date of this Amended Complaint, Plaintiff had delivered $8,920,000 in collateral against the notional amount of $10,000,000.

Wachovia Escalates its Margin Demands

38.    On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

39.    Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

40.    In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

41.    At first, Wachovia did not respond to the November 21 letter.

42.    Instead, on the next business day, which was the day after Thanksgiving, Wachovia sent a new margin call, this time in the amount of $810,000.

43.     Intriguingly, the margin call for November 23, 2007, which demanded

$260,000 more collateral than the November 21, 2007 margin call, recited that it

constituted "notice of the following Collateral Movement as of Close of Business of 22

November 2007," which was Thanksgiving Day.

44.     As it had in response to the November 21, 2007 margin call, Plaintiff

notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA

Credit Support Annex and would therefore not post any further collateral until the matter

was resolved.

45.     On the morning of the following business day, November 26, 2007,

Wachovia again sent a new margin call – the third in three consecutive days – this time

demanding $820,000.

46.     It was not until later in the day that Wachovia finally held a conference

call with Plaintiff's principals to attempt a resolution of the dispute.

47.     When asked why Wachovia had suddenly started sending daily margin

calls, Wachovia's counsel responded that Wachovia marked the position to market daily

(even though Wachovia had never issued daily margin calls to Plaintiff before).

48.     On November 27, 2007, Wachovia sent yet another margin call, this

time calling for $1,490,000 of additional collateral, for a total of $10,410,000 – almost

half a million dollars *more* than the notional amount of the swap!

49.     Wachovia also sent four market quotations of the swap, expressed in

"points upfront," which purported to justify Wachovia's exorbitant margin calls,

suggesting that the reference obligation's creditworthiness had deteriorated to the point

that it was worth approximately five cents on the dollar.

11

50.     At the same time, Wachovia finally included a copy of the servicer's report, which revealed that *none* of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

51.     Upon reviewing the servicer's report, Plaintiff was able to confirm that Wachovia had not been collecting "Floating Payments," since no "Floating Amount Event" had taken place.

52.     Moreover, even if Wachovia were entitled to demand margin (as distinguished from Floating Payments), Wachovia had failed to calculated its "exposure" to the credit risk of the reference obligation in good faith.

53.     The creditworthiness of the reference obligation has not been impaired, at least not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

54.     Wachovia had therefore improperly demanded and collected sums that Plaintiff should never have been required to pay. The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO was commercially unreasonable – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

55.     At the same time, it allowed Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

Plaintiff Files the Lawsuit in Supreme Court and
Wachovia Declares an Event of Default

56.     On November 28, 2007, Plaintiff commenced the instant civil action in the Supreme Court of the State of New York.  On December 7, 2007, Wachovia removed this action to the United States District Court for the Southern District of New York.

57.     On December 7, 2007, Wachovia sent Plaintiff a Notice of Failure to Transfer, reciting that "*[a]s of November 28, 2007* and continuing through the date hereof, Counterparty [*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers of Eligible Collateral in an amount equal to $1,740,000 to Wachovia as required under the Credit Support Annex.  Counterparty's failure to Transfer will become an Event of Default under Paragraph 7(i) of the Credit Support Annex and Section 5(a)(iii)(1) of the Agreement if the required amount of Eligible Collateral is not delivered to Wachovia on or before the first Local Business Day after this notice is delivered to you."

58.     Plaintiff declined to pay any further sums to Wachovia.

59.     On or about December 10, 2007, Wachovia sent Plaintiff a Notice of Event of Default.

60.     On December 13, 2007, Wachovia sent Plaintiff a Notice of Early Termination, and designated December 18, 2007 as the Early Termination Date.

61.     On December 20, 2007, Wachovia notified Plaintiff that it was closing out the swap transaction.  Wachovia purported to determine its loss on the transaction as $9,990,000, based upon quotations for the reference obligation that it had obtained from market-makers.

62.        Wachovia further stated that a Writedown in the amount of $10,000,000 had occurred with respect to the Reference Obligation. However, no such Writedown had occurred within the meaning of the Confirmation Letter.

Wachovia Converts Plaintiff's Collateral

63.        On or about December 27, 2007, Wachovia notified Plaintiff that it had foreclosed on the $8,920,000 of collateral, and that Plaintiff owed Wachovia the amount of the "deficiency," $1,030,861.12, together with interest and other amounts, including collection costs and legal fees.

### AS AND FOR A FIRST CAUSE OF ACTION
### (For Rescission - Fraud)

64.        Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

65.        Wachovia made numerous false representations to, and concealed material existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure Wachovia against its perceived counterparty risk.

66.        In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

67.        The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

68.        But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia. By reason of the foregoing,

14

Plaintiff is entitled to rescission of the swap and restitution by Wachovia of all sums paid by Plaintiff to date, including without limitation the initial margin and all further sums paid as collateral.

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Rescission - Mistake)

69.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

70.    No meeting of the minds had been achieved at the time that the parties entered into the swap transaction. Based upon the Confirmation Letter and the negotiations leading up to it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of daily mark-to-market movements in the value of the reference obligation. Wachovia was aware that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily changes in the creditworthiness of the Forge CDO, but did not address the discrepancy until after Plaintiff had closed on the trade in May 2007. As to Plaintiff, the mistake was honest and excusable, such that enforcement of the variation margin provision would therefore be unconscionable.

71.    Accordingly, Plaintiff is entitled to an equitable rescission or reformation of the swap and a return of its collateral.

## AS AND FOR A THIRD CAUSE OF ACTION
### (For Damages from Wachovia's Fraud)

72.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

73.    The misrepresentations and omissions set forth herein were engaged in by Wachovia with intent to deceive Plaintiff and constitute fraud under principles of common law entitling Plaintiff to an award of compensatory damages in an amount to be

determined at trial, as well as incidental damages incurred in connection with the negotiation, execution and consummation of the swap.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract)

74.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

75.    Plaintiff has performed all of its obligations under the swap agreement.

76.    Wachovia has breached the agreement, *inter alia*, by demanding the deposit of collateral far in excess of the amount actually required.

77.    Plaintiff has been thereby damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

79.    By gradually making oppressive margin demands without justification, Wachovia acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap agreement, namely, the premium to be paid by Wachovia on the notional amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually required to secure counterparty risk and credit risk.

80.    To the extent that the swap agreement gave Wachovia any discretion as calculation agent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Wachovia not to act arbitrarily or irrationally in exercising that discretion.

81.    By extracting collateral from Plaintiff far in excess of what Wachovia actually required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

16

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

82.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

83.    By extracting an unnecessarily large amount of collateral from Plaintiff, Wachovia received money properly belonging to the Plaintiff.

84.    Wachovia has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Wachovia should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (For a Permanent Injunction/Specific Performance)

85.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

86.    Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

87.    If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

88.    The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

89.    The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Conversion)

90.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

91.    Wachovia intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

92.    The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

93.    Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    On the Third, Fourth, Fifth and Eighth Causes of Action, damages in an amount to be determined at trial, plus interest and costs;

B.    On the First, Second, Sixth and Seventh Causes of Action, restitution of the sums paid by Plaintiff to Wachovia under the swap agreement;

C.    On the First and Second Causes of Action, an equitable rescission of the swap agreement;

D.    On the Seventh Cause of Action, an order directing specific performance of the swap according to the terms of the Confirmation Letter; declaring the obligation to pay variation margin superseded by the terms of the Confirmation Letter; directing restitution of all collateral apart from the initial margin; and permanently enjoining Wachovia from future breaches of the swap agreement;

18

E.    On the First, Second, Third and Eighth Causes of Action, an award of

punitive damages; and

F.    Interest, costs, and such other and further relief as to the Court may seem

proper and equitable, including an award of reasonable attorney's fees.

Dated: New York, New York
       January 12, 2008

MINTZ & GOLD LLP

*Terence W. McCormick*

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

To:    **HUNTON & WILLIAMS LLP**
       Patrick L. Robson, Esq.
       Bank of America Plaza, Suite 3500
       101 South Tryon Street
       Charlotte, North Carolina 28280

       Shawn Patrick Regan, Esq.
       200 Park Avenue
       New York, New York 10166-0091
       *Attorneys for Defendant*
       *Wachovia Bank, N.A.*

19

***EXHIBIT B TO ROBSON DECLARATION***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                                   :
CDO Plus Master Fund Ltd.,                                         :
                                                                   :
                              Plaintiff,                           :        07 CV 11078 (LTS)(AJP)
                                                                   :              ECF Case
                    -against-                                      :
                                                                   :
Wachovia Bank, National Association,                              :
                                                                   :
                              Defendant.                           :
-------------------------------------------------------------------x

# DEFENDANT WACHOVIA BANK'S
# ANSWER AND COUNTERCLAIM

Defendant Wachovia Bank, National Association ("Wachovia"), by and through its

undersigned counsel, Hunton & Williams LLP, for its Answer to the amended complaint of CDO

Plus Master Fund Ltd., filed January 15, 2008 (the "Complaint"), responds as follows:

## <u>Introduction</u>

1.      This action concerns a classic "bait and switch" by the Defendant, Wachovia
Bank, National Association ("Wachovia"), in which Wachovia fraudulently induced the Plaintiff,
CDO Plus Master Fund Ltd.,[1] to enter into a credit derivative transaction, or "swap," through the
offer of more favorable margin terms than Wachovia actually intended to honor.  In reliance
upon Wachovia's representations, Plaintiff entered into the trade and deposited $750,000 to
collateralize the swap.  Within weeks of the trade, however, Wachovia demanded unreasonably
high amounts of additional margin even though Plaintiff was not under an obligation to post any
collateral at all after depositing the initial margin of $750,000.  Under the Confirmation Letter of
the swap agreement, after the initial margin deposit Wachovia was entitled to demand payments
from Plaintiff **only** upon the occurrence of an actual credit default, *i.e.*, a failure to pay principal,
an interest shortfall or a "writedown" in the underlying "reference obligation" (which in this case
is an investment-grade collateralized debt obligation, or "CDO").  Perhaps in a panic over recent
turmoil in the debt markets connected to the sub-prime mortgage lending crisis, Wachovia

---

[1]     On November 21, 2007, the Companies Registry of the Jersey Financial Services
        Commission recorded the change of Plaintiff's name to VCG Special Opportunities
        Master Fund Limited.

purportedly determined (but without any reasonable basis) that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated in the scant weeks that had passed since it entered into the credit default swap with the Plaintiff.

**<u>ANSWER</u>:**

Wachovia admits that CDO Plus Master Fund Ltd. ("CDO Plus") deposited the

Independent Amount, as defined by paragraph 7 of the Confirmation, with Wachovia. Wachovia

admits the allegations set forth in footnote 1 of paragraph 1 of the Complaint. Wachovia denies

the remaining allegations set forth in paragraph 1 of the Complaint that purport to describe acts

by Wachovia. To the extent that Plaintiff purports to characterize the written agreement between

the parties, Wachovia refers to the documents for their terms and denies that Plaintiff's

characterization of those terms is correct. Wachovia is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 1 of

the Complaint.


2.      In the alternative, if Wachovia had not planned to deceive Plaintiff regarding the amount of collateral it intended to extract in order to protect itself against counterparty risk, then there was no meeting of the minds regarding the subject matter of the transaction. Relying upon the terms of the Confirmation Letter governing the swap, Plaintiff entered into the transaction with the understanding that it was selling risk protection ***against a credit default only***. Wachovia knew or should have known this fact but, in retrospect, sought to hold Plaintiff to a different set of obligations, such as a market value swap, *i.e.*, a transaction under which Plaintiff would bear the risk of daily movements in the value of the reference obligation. When Plaintiff confirmed that no credit default had taken place, it refused to pay more money as "margin." After Plaintiff commenced this action (originally in New York Supreme Court), Wachovia closed out the trade and converted all the money that had been deposited to date, $8,920,000.

**<u>ANSWER</u>:**

To the extent that the allegations set forth in paragraph 2 of the Complaint assert

conclusions of law, no response is required. Wachovia admits that Plaintiff failed to meet its

obligation under the Agreement to post collateral with Wachovia. Wachovia admits that as a

result of Plaintiff's default, Wachovia caused an early termination of the Agreement, exercised

its right to liquidate the Posted Collateral, and applied the liquidation proceeds to satisfy a

portion of Plaintiff's Obligations under the agreement.  Wachovia denies the remaining

allegations set forth in paragraph 2 of the Complaint that purport to describe acts by Wachovia or

that purport to characterize the terms of the Agreement, and refers to the documents for their

terms.  Wachovia is without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations set forth in paragraph 2 of the Complaint.


3.      Plaintiff seeks rescission of the swap transaction, the return of all sums Plaintiff
deposited as collateral or otherwise, damages from the breach and/or specific performance and a
permanent injunction against further violations by Wachovia.

**ANSWER:**

Wachovia admits that the purpose of Plaintiff's Complaint is to seek the relief set forth in

paragraph 3 of the Complaint, but denies that Plaintiff is entitled to such relief, in whole or in

part.

### The Parties

4.      Plaintiff is an Isle of Jersey exempted corporation having its principal place of
business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 4 of the Complaint.


5.      Wachovia is a national banking association with its designated main office and
principal place of business in Charlotte, North Carolina.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 5 of the Complaint.

## Jurisdiction and Venue

6.      The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

**ANSWER:**

To the extent that the allegations set forth in paragraph 6 of the Complaint assert

conclusions of law, no response is required.  Wachovia admits the remaining allegations set forth

in paragraph 6 of the Complaint.

7.      In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

**ANSWER:**

Wachovia admits that, pursuant to Section 13(b)(1) of the International Swap Dealers

Association, Inc.'s Master Agreement, dated May 4, 2007, the parties submitted to the

jurisdiction of this Court and to the application of New York law.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 7 of the Complaint.

## Substantive Allegations

The Credit Default Swap

8.      Plaintiff is a hedge fund with approximately $50,000,000 of funds under management.

**ANSWER:**

Wachovia is without knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph 8 of the Complaint.

9.      On or about May 21, 2007, Plaintiff entered into a credit default swap transaction with Wachovia.

**ANSWER:**

Wachovia admits that the Trade Date of the Credit Derivative Transaction on

Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement between Wachovia

and CDO Plus was May 21, 2007.

10.     A credit default swap is a contract under which two financial institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this case, a CDO.  A credit default swap bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based.  The underlying debt instrument is called the "reference obligation."  Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here).  In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

**ANSWER:**

Wachovia admits that it was Party A to the Credit Derivative Transaction between

Wachovia and CDO Plus, which is defined within the Confirmation between Wachovia and

CDO Plus, dated May 30, 2007, (the "Confirmation") as the "Buyer."  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 10 of the Complaint.

11.     In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of the Class B tranche of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007-1A, which were issued pursuant to an Indenture dated April 11, 2007.[2]

---

[2]      Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's default risk, the amount of the debt obligation on

**ANSWER:**

Wachovia admits that the Fixed Rate is defined in the Confirmation as 2.75% per annum. Wachovia further admits that the Reference Entity is defined in the Confirmation as Forge ABS High Grade CDO LTD 2007-1A, and the Reference Obligation is "Class B Fifth Priority Senior Secured Floating Rate Notes Due 2053." Wachovia admits that the amount of the Fixed Payments it is obligated to make, pursuant to the Confirmation, is defined in Section 2 of the Confirmation. Wachovia denies the remaining allegations set forth in paragraph 11 of the Complaint. To the extent that footnote 2 to paragraph 11 purports to characterize the written agreement between the parties, Wachovia refers to the written agreement between the parties for its terms.


12.    The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 12 of the Complaint, subject to the understanding that: (i) Plaintiff is referring to the forms of the Master Agreement (Multicurrency-Cross Border) and the Credit Support Annex published by the International Swaps and Derivatives Association, Inc., formerly known as the International Swap Dealers Association, Inc., ("ISDA"), in 1992 and 1994, respectively; (ii) the Confirmation is in the form of the then-current template published by ISDA and is between the parties rather than by

---

which the fee is calculated (and for which the seller agrees to undertake credit default exposure in return) is termed the "notional" amount.

Wachovia; and (iii) each of the contract document forms were modified or not as agreed to by the parties.  Wachovia admits the remaining allegations set forth in paragraph 12 of the Complaint.

13.     By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

**ANSWER:**

Wachovia admits that the ISDA Master Agreement, executed by CDO Plus on May 4, 2007 states, at paragraph 1 (b), that "[i]n the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction."  Wachovia avers that there are no conflicts or other inconsistencies between the parties' payment obligations set forth in the Confirmation and the parties' credit support obligations set forth in the ISDA Credit Support Annex (which is part of the Schedule).

Initial Margin and Floating Payments

14.     When Plaintiff and Wachovia executed the swap, Plaintiff paid Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the "independent amount."  For purposes of clarity, however, this Complaint instead refers to the deposit of $750,000 as the "initial margin."  The purpose of the initial margin was to secure Wachovia against the credit risk of the counterparty (Plaintiff).

**ANSWER:**

Wachovia admits that CDO Plus transferred the Independent Amount, as defined by paragraph 7 of the Confirmation, to Wachovia.  Wachovia admits that the purpose of the transfer of the Independent Amount was to secure Plaintiff's Obligations, as defined by the ISDA Credit Support Annex.  Wachovia expressly denies that the Independent Amount was "margin," but,

rather, it and the other amounts transferred by Plaintiff under the ISDA Credit Support Annex were collateral security.  Wachovia denies the remaining allegations set forth in paragraph 14 of the Complaint.


15.    Under the Confirmation Letter, the only payments that Wachovia may demand from Plaintiff *after* the initial margin are "Floating Payments."  Wachovia may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Wachovia) that a "Floating Amount Event" had taken place: (i) the obligor on the reference obligation (the CDO) had failed to make a required principal or a scheduled interest payment or (ii) a writedown had taken place according to the method prescribed by the reference obligation's governing instrument – ***not*** on the basis of the perceived creditworthiness of the counterparty (Plaintiff).

**<u>ANSWER:</u>**

Wachovia denies the allegations set forth in paragraph 15 of the Complaint, except Wachovia admits that it may not demand collateral on the basis of the perceived credit worthiness of Plaintiff and asserts that it did not do so.  Wachovia avers that Plaintiff's attempt to summarize the payment obligations of the parties under the Agreement intentionally ignores the parties' obligations to Transfer Eligible Credit Support, which are set forth in the ISDA Credit Support Annex.  Such Transfers of Eligible Credit Support are not determined by the Calculation Agent.  The parties' credit support obligations at any given time are determined by the parties' valuation of Exposure, among other things, as defined in the Agreement.  Insofar as Plaintiff purports to characterize the agreements between the parties, Wachovia refers to the agreements for their terms.


16.    Apart from the initial margin and Floating Payments, the Confirmation Letter does not otherwise authorize Wachovia to demand payments of any kind to secure Wachovia against the credit risk of the counterparty or the reference obligation.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 16 of the Complaint and refers to the agreements between the parties for their terms.  Further, the Confirmation supplements, forms a part of, is subject to, and is governed by the ISDA Master Agreement (including the Schedule and the ISDA Credit Support Annex), and the ISDA Credit Support Annex authorizes Wachovia to demand collateral from Plaintiff as security for its Obligations.

17.    On some swaps, margin may be collected after the initial margin.  In such cases, the additional margin is referred to as "variation margin" and is based upon a downward movement in the mark-to-market value of the underlying obligation.

**ANSWER:**

Wachovia is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17 of the Complaint.

18.    In or about April 2007, before the parties entered into the swap agreement, Wachovia had originally demanded initial margin in the amount of $1,500,000, but Plaintiff informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial margin were reduced to $750,000.

**ANSWER:**

Wachovia admits that the parties negotiated the terms of the Independent Amount and ultimately agreed on the amount defined by paragraph 7 of the Confirmation.  Wachovia denies that the parties negotiated initial margin, and denies the remaining allegations set forth in paragraph 18 of the Complaint.

19.    Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms, knowing at the time that it would simply contrive later to demand more collateral on the pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once Plaintiff was locked into to the trade.  (The CDO matures in 2053).

**ANSWER:**

Wachovia admits that the Legal final maturity date of the Reference Obligation is

October 05, 2053.  Wachovia denies the remaining allegations set forth in paragraph 19 of the

Complaint.

20.     Plaintiff wired the $750,000 of initial margin to Wachovia's account on or about
May 30, 2007.

**ANSWER:**

Wachovia admits that CDO Plus wired the Independent Amount to Wachovia on or about

May 30, 2007 and otherwise denies the allegations in paragraph 20.

Wachovia Squeezes Plaintiff for More Money

21.     However, less than three weeks later, Wachovia demanded an additional amount
of collateral, requiring a deposit of $320,000 on or about June 18, 2007.  Several days later,
Wachovia requested an additional $430,000.  Tellingly, the sum of the initial margin and these
two latter deposits comes to a total of $1,500,000 – precisely the amount that Wachovia had
wanted in the first instance and that Plaintiff had thought it had bargained down to $750,000.

**ANSWER:**

Wachovia admits that, on June 18 and 21, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded Transfers of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex.

Wachovia denies the remaining allegations set forth in paragraph 21 of the Complaint.

22.     Nor was Wachovia finished at $1,500,000.  Wachovia continued to ratchet up its
demands for variation margin over the weeks that followed:

| Date | Amount |
|------|--------|
| May 30, 2007 | $750,000 (initial deposit) |

| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |
| July 20, 2007 | $740,000 |
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, 2007 | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |
| October 30, 2007 | $850,000 |
| November 1, 2007 | $620,000 |

**ANSWER:**

Wachovia admits that, pursuant to paragraph 3 of the ISDA Credit Support Annex,

Wachovia demanded Transfers of Eligible Credit Support as collateral security for Plaintiff's

Obligations in accordance with the ISDA Credit Support Annex on the dates and the in amounts

corresponding to those set forth on the chart in paragraph 22.  Wachovia denies the remaining

allegations set forth in paragraph 22 of the Complaint.


23.     In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a period of five
months purportedly to secure Wachovia against a total credit risk of $10,000,000 from an
investment-grade debt instrument.

**ANSWER:**

Wachovia admits that as of the date Plaintiff's original complaint was filed, CDO Plus

had deposited with Wachovia $8.92 million pursuant to its credit support obligations under the

ISDA Credit Support Annex.  Wachovia denies the remaining allegations set forth in paragraph

23 of the Complaint.

- 11 -

24.    However, upon information and belief, during the entire period described in the table above, and as of the date of the filing of the original Complaint in this action, the reference obligation (Forge ABS High Grade CDO Ltd, 2007-1A) had not experienced any shortfall in principal or interest payments whatsoever.

**ANSWER:**

Wachovia admits that between May 30 and November 28, 2007, Wachovia did not give

notice of any Floating Amount Events or Credit Events.  Wachovia further admits that the

Reference Entity is defined in the Confirmation as Forge ABS High Grade CDO LTD 2007-1A,

and the Reference Obligation is "Class B Fifth Priority Senior Secured Floating Rate Notes Due

2053."  Wachovia avers that whether the Reference Obligation experienced any shortfall in

principal or interest payments is not solely determinative of whether a party to the Agreement is

required to make a Transfer of Eligible Credit Support.  There are many reasons why a party

might be required to make a Transfer of Eligible Credit Support.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 24 of the Complaint.


25.    Also upon information and belief, during the same period, no write-down had taken place according to the reference obligation's controlling documents resulting in any reduction of the outstanding principal amount of the reference obligation, nor had any other write-down taken place such that Plaintiff could properly have been required to make a Floating Payment to Wachovia.  Upon information and belief, from the date when Wachovia and Plaintiff first entered into the credit default swap, and as of the date of this Complaint, the reference obligation has at all times been and continues to be an investment grade debt instrument.

**ANSWER:**

Wachovia admits that between May 30 and November 28, 2007, Wachovia did not give

notice of any Floating Amount Events or Credit Events.  Wachovia avers that whether Plaintiff

would have been required to make a Floating Payment to Wachovia is not solely determinative

of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support.

Wachovia is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations set forth in paragraph 25 of the Complaint.

26.    Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia ***solely*** upon the basis of a report of the servicer of the underlying reference obligation.[3]

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 26 of the Complaint.  Wachovia

avers that the parties' obligations to make or demand Transfers of Eligible Credit Support are set

forth in paragraph 3 of the ISDA Credit Support Annex, and are not governed by paragraph 6(b)

of the Confirmation Letter.  Wachovia is without knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in footnote 3 of paragraph 26 of the Complaint.

27.    At first, Plaintiff delivered the additional collateral requested by Wachovia without protest.  However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over ***40%*** of the notional amount.

**ANSWER:**

Wachovia admits that it received a letter from Robert H. Fasulo, General Counsel for

Vanquish Capital Group, LLC, dated August 16, 2007 and refers to the letter for its terms.

Wachovia avers that it responded to Fasulo's August 16 letter in an email message dated August

21, 2007 and refers to the email message for its terms.  Wachovia is without knowledge or

---

[3]    Pursuant to the indenture of a collateralized debt obligation, a servicer performs the ministerial task of calculating payment amounts and preparing reports regarding the interest and principal due to be paid on the CDO.

information sufficient to form a belief as to the truth of the remaining allegations set forth in

paragraph 27 of the Complaint.


28.    While Plaintiff believed it was not obligated to pay the sums demanded by
Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal
to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral
– which ultimately, Wachovia did.

**ANSWER:**

Wachovia admits that as a result of Plaintiff's default, Wachovia caused an early

termination of the Agreement, exercised its right to liquidate the Posted Collateral, and applied

the liquidation proceeds to satisfy a portion of Plaintiff's Obligations under the agreement.

Wachovia is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations set forth in paragraph 28 of the Complaint.


29.    Wachovia responded that it was entitled to require variation margin pursuant to
the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-
to-market value of the reference obligation.

**ANSWER:**

Wachovia admits that, pursuant to paragraph 3 of the ISDA Credit Support Annex, it was

entitled to:  (i) value Exposure on a mark-to-market basis; (ii) demand Transfers of Eligible

Credit Support; and (iii) that it did demand such Transfers.  Wachovia is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations set forth in

paragraph 29 of the Complaint.


30.    Although the overall CDO market had certainly experienced considerable turmoil
during the summer of 2007, no credit event had yet occurred such that Plaintiff should have been
required to make a Floating Payment.  While one rating agency, Fitch, had downgraded the
reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not

constitute a credit event within the meaning of the swap documents.  No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

**ANSWER:**

Wachovia admits that in the summer of 2007, it did not give notice of any Floating Amount Events or Credit Events.  Wachovia avers that whether Plaintiff was required to make a Floating Payment is not solely determinative of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support.  Wachovia admits that in November 2007 Moody's downgraded the Reference Obligation from "AA" to "A," that on January 30, 2008 the Reference Obligation experienced an Event of Default, and on February 8, 2008 Moody's downgraded the Reference Obligation to "Ca".  Wachovia is without knowledge or information sufficient to form a belief as to the remaining allegations set forth in paragraph 30 of the Complaint.

31.    Moreover, even if Wachovia had been entitled to demand variation margin, *i.e.*, to secure Wachovia against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Wachovia failed even to make a good faith estimate of the required collateral.  Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 31 of the Complaint insofar as they purport to characterize the acts of Wachovia or the terms of the Agreement.  Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 31 of the Complaint.

32.    In such an event, even under Wachovia's interpretation of the swap agreements, Wachovia would have been required to *return* a portion of the collateral to Plaintiff, and certainly not to demand more.  Thus, even assuming that Wachovia faced exposure on the

reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of Wachovia's exposure would in every case call for a payment by Plaintiff to Wachovia.

**ANSWER:**

Wachovia denies that it was required to return any collateral to Plaintiff and that it was not entitled to demand the collateral that it demanded. Wachovia avers that Plaintiff, as Pledgor, never made a demand for a Return Amount, pursuant to paragraph 3 of the ISDA Credit Support Annex. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the hypothetical allegations set forth in paragraph 32 of the Complaint.

Wachovia Admits that it Breached the Swap Agreement

33.     In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

**ANSWER:**

Wachovia admits that its traders had numerous conversations with representatives of Plaintiff in August 2007 and may have discussed the rationale for demanding additional collateral. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 33 of the Complaint.

34.     Wachovia admitted that it had ***not*** used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 34 of the Complaint except as to its knowledge of the trading activity in the reference obligation.

35.     Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

**<u>ANSWER</u>:**

Wachovia admits that its salespeople have spoken with representatives at CDO Plus but

denies knowledge or information sufficient to form a belief at this time as to the truth of the

remaining allegations set forth in paragraph 35 of the Complaint.

36.     Thus, the margin calls had been expressly used by Wachovia not to satisfy Plaintiff's obligation to make a "Floating Payment," or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

**<u>ANSWER</u>:**

Wachovia denies the allegations set forth in paragraph 36 of the Complaint.

37.     As of the date of this Amended Complaint, Plaintiff had delivered $8,920,000 in collateral against the notional amount of $10,000,000.

**<u>ANSWER</u>:**

Wachovia admits that as of the date Plaintiff's original complaint was filed, CDO Plus

had deposited with Wachovia $8.92 million pursuant to its credit support obligations under the

ISDA Credit Support Annex.  Wachovia denies the remaining allegations set forth in paragraph

37 of the Complaint.

<u>Wachovia Escalates its Margin Demands</u>

     38.    On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

**<u>ANSWER</u>:**

     Wachovia admits that, on November 21, 2007**,** pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.

     39.    Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

**<u>ANSWER</u>:**

     Wachovia admits that in a letter dated November 21, 2007, CDO Plus invoked the

Dispute Resolution provision of paragraph 5 of the ISDA Credit Support Annex.  Wachovia is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations set forth in paragraph 39 of the Complaint.

     40.    In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

**<u>ANSWER</u>:**

     Wachovia admits the allegations set forth in paragraph 40 of the Complaint.

     41.    At first, Wachovia did not respond to the November 21 letter.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 41 of the Complaint. Wachovia

avers that it did respond orally and in writing to Plaintiff's November 21 letter, and refers to

those responses for their terms.

42.     Instead, on the next business day, which was the day after Thanksgiving,
Wachovia sent a new margin call, this time in the amount of $810,000.

**ANSWER:**

Wachovia admits that, on November 23, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.

43.     Intriguingly, the margin call for November 23, 2007, which demanded $260,000
more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the
following Collateral Movement as of Close of Business of 22 November 2007," which was
Thanksgiving Day.

**ANSWER:**

Wachovia admits that, on November 23, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms. Wachovia admits that November 22, 2007 was Thanksgiving Day.

Wachovia avers that the date reflected on its November 23 demand for Transfer of Eligible

Credit Support reflects nothing more than a computer generated response that may not have

processed the fact that November 22, 2007 was Thanksgiving Day.

44.     As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved.

**ANSWER:**

Wachovia admits that it received a letter from CDO Plus dated November 23, 2007 and

refers to the letter for its terms.


45.     On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000.

**ANSWER:**

Wachovia admits that, on November 26, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.


46.     It was not until later in the day that Wachovia finally held a conference call with Plaintiff's principals to attempt a resolution of the dispute.

**ANSWER:**

Wachovia admits that it participated in a conference call with representatives of CDO

Plus on November 26, 2007 and denies the remaining allegations set forth in paragraph 46.


47.     When asked why Wachovia had suddenly started sending daily margin calls, Wachovia's counsel responded that Wachovia marked the position to market daily (even though Wachovia had never issued daily margin calls to Plaintiff before).

**ANSWER:**

Wachovia admits that it informed CDO Plus that Wachovia determined the Credit

Support Amount as defined by paragraph 3 of the ISDA Credit Support Annex by marking the

position to the market.  Wachovia avers that pursuant to paragraph 13(c)(ii) of the ISDA Credit

Support Annex, Wachovia was entitled to mark the position on a daily basis.  Wachovia avers

that Plaintiff's receipt of daily demands for Transfer of Eligible Credit Support was due to the

fact that Plaintiff continued to refuse to post collateral (and therefore continued to receive

demands from Wachovia), not a reflection of a change in Wachovia's method of valuing

Exposure.  Wachovia denies the remaining allegations set forth in paragraph 47 of the

Complaint.


48.    On November 27, 2007, Wachovia sent yet another margin call, this time calling
for $1,490,000 of additional collateral, for a total of $10,410,000 – almost half a million dollars
*more* than the notional amount of the swap!

**ANSWER:**

Wachovia admits that, on November 27, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.  The ISDA Credit Support Annex entitles Wachovia to demand such

collateral in an amount up to the sum of the $10 million notional amount of the Swap, the

$750,000 Independent Amount and the Exposure to interest on the Reference Obligation.  The

$10,410,000 total demanded by Wachovia is less than such sum.


49.    Wachovia also sent four market quotations of the swap, expressed in "points
upfront," which purported to justify Wachovia's exorbitant margin calls, suggesting that the

reference obligation's creditworthiness had deteriorated to the point that it was worth approximately five cents on the dollar.

**ANSWER:**

Wachovia admits that it provided market quotations to CDO Plus and refers to the context of those documents for their terms. Wachovia further avers that it performed in accordance with the dispute resolution provisions of the ISDA Credit Support Annex. Wachovia denies the remaining allegations set forth in paragraph 49 of the Complaint.

50.     At the same time, Wachovia finally included a copy of the servicer's report, which revealed that ***none*** of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

**ANSWER:**

Wachovia admits that it provided CDO Plus with a copy of a Servicer's Report, dated November 5, 2007, and refers to that Report for its terms. Wachovia avers that whether any of the securities collateralizing in the Reference Obligation defaulted or remained investment grade is not solely determinative of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support.

51.     Upon reviewing the servicer's report, Plaintiff was able to confirm that Wachovia had not been collecting "Floating Payments," since no "Floating Amount Event" had taken place.

**ANSWER:**

Wachovia admits that, as of November 5, 2007, it had not given notice of any Floating Amount Events or Credit Events. Wachovia refers to the Servicer's Report for its terms and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 51 of the Complaint.

52.     Moreover, even if Wachovia were entitled to demand margin (as distinguished from Floating Payments), Wachovia had failed to calculated its "exposure" to the credit risk of the reference obligation in good faith.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 52 of the Complaint.

53.     The creditworthiness of the reference obligation has not been impaired, at least not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 53 of the Complaint.

54.     Wachovia had therefore improperly demanded and collected sums that Plaintiff should never have been required to pay.  The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO was commercially unreasonable – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 54 of the Complaint insofar as

they purport to characterize any actions of Wachovia as inappropriate.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 54 of the Complaint.

55.     At the same time, it allowed Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 55 of the Complaint insofar as

they purport to characterize any actions of Wachovia as inappropriate.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 55 of the Complaint.

Plaintiff Files the Lawsuit in Supreme Court and
Wachovia Declares an Event of Default

56.     On November 28, 2007, Plaintiff commenced the instant civil action in the
Supreme Court of the State of New York.  On December 7, 2007, Wachovia removed this action
to the United States District Court for the Southern District of New York.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 56 of the Complaint.

57.     On December 7, 2007, Wachovia sent Plaintiff a Notice of Failure to Transfer,
reciting that "*[a]s of November 28, 2007* and continuing through the date hereof, Counterparty
[*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers of Eligible Collateral in an
amount equal to $1,740,000 to Wachovia as required under the Credit Support Annex.
Counterparty's failure to Transfer will become an Event of Default under Paragraph 7(i) of the
Credit Support Annex and Section 5(a)(iii)(1) of the Agreement if the required amount of
Eligible Collateral is not delivered to Wachovia on or before the first Local Business Day after
this notice is delivered to you."

**ANSWER:**

Wachovia admits that on December 7, 2007, it sent Plaintiff a Notice of Failure to

Transfer and refers to the Notice for its complete terms.

58.     Plaintiff declined to pay any further sums to Wachovia.

**ANSWER:**

Wachovia admits that Plaintiff continued to refuse to meet its credit support obligations

to Wachovia.

59.    On or about December 10, 2007, Wachovia sent Plaintiff a Notice of Event of
Default.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 59 of the Complaint.

60.    On December 13, 2007, Wachovia sent Plaintiff a Notice of Early Termination,
and designated December 18, 2007 as the Early Termination Date.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 60 of the Complaint.

61.    On December 20, 2007, Wachovia notified Plaintiff that it was closing out the
swap transaction.  Wachovia purported to determine its loss on the transaction as $9,990,000,
based upon quotations for the reference obligation that it had obtained from market-makers.

**ANSWER:**

Wachovia admits that, on December 20, 2007, it sent Plaintiff a Notice of Amount Due

Following Early Termination and refers to the Notice for its terms.  Wachovia denies the

remaining allegations set forth in paragraph 61 of the Complaint.

62.    Wachovia further stated that a Writedown in the amount of $10,000,000 had
occurred with respect to the Reference Obligation.  However, no such Writedown had occurred
within the meaning of the Confirmation Letter.

**ANSWER:**

Wachovia admits that in the December 20, 2007 Notice of Amount Due Following Early Termination, it stated that "The most recent Servicer Report regarding the Reference Obligation indicates that a Writedown has occurred with respect to the Reference Obligation." Wachovia refers to the Notice for its complete terms. Wachovia denies the remaining allegations set forth in paragraph 62 of the Complaint.

Wachovia Converts Plaintiff's Collateral

63.     On or about December 27, 2007, Wachovia notified Plaintiff that it had foreclosed on the $8,920,000 of collateral, and that Plaintiff owed Wachovia the amount of the "deficiency," $1,030,861.12, together with interest and other amounts, including collection costs and legal fees.

**ANSWER:**

Wachovia admits that, on December 27, 2007, it sent Plaintiff a Notice of Amount Due Following Application of Collateral and refers to the Notice for its terms.

## AS AND FOR A FIRST CAUSE OF ACTION
### (**For Rescission - Fraud**)

64.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 64 of the Complaint, Wachovia repeats and re-alleges its responses to paragraphs 1 through 63 of the Complaint as if fully set forth herein.

65.     Wachovia made numerous false representations to, and concealed material existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure Wachovia against its perceived counterparty risk.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 65 of the Complaint.


66.     In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 66 of the Complaint.


67.     The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 67 of the Complaint.


68.     But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia.  By reason of the foregoing, Plaintiff is entitled to rescission of the swap and restitution by Wachovia of all sums paid by Plaintiff to date, including without limitation the initial margin and all further sums paid as collateral.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 68 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 68 of the Complaint.


### AS AND FOR A SECOND CAUSE OF ACTION
### (For Rescission - Mistake)

69.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 69 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70.     No meeting of the minds had been achieved at the time that the parties entered
into the swap transaction.  Based upon the Confirmation Letter and the negotiations leading up to
it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of
daily mark-to-market movements in the value of the reference obligation.  Wachovia was aware
that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily
changes in the creditworthiness of the Forge CDO, but did not address the discrepancy until after
Plaintiff had closed on the trade in May 2007.  As to Plaintiff, the mistake was honest and
excusable, such that enforcement of the variation margin provision would therefore be
unconscionable.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 70 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 70 of the Complaint.

71.     Accordingly, Plaintiff is entitled to an equitable rescission or reformation of the
swap and a return of its collateral.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 71 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 71 of the Complaint.

## AS AND FOR A THIRD CAUSE OF ACTION
### (For Damages from Wachovia's Fraud)

72.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 72 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 71 of the Complaint as if fully set forth herein.

73.     The misrepresentations and omissions set forth herein were engaged in by
Wachovia with intent to deceive Plaintiff and constitute fraud under principles of common law
entitling Plaintiff to an award of compensatory damages in an amount to be determined at trial,
as well as incidental damages incurred in connection with the negotiation, execution and
consummation of the swap.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 73 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 73 of the Complaint.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract)

74.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 74 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.     Plaintiff has performed all of its obligations under the swap agreement.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 75 of the Complaint.

76.     Wachovia has breached the agreement, *inter alia*, by demanding the deposit of
collateral far in excess of the amount actually required.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 76 of the Complaint.

77.    Plaintiff has been thereby damaged in an amount to be determined at trial.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 77 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 77 of the Complaint.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>)

78.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 78 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.    By gradually making oppressive margin demands without justification, Wachovia
acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap
agreement, namely, the premium to be paid by Wachovia on the notional amount at a cost to
Plaintiff no greater than the opportunity cost of the collateral actually required to secure
counterparty risk and credit risk.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 79 of the Complaint.

80.    To the extent that the swap agreement gave Wachovia any discretion as
calculation agent in the determination of the credit risk of the reference obligation, the implied
covenant of good faith and fair dealing included a promise on the part of Wachovia not to act
arbitrarily or irrationally in exercising that discretion.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 80 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia admits that the parties were required to perform all obligations under the agreement in

good faith, avers that it did so and otherwise denies the allegations set forth in paragraph 80.

81.    By extracting collateral from Plaintiff far in excess of what Wachovia actually
required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

**ANSWER:**

To the extent that an answer is required, Wachovia denies the allegations set forth in

paragraph 81 of the Complaint.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

82.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 82 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 81 of the Complaint as if fully set forth herein.

83.    By extracting an unnecessarily large amount of collateral from Plaintiff,
Wachovia received money properly belonging to the Plaintiff.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 83 of the Complaint.

84.    Wachovia has benefited and is benefiting from the receipt of those funds and,
under principles of equity and good conscience, Wachovia should not be permitted to retain such

collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 84 of the Complaint constitute legal conclusions to which no answer is required.  To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 84 of the Complaint.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (For a Permanent Injunction/Specific Performance)

85.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 85 of the Complaint, Wachovia repeats and re-alleges its responses to paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.    Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 86 of the Complaint constitute legal conclusions to which no answer is required.  To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 86 of the Complaint.

87.    If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 87 of the Complaint constitute legal conclusions to which no answer is required. To the extent that a response is required, Wachovia denies the allegations set forth in paragraph 87 of the Complaint insofar as they purport to characterize any actions of Wachovia as inappropriate. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 87 of the Complaint.

88. The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

**ANSWER:**

To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 88 of the Complaint.

89. The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 89 of the Complaint call for a legal conclusion for which no answer is required. To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 89 of the Complaint.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (<u>Conversion</u>)

90. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 90 of the Complaint, Wachovia repeats and re-alleges its responses to paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.    Wachovia intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

**ANSWER**:

Wachovia denies the allegations set forth in paragraph 91 of the Complaint.

92.    The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

**ANSWER**:

Wachovia denies the allegations set forth in paragraph 92 of the Complaint.

93.    Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.

**ANSWER**:

Wachovia denies the allegations set forth in paragraph 93 of the Complaint.

# **ADDITIONAL DEFENSES**

1.    For its first affirmative defense, Wachovia alleges that the allegations of the Complaint, in whole or in part, fail to state a claim for which relief may be granted.

2.    For its second affirmative defense, Wachovia alleges that Plaintiff's claims are barred by the equitable doctrines of laches and estoppel.

3.    For its third affirmative defense, Wachovia alleges that Plaintiff's claims may be barred, in whole or in part, by the doctrine of unclean hands.

4.      For its fourth affirmative defense, Wachovia alleges that the rights and obligations of the parties are governed by the terms of the agreement between the parties, and, therefore, Plaintiff's' tort claims are precluded as a matter of law.

5.      For its fifth affirmative defense, Wachovia alleges that damages, if any, alleged to have been suffered by Plaintiff are subject to offset by damages Plaintiff caused to Wachovia as a result of Plaintiff's conduct.

6.      For its sixth affirmative defense, Wachovia alleges that damages, if any, alleged to have been suffered by Plaintiff were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of Plaintiff or others over whom Plaintiff exercised control.

7.      For its seventh affirmative defense, Wachovia alleges that, at all times, it has acted in accordance with the agreements, and, therefore, Plaintiff is not entitled to the judgment demanded.

8.      For its eighth affirmative defense, Wachovia alleges that Plaintiff has been paid all monies due and owing under the terms of the agreement.

9.      For its ninth affirmative defense, Wachovia alleges that, at all times, Plaintiff had equal or superior knowledge of all relevant matters, including:  (1) the rights and obligations of the agreement between the parties; (2) the value of the Credit Support Amount as defined by the ISDA Credit Support Annex; (3) the value of the Exposure as defined by the ISDA Credit Support Annex; and (4) the financial condition of the Reference Obligation as defined by the Confirmation.

10.      For its tenth affirmative defense, Wachovia alleges that Plaintiff has failed to mitigate any damages it has allegedly suffered.

11.     Wachovia hereby reserves the right to rely on such other additional defenses as may become available or apparent during discovery.

# WACHOVIA'S COUNTERCLAIM

## PARTIES

1.      Plaintiff CDO Plus is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

2.      CDO Plus was incorporated in Jersey on June 13, 2006.  Effective November 21, 2007, CDO Plus changed its name to VCG Special Opportunities Master Fund Limited.

3.      Wachovia Bank, National Association is a national banking association and a wholly owned subsidiary of Wachovia Corporation.  Wachovia Bank, National Association has its principal place of business located at 301 South College Street, Charlotte, North Carolina.

## Jurisdiction and Venue

4.      This court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs.  The parties also consented to this Court's jurisdiction in the Agreement that is the subject of this dispute.

5.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).  The parties also consented to this venue in the Agreement that is the subject of this dispute.

## Substantive Allegations

### Plaintiff is a Sophisticated Investor

6.      CDO Plus is a hedge fund with extensive experience investing in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

7.    CDO Plus asserts that "[i]nvestors in the fund will have the opportunity to invest in a CDO strategy "with a twist"; one fund that simultaneously earns returns from CDO debt/CDO equity <u>AND</u> participates in management fees from CDO deals."

8.    CDO Plus asserts that its "investment team members are all seasoned professionals with extensive experience in fixed income, structured products markets, and hedge funds."

9.    Upon information and belief, CDO Plus has entered into numerous derivative swap transactions.

10.    CDO Plus is managed and controlled by the Vanquish Capital Group.

11.    At all relevant times, rékon advisors llc has acted as CDO Plus's Investment Manger.

12.    Upon information and belief, Vanquish Capital Group has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

13.    Upon information and belief, rékon advisors llc has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

14.    Don Uderitz is a director of CDO Plus.

15.    Jorge Rodriquez-Lugo is a director of CDO Plus.

16.    Don Uderitz and Jorge Rodriquez-Lugo control rékon advisors llc.

17.    Don Uderitz and Jorge Rodriquez-Lugo are principals with Vanquish Capital Group.

18.    Robert H. Fasulo, Esq. is the General Counsel of Vanquish Capital Group.

19.     Don Uderitz has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

20.     Uderitz asserts that his experience includes, but is not limited to:  (i) "through a unique joint venture arrangement . . . direct[ing] all [] Tax Related Products at Wachovia Securities with primary responsibility for the portfolio management of tax related structured products;" (ii) serving as a "general partner[] and co-head of mortgage trading for the III Global Funds;" (iii) serving as a "general partner in Adams, Viner and Mosler, Ltd., a registered broker dealer;" and (iv) serving as a "Senior Vice President and Portfolio Manager for Ocwen Financial Corporation."

21.     Uderitz also considers himself "to be one of the foremost authorities on REMIC residuals."

22.     Jorge Rodriquez-Lugo has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

23.     Rodriquez-Lugo asserts that his experience includes, but is not limited to:  (i) serving as "a Senior Vice President at Lehman Brother's Private Investment Management Division;" (ii) working at "AVM promoting unique arbitrage opportunities using mortgage securities and derivatives to a select group of institutional clients in the U.S.;" and (iii) serving for 14 years as a "senior institutional mortgage and derivatives sales person at various Wall Street firms."

24.     Robert H. Fasulo, Esq. has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

WACHOVIA AND CDO PLUS ENTER INTO A DERIVATIVE SWAP TRANSACTION

25.     In the spring of 2007, Plaintiff approached Wachovia and sought to enter into a derivative swap transaction worth $10 million.

26.     In May 2007, CDO Plus entered into a Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "Derivative Swap Transaction" or "Transaction") with Wachovia.

27.     Under the terms of the Transaction, Wachovia agreed to pay CDO Plus a fixed amount quarterly over the life of the Reference Obligation (in this case a collateralized debt obligation ("CDO")).

28.     In return, CDO Plus was required to pay Wachovia amounts in respect of certain events associated with the CDO, if and when those events occurred.

29.     If the investment was successful, and the underlying CDO thrived, CDO Plus stood to receive a quarterly fixed amount from Wachovia for the life of the CDO or until the parties agreed to terminate the swap.

30.     If the investment was unsuccessful, CDO Plus would have to pay Wachovia principal-related amounts up to $10 million, and interest-related amounts, to cover amounts in respect of the events associated with the underlying CDO.

31.     The Trade Date of the Transaction was May 21, 2007.

32.     The Effective Date of the Transaction was May 24, 2007.

33.     The terms of the Transaction were governed by four documents:  (1) an ISDA Master Agreement, dated May 4, 2007; (2) the Schedule to the Master Agreement dated as of May 4, 2007; (3) an ISDA Credit Support Annex dated as of May 4, 2007, which incorporates by reference the ISDA 1994 Credit Support Annex; and (4) a Confirmation dated May 30, 2007

(collectively, the "Agreement"). Copies of each of these documents are attached as Exhibits 1-4 to Wachovia's Counterclaim.

34.     The ISDA Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

35.     The Schedule to the Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

36.     The ISDA Credit Support Annex was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

37.     The Confirmation was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 30, 2007.

38.     The Agreement represented the entire understanding of the parties to the Derivative Swap Transaction.

39.     The terms of the Agreement are not ambiguous.

40.     The terms of the Agreement are not in conflict.

### SIGNIFICANT TERMS OF THE AGREEMENT

41.     The Reference Obligation is defined in Section 1 of the Confirmation.

42.     The Initial Face Amount of the Agreement is USD $10,000,000.00.

43.     The Reference Obligation Notional Amount is defined in Section 1 of the Confirmation.

44.     Wachovia is the Fixed Rate Payer or Buyer in the Transaction.

45.     CDO Plus is the Floating Rate Payer or Seller in the Transaction.

46.     Wachovia's payment obligations under the Agreement are defined in Section 2 of the Confirmation.

47.     CDO Plus's payment obligations as the Floating Rate Payer are defined in Section 3 of the Confirmation.

48.     The Independent Amount is defined in Section 7 of the Confirmation.

49.     CDO Plus may be obligated to transfer collateral to Wachovia pursuant to the terms of the Agreement; specifically, paragraph 3 of the ISDA Credit Support Annex.

50.     Paragraph 3 of the ISDA Credit Support Annex specifies the amount of collateral to be posted under the Agreement.

51.     The Credit Support Amount is defined in Paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex.

52.     The Delivery Amount is defined in Paragraph 3 of the ISDA Credit Support Annex.

53.     The Return Amount is defined in Paragraph 3 of the ISDA Credit Support Annex.

54.     Wachovia is the Secured Party as defined by the Agreement.

55.     CDO Plus is the Pledgor as defined by the Agreement.

56.     Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Secured Party may demand Transfers of Eligible Credit Support.

57.     Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Pledgor may demand Return Amounts.

58.     Throughout the term of the Agreement, the Pledgor never made a demand for a Return Amount, as defined by Paragraph 3(b) of the ISDA Credit Support Annex.

59.     Under the terms of the Agreement Wachovia is the Valuation Agent.

60.     Pursuant to Paragraph 4(c) of the ISDA Credit Support Annex, the Valuation Agent determines Exposure and Value as defined by the ISDA Credit Support Annex.

61.     Under the terms of the Agreement, the Calculation Agent does not determine either Exposure or Value.

62.     Under the terms of the Agreement, the Calculation Agent does not determine the Credit Support Amount.

63.     Pursuant to paragraph 13(c)(ii) of the ISDA Credit Support Annex, Wachovia was entitled to mark the position on a daily basis.

64.     Paragraph 5 of the ISDA Credit Support Annex sets forth the obligations of the Parties if either party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount.

## CDO PLUS'S FAILURE TO POST COLLATERAL

65.     Between May and November 2007, the market for CDOs declined.

66.     As the market for CDOs declined, so too did the market for credit protection tied to CDOs.

67.     Because the market value of CDO Plus's position in this transaction (as a credit protection seller) declined, Wachovia was entitled to require additional collateral from CDO Plus as security against CDO Plus's payment obligations under the contract.

68.     The declining market value for derivative swap transactions tied to CDOs reflected the fact that investors were no longer willing to make investments at terms similar to the Transaction entered into by CDO Plus.

69.     Paragraph 3 of the ISDA Credit Support Annex sets forth the terms and conditions under which Plaintiff may be obligated to provide Wachovia with collateral support for Plaintiff's obligations under the Agreement.

70.     Under the terms of Paragraph 3, Wachovia is entitled to demand collateral transfers from CDO Plus ("Notice of Collateral Demand" or "Collateral Call") when the Credit Support Amount exceeds the Value of all Posted Credit Support by $250,000.00.

71.     As the Valuation Agent, Wachovia was obligated to calculate Exposure.

72.     Exposure is defined in paragraph 12 of the ISDA Credit Support Annex.

73.     Wachovia, as Valuation Agent, calculated Exposure pursuant to the ISDA Credit Support Annex definition on a mark-to-market basis throughout the term of the Agreement.

74.     Calculating Exposure in a credit derivative swap transaction on a mark-to-market basis is required under the Agreement.

75.     Wachovia never calculated Exposure based upon the creditworthiness of CDO Plus.

76.     Pursuant to paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex, Wachovia used its calculation of Exposure to determine the Credit Support Amount.

77.     When the Credit Support Amount exceeded the Value of all Posted Credit Support (the amount of collateral Wachovia was holding on behalf of CDO Plus) by $250,000.00, Wachovia provided CDO Plus with a Notice of Collateral Demand, which stated the additional amount of collateral that CDO Plus was required to deposit with Wachovia.

78.     Beginning in the summer of 2007, CDO Plus began to object to Wachovia's Collateral Calls.  Specifically, CDO Plus objected to Wachovia's calculation of Exposure.

79.     CDO Plus understood Wachovia's Collateral Calls to be demands for Transfers of Eligible Credit Support, and not demands for payments of Floating Amounts.

80.     CDO Plus declined to invoke the Dispute Resolution provision of the Agreement for the first five months of the Transaction.

81.     Wachovia's calculations of Exposure were commercially reasonable.

CDO PLUS BREACHES THE AGREEMENT

82.     On November 21, 2007, Wachovia determined that the Credit Support Amount exceeded CDO Plus's Posted Credit Support by $550,000.00.  Wachovia then sent CDO Plus a Notice of Collateral Demand requesting that CDO Plus deposit with Wachovia the outstanding collateral amount.

83.     CDO Plus refused to transfer the additional collateral and, in a letter dated November 21, 2007, invoked the Dispute Resolution provision of the Agreement.

84.     Because Wachovia's Collateral Calls are generated automatically, Wachovia continued to issue a Collateral Call every business day that CDO Plus failed to transfer the additional collateral due under the Agreement.

85.     Under the terms of the Dispute Resolution provision of the Agreement, if a party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount, it may notify the counterparty and the Valuation Agent that the Valuation Agent's calculation is disputed.  The Valuation Agent then must recalculate the Exposure pursuant to the terms of paragraph 5 of the ISDA Credit Support Annex.

86.     Pursuant to the terms of this Dispute Resolution provision, on November 26, 2007, Wachovia obtained four actual quotations at mid-market from Reference Market-makers for the purposes of calculating the Market Quotation.  This valuation was the prescribed method for recalculating the Exposure pursuant to paragraph 5 of the ISDA Credit Support Annex.

87.     Based upon these quotations, Wachovia calculated the Market Quotation as 96.5 percent.

88.     A quotation of 96.5 percent of the Notional Amount, plus the Independent Amount, meant that Wachovia was entitled to hold an additional $1,490,000 from CDO Plus in collateral

89.     The Market Quotation revealed that Wachovia's November 21, 2007 determination of Exposure was below the Market Quotation.

90.     The Market Quotation established that Wachovia's November 21, 2007 determination of Exposure was commercially reasonable.

91.     On November 26, 2007, Wachovia provided CDO Plus with copies of the four quotations.

92.     On November 27, 2007, Wachovia issued a Collateral Call to CDO Plus based upon the revised valuation of Exposure.

93.     Under the terms of the Agreement, CDO Plus was required to meet the Collateral Call, by transferring to Wachovia the additional required collateral, by close of business on November 27, 2007.

94.     CDO Plus failed to transfer the additional required collateral.

95.     Instead, in an email dated November 27, 2007, CDO Plus stated:  [w]ith regard to your email and margin call that we received today, we do not consider that the dispute resolution process we recently invoked to be resolved to our satisfaction.  We are still in the process of securing our own market levels and analyzing the servicer's report.  As the process is not complete, we are not ready to conclude as to a course of action."

96.     Under the terms of the Agreement, CDO Plus was required to transfer the required collateral amount established by the Valuation Agent's revised calculation of Exposure, upon the demand made by Wachovia.

97.    CDO Plus breached the Agreement when it refused to transfer the additional collateral demanded by Wachovia on November 27, 2007.

98.    Under the terms of the Dispute Resolution provision of the Agreement, CDO Plus was not entitled to "seek [its] own market levels" as an alternative to the Valuation Agent's revised calculation; however, in an effort to remedy CDO Plus's breach of the Agreement, on November 27, 2007, Wachovia offered to review any additional market quotes that CDO Plus had obtained through its independent research.

99.    Wachovia requested that CDO Plus provide Wachovia with any additional market quotes by no later than 12 p.m., on Wednesday November 28, 2007.

100.    Despite Wachovia's efforts to remedy CDO Plus's breach of the Agreement, CDO Plus did not provide Wachovia with any additional market quotes.

101.    Indeed, rather than provide Wachovia with any objective evidence that the Valuation Agent's revised calculation was incorrect, CDO Plus filed the Complaint in this action.

102.    Upon information and belief, CDO Plus never obtained any additional market quotes that were materially different from the quotes obtained by the Valuation Agent when it conducted the Dispute Resolution procedure.

103.    CDO Plus's lawsuit against Wachovia constituted an Event of Default under the Agreement.

104.    On December 7, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Failure to Transfer.  The Notice demanded that CDO Plus transfer the additional collateral due under the terms of the Agreement.

105.    CDO Plus again refused to transfer the additional required collateral.

106.   On December 10, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Events of Default, which outlined the basis for CDO Plus's default on the Agreement.

107.   Under the terms of the Agreement, CDO Plus's default gave rise to an Event of Default, which gave Wachovia the right to cause an early termination of the Agreement.

108.   On December 13, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Early Termination for Event of Default.  In that Notice, Wachovia designated December 18, 2007 as the Early Termination Date.

109.   On the Early Termination Date, Wachovia calculated the amount due and payable by CDO Plus, pursuant to the terms of the Agreement.

110.   On December 20, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Amount Due Following Early Termination.

111.   Based upon Wachovia's calculation, which was made in accordance with the terms of the Agreement, the amount due and payable to Wachovia was $9,999,000.00.

112.   Pursuant to the terms of the Agreement, CDO Plus was required to pay Wachovia $9,999,000.00, plus interest from the Early Termination Date.

113.   CDO Plus refused to pay the amount due as a result of the Early Termination of the Agreement.

114.   On December 27, 2007, Wachovia exercised its right to liquidate CDO Plus's Posted Collateral Amount (which was the sum of the Collateral Transferred to Wachovia, $8,920,000.00, plus Interest Amounts, $61,290.34) and apply the proceeds against the Settlement Amount due as a result of the Early Termination of the Agreement.

115.   The liquidation proceeds due and payable to Wachovia were $8,968,138.88 (which was the difference of the Posted Collateral Amount, $8,981,290.34, and interest due and payable to Wachovia at the Default Rate, $13,151.46).  Pursuant to paragraph 8 of the ISDA Credit Support Annex, Wachovia exercised its right to apply the proceeds against the Settlement Amount, $9,999,000.00.  After liquidation of the Posted Collateral against the Settlement Amount, Wachovia is still owed $1,030,861.12 (which was the difference of $9,999,000.00 and $8,968,138.88).

116.   On December 27, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with formal Notice of Amount Due Following Application of Collateral, and requested that CDO Plus make immediate payment of the remaining unpaid Settlement Amount, which was $1,030,861.12.

117.   The December 27, 2007 letter also placed CDO Plus on notice of its obligation, pursuant to paragraph 11 of the ISDA Credit Support Annex, to indemnify and hold harmless Wachovia for and against all reasonable out-of-pocket expenses, including legal fees incurred by Wachovia by reason of enforcement and protection of its rights under the Agreement.

118.   CDO Plus refused to pay the remaining unpaid Settlement Amount.

119.   CDO Plus also refused to meet its indemnity obligations under the Agreement.

120.   On January 30, 2008, the Reference Obligation experienced an Event of Default.

121.   On February 8, 2008, Moody's downgraded the Reference Obligation to "Ca".

## FIRST CAUSE OF ACTION
### (Breach of Contract)

122.   Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

123.   Wachovia and CDO Plus entered into the Agreement in May 2007.

124.    Wachovia performed all of its obligations under the Agreement.

125.    At all times, Wachovia acted in good faith and in a commercially reasonable manner.

126.    CDO Plus breached the Agreement by, among other things:  (1) refusing to transfer the Eligible Credit Support required under the Agreement; (2) refusing to pay the amount due following the Early Termination Event; (3) refusing to pay the remaining unpaid Settlement Amount, with interest thereon; and (4) refusing to indemnify Wachovia pursuant to the terms of the Agreement.

127.    In addition, filing the Complaint in this action constituted an Event of Default pursuant to Section 5 of the ISDA Master.

128.    As a result of CDO Plus's breach of the Contract, Wachovia has been damaged in an amount to be determined at trial.

## RESERVATION OF RIGHTS AND NON-WAIVER

Wachovia reserves the right to amend this Answer and Counterclaims and to assert such other and additional claims and defenses that are warranted by disclosure or by discovery in this matter.

WHEREFORE, Wachovia respectfully requests that the Court enter a judgment:

(i)     awarding Wachovia $1,030,861.12, with interest thereon, plus prejudgment interest;

(ii)    awarding Wachovia all costs associated with collection of amounts due under the Agreement, including, but not limited to, attorneys' fees; and

(iii)   such other and further relief as the Court may deem proper.


Date:  New York, New York
       February 15, 2008

HUNTON & WILLIAMS LLP

By:  /s/ Shawn Patrick Regan
     Shawn Patrick Regan
     200 Park Avenue, 52nd Floor
     New York, New York  10166
     (212) 309-1000
     sregan@hunton.com

     -and-

     Patrick L. Robson
     HUNTON & WILLIAMS LLP
     Bank of America Plaza
     101 S. Tyson Street, Suite 3500
     Charlotte, North Carolina  28280
     (704) 378-4700
     probson@hunton.com

     *Attorneys for Defendant*
     *Wachovia Bank, National Association*

## DECLARATION OF SERVICE

Raymond E. Galbraith, hereby declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that:

I am a Litigation Paralegal at the law firm of Hunton & Williams LLP, attorneys for

Defendant Wachovia Bank, National Association.

That on February 15, 2008, I served a true copy of the attached Answer and

Counterclaim on counsel of record listed below via the Court's ECF System.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2008.

/s/ Raymond E. Galbraith<br>Raymond E. Galbraith

TO:    Terence W. McCormick, Esq.<br>
        Steven Glen Mintz, Esq.<br>
        Mintz & Gold LLP<br>
        470 Park Avenue South<br>
        10th Floor<br>
        New York, NY  10016-6819

*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

***EXHIBIT C TO ROBSON DECLARATION***

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

| | | |
|---|---|---|
| CDO PLUS MASTER FUND LTD., | : | |
| | : | **07 Civ. 11078 (LTS)(AJP)** |
| Plaintiff, | : | |
| | : | **ANSWER TO COUNTERCLAIM** |
| - against - | : | |
| | : | |
| WACHOVIA BANK, | : | **ECF CASE** |
| NATIONAL ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------X

Plaintiff, CDO Plus Master Fund Ltd., ("Plaintiff" or "CDO Plus"), by its attorneys,

Mintz & Gold LLP, as and for its Answer and Affirmative Defenses to Defendant's

Counterclaim herein, responds and alleges as follows:

**1.      Plaintiff CDO Plus is an Isle of Jersey exempted corporation having its**

**principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel**

**Islands.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 1 of the Counterclaim.

**2.      CDO Plus was incorporated in Jersey on June 13, 2006.  Effective November**

**21, 2007, CDO Plus changed its name to VCG Special Opportunities Master Fund**

**Limited.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 2 of the Counterclaim.

**3.     Wachovia Bank, National Association is a national banking association and a wholly-owned subsidiary of Wachovia Corporation. Wachovia Bank, National Association has its principal place of business located at 301 South College Street, Charlotte, North Carolina.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 3 of the Counterclaim.

## Jurisdiction and Venue

**4.     This court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs. The parties also consented to this Court's jurisdiction in the Agreement that is the subject of this dispute.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 4 of the Counterclaim.

**5.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).  The parties also consented to this venue in the Agreement that is the subject of this dispute.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 5 of the Counterclaim.

## Substantive Allegations

### Plaintiff is a Sophisticated Investor

**6.     CDO Plus is a hedge fund with extensive experience investing in**

collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 6 of the Counterclaim.

7. **CDO Plus asserts that "[i]nvestors in the fund will have the opportunity to invest in a CDO strategy "with a twist"; one fund that simultaneously earns returns from CDO debt/CDO equity <u>AND</u> participates in management fees from CDO deals."**

**ANSWER:**

In response to the allegation of paragraph 7 of the Counterclaim, Plaintiff admits that it has supplied written disclosure or marketing language in similar terms.

8. **CDO Plus asserts that its "investment team members are all seasoned professionals with extensive experience in fixed income, structured products markets, and hedge funds."**

**ANSWER:**

In response to the allegation of paragraph 8 of the Counterclaim, Plaintiff admits that it has supplied written disclosure or marketing language in similar terms.

9. **Upon information and belief, CDO Plus has entered into numerous derivative swap transactions.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 9 of the Counterclaim.

10. **CDO Plus is managed and controlled by the Vanquish Capital Group.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 10 of the Counterclaim, except admits that Vanquish Advisors LLC is the investment manager of CDO Plus (now known as

VCG Special Opportunities Master Fund Ltd.

**11.     At all relevant times, rékon advisors llc has acted as CDO Plus's Investment Manager.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 11 of the Counterclaim, except notes that rekon advisors llc is now known as Vanquish Advisors LLC.

**12.     Upon information and belief, Vanquish Capital Group has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 12 of the Counterclaim.

**13.     Upon information and belief, rékon advisors llc has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 13 of the Counterclaim.

**14.     Don Uderitz is a director of CDO Plus.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 14 of the Counterclaim.

**15.     Jorge Rodriguez-Lugo is a director of CDO Plus.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 15 of the Counterclaim.

**16.     Don Uderitz and Jorge Rodriquez-Lugo control rékon advisors llc.**

**ANSWER:**

The allegations of paragraph 16 of the Counterclaim set forth a legal conclusion as to which no responsive pleading is required.

**17.     Don Uderitz and Jorge Rodriquez-Lugo are principals with Vanquish Capital Group.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 17 of the Counterclaim.

**18.     Robert H. Fasulo, Esq. is the General Counsel of Vanquish Capital Group.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 18 of the Counterclaim.

**19.     Don Uderitz has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 19 of the Counterclaim.

**20.     Uderitz asserts that his experience includes, but is not limited to: (i) "through a unique joint venture arrangement . . . direct[ing] all [] Tax Related Products at Wachovia Securities with primary responsibility for the portfolio management of tax related structured products;" (ii) serving as a "general partner[] and co-head of mortgage trading for the III Global Funds;" (iii) serving as a "general partner in Adams, Viner and Mosler, Ltd., a registered broker dealer;" and (iv) serving as a "Senior Vice President and Portfolio Manager for Ocwen Financial Corporation."**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 20 of the Counterclaim, except admits that it has supplied written disclosure in similar terms regarding Mr. Uderitz.

5

21.     Uderitz also considers himself "to be one of the foremost authorities on REMIC residuals."

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 21 of the Counterclaim, except admits that it has supplied written disclosure reporting that some in the industry regard Mr. Uderitz to be among the foremost authorities on REMIC residuals.

22.     Jorge Rodriquez-Lugo has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 22 of the Counterclaim.

23.     Rodriquez-Lugo asserts that his experience includes, but is not limited to: (i) serving as "a Senior Vice President at Lehman Brother's Private Investment Management Division;" (ii) working at "AVM promoting unique arbitrage opportunities using mortgage securities and derivatives to a select group of institutional clients in the U.S.;" and (iii) serving for 14 years as a "senior institutional mortgage and derivatives sales person at various Wall Street firms."

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 23 of the Counterclaim, except admits that it has supplied written disclosure in the past containing similar descriptions of Mr. Rodriguez's experience.

24.     Robert H. Fasulo, Esq. has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

6

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 24 of the Counterclaim.

WACHOVIA AND CDO PLUS ENTER INTO A DERIVATIVE SWAP TRANSACTION

**25.     In the spring of 2007, Plaintiff approached Wachovia and sought to enter into a derivative swap transaction worth $10 million.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 25 of the Counterclaim.

**26.     In May 2007, CDO Plus entered into a Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "Derivative Swap Transaction" or "Transaction") with Wachovia.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 26 of the Counterclaim.

**27.     Under the terms of the Transaction, Wachovia agreed to pay CDO Plus a fixed amount quarterly over the life of the Reference Obligation (in this case a collateralized debt obligation ("CDO")).**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 27 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**28.     In return, CDO Plus was required to pay Wachovia amounts in respect of certain events associated with the CDO, if and when those events occurred.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 28 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents.

**29.    If the investment was successful, and the underlying CDO thrived, CDO Plus stood to receive a quarterly fixed amount from Wachovia for the life of the CDO or until the parties agreed to terminate the swap.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 29 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**30.    If the investment was unsuccessful, CDO Plus would have to pay Wachovia principal-related amounts up to $10 million, and interest-related amounts, to cover amounts in respect of the events associated with the underlying CDO.**

**ANSWER:**

To the extent that the allegations of paragraph 30 purport to characterize the written agreement between the parties, Plaintiff respectfully refers the Court to the governing documents of the swap transaction at issue in this action.

**31.    The Trade Date of the Transaction was May 21, 2007.**

**ANSWER:**

Plaintiff admits the allegations of paragraph 31 of the Counterclaim.

**32.    The Effective Date of the Transaction was May 24, 2007.**

**ANSWER:**

Plaintiff admits the allegations of paragraph 32 of the Counterclaim.

**33.    The terms of the Transaction were governed by four documents: (1) an ISDA Master Agreement, dated May 4, 2007; (2) the Schedule to the Master Agreement dated as of May 4, 2007; (3) an ISDA Credit Support Annex dated as of May 4, 2007, which**

incorporates by reference the ISDA 1994 Credit Support Annex; and (4) a Confirmation dated May 30, 2007 (collectively, the "Agreement"). Copies of each of these documents are attached as Exhibits 1-4 to Wachovia's Counterclaim.

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 33 of the Counterclaim, although notes that none of the documents referenced therein are actually attached and filed as Exhibits to Wachovia's Counterclaim.

**34.** **The ISDA Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.**

**ANSWER:**

Plaintiff admits that Donald S. Uderitz executed an ISDA Master Agreement dated as of May 4, 2007, and otherwise denies knowledge or information sufficient to form a belief as to when the document was executed.

**35.** **The Schedule to the Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.**

**ANSWER:**

In response to the allegations set forth in paragraph 35 of the Counterclaim, Plaintiff admits that Donald S. Uderitz executed a Schedule to the ISDA Master Agreement, also dated as of May 4, 2007, and otherwise denies knowledge or information sufficient to form a belief as to when the document was executed.

**36.** **The ISDA Credit Support Annex was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.**

**ANSWER:**

In response to the allegations set forth in paragraph 36 of the Counterclaim, Plaintiff

admits that Donald S. Uderitz executed an ISDA Credit Support Annex dated as of May 4, 2007, and otherwise denies knowledge or information sufficient to form a belief as to when the document was executed.

**37.    The Confirmation was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 30, 2007.**

**ANSWER:**

Plaintiff admits the allegations of paragraph 37 of the Counterclaim.

**38.    The Agreement represented the entire understanding of the parties to the Derivative Swap Transaction.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 38 of the Counterclaim set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**39.    The terms of the Agreement are not ambiguous.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 39 of the Counterclaim set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**40.    The terms of the Agreement are not in conflict.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 40 of the Counterclaim.

<u>S</u><small>IGNIFICANT</small> <u>T</u><small>ERMS OF THE</small> <u>A</u><small>GREEMENT</small>

**41.     The Reference Obligation is defined in Section 1 of the Confirmation.**

<u>**ANSWER:**</u>

Plaintiff admits that the Confirmation supplies a definition of the Reference Obligation

in Section 1 and respectfully refers the Court to the Confirmation for its contents.

**42.     The Initial Face Amount of the Agreement is USD $10,000,000.00.**

<u>**ANSWER:**</u>

Plaintiff admits the allegation set forth in paragraph 42 of the Counterclaim.

**43.     The Reference Obligation Notional Amount is defined in Section 1 of the
Confirmation.**

<u>**ANSWER:**</u>

Plaintiff admits that the Confirmation supplies a definition of the Reference Obligation

Notional Amount in Section 1 and respectfully refers the Court to the Confirmation for its

contents.

**44.     Wachovia is the Fixed Rate Payer or Buyer in the Transaction.**

<u>**ANSWER:**</u>

Plaintiff admits the allegation set forth in paragraph 44 of the Counterclaim.

**45.     CDO Plus is the Floating Rate Payer or Seller in the Transaction.**

<u>**ANSWER:**</u>

Plaintiff admits the allegation set forth in paragraph 45 of the Counterclaim.

**46.     Wachovia's payment obligations under the Agreement are defined in
Section 2 of the Confirmation.**

<u>**ANSWER:**</u>

Plaintiff responds that the allegations of paragraph 46 set forth a legal conclusion as to

which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents.

47.    **CDO Plus's payment obligations as the Floating Rate Payer are defined in Section 3 of the Confirmation.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 47 set forth a legal conclusion as to

which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents.

48.    **The Independent Amount is defined in Section 7 of the Confirmation.**

**ANSWER:**

Plaintiff admits that the Confirmation supplies a definition of the Independent Amount

in Section 7 and respectfully refers the Court to the Confirmation for its contents.

49.    **CDO Plus may be obligated to transfer collateral to Wachovia pursuant to the terms of the Agreement; specifically, paragraph 3 of the ISDA Credit Support Annex.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 49 of the Counterclaim.

50.    **Paragraph 3 of the ISDA Credit Support Annex specifies the amount of collateral to be posted under the Agreement.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 50 of the Counterclaim.

51.    **The Credit Support Amount is defined in Paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 51 set forth a legal conclusion as to

which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents, and otherwise

denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support

Annex.

     **52.**    **The Delivery Amount is defined in Paragraph 3 of the ISDA Credit Support
Annex.**

     <u>**ANSWER**</u>**:**

     Plaintiff responds that the allegations of paragraph 52 set forth a legal conclusion as to

which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents, and otherwise

denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support

Annex.

     **53.**    **The Return Amount is defined in Paragraph 3 of the ISDA Credit Support
Annex.**

     <u>**ANSWER**</u>**:**

     Plaintiff responds that the allegations of paragraph 53 set forth a legal conclusion as to

which no responsive pleading is required and respectfully refers the Court to the relevant

transaction documents for a complete and accurate statement of their contents, and otherwise

denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support

Annex.

     **54.**    **Wachovia is the Secured Party as defined by the Agreement.**

     <u>**ANSWER**</u>**:**

     Plaintiff denies the allegations set forth in paragraph 54 of the Counterclaim.

     **55.**    **CDO Plus is the Pledgor as defined by the Agreement.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 55 of the Counterclaim.

56.    **Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Secured Party may demand Transfers of Eligible Credit Support.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 56 of the Counterclaim.

57.    **Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Pledgor may demand Return Amounts.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 57 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

58.    **Throughout the term of the Agreement, the Pledgor never made a demand for a Return Amount, as defined by Paragraph 3(b) of the ISDA Credit Support Annex.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 58 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies the allegation that it failed to demand the return of sums it had deposited with Wachovia.

59.    **Under the terms of the Agreement Wachovia is the Valuation Agent.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 59 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

**60.      Pursuant to Paragraph 4(c) of the ISDA Credit Support Annex, the Valuation Agent determines Exposure and Value as defined by the ISDA Credit Support Annex.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 60 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**61.      Under the terms of the Agreement, the Calculation Agent does not determine either Exposure or Value.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 61 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.

**62.      Under the terms of the Agreement, the Calculation Agent does not determine the Credit Support Amount.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 62 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support

Annex.

63.     **Pursuant to paragraph 13(c)(ii) of the ISDA Credit Support Annex, Wachovia was entitled to mark the position on a daily basis.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 63 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents.  Plaintiff otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

64.     **Paragraph 5 of the ISDA Credit Support Annex sets forth the obligations of the Parties if either party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount.**

**ANSWER:**

Plaintiff responds that the allegations in paragraph 64 of the Counterclaim set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

CDO PLUS'S FAILURE TO POST COLLATERAL

65.     **Between May and November 2007, the market for CDOs declined.**

**ANSWER:**

Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 65 of the Counterclaim.

66.     **As the market for CDOs declined, so too did the market for credit**

**protection tied to CDOs.**

     <u>**ANSWER:**</u>

     Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 66 of the Counterclaim.

     **67.    Because the market value of CDO Plus's position in this transaction (as a credit protection seller) declined, Wachovia was entitled to require additional collateral from CDO Plus as security against CDO Plus's payment obligations under the contract.**

     <u>**ANSWER:**</u>

     Plaintiff denies the allegations set forth in paragraph 67 of the Counterclaim.

     **68.    The declining market value for derivative swap transactions tied to CDOs reflected the fact that investors were no longer willing to make investments at terms similar to the Transaction entered into by CDO Plus.**

     <u>**ANSWER:**</u>

     Plaintiff denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 68 of the Counterclaim.

     **69.    Paragraph 3 of the ISDA Credit Support Annex sets forth the terms and conditions under which Plaintiff may be obligated to provide Wachovia with collateral support for Plaintiff's obligations under the Agreement.**

     <u>**ANSWER:**</u>

     Plaintiff denies the allegations set forth in paragraph 69 of the Counterclaim.

     **70.    Under the terms of Paragraph 3, Wachovia is entitled to demand collateral transfers from CDO Plus ("Notice of Collateral Demand" or "Collateral Call") when the Credit Support Amount exceeds the Value of all Posted Credit Support by $250,000.00.**

     <u>**ANSWER:**</u>

Plaintiff denies the allegations set forth in paragraph 70 of the Counterclaim.

**71.     As the Valuation Agent, Wachovia was obligated to calculate Exposure.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 71 of the Counterclaim.

**72.     Exposure is defined in paragraph 12 of the ISDA Credit Support Annex.**

**ANSWER:**

Plaintiff responds that the allegations of paragraph 72 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

**73.     Wachovia, as Valuation Agent, calculated Exposure pursuant to the ISDA Credit Support Annex definition on a mark-to-market basis throughout the term of the Agreement.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 73 of the Counterclaim.

**74.     Calculating Exposure in a credit derivative swap transaction on a mark-to-market basis is required under the Agreement.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 74 of the Counterclaim.

**75.     Wachovia never calculated Exposure based upon the creditworthiness of CDO Plus.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 75 of the Counterclaim.

76.     Pursuant to paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex, Wachovia used its calculation of Exposure to determine the Credit Support Amount.

**ANSWER:**

Plaintiff responds that the allegations of paragraph 76 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

77.     When the Credit Support Amount exceeded the Value of all Posted Credit Support (the amount of collateral Wachovia was holding on behalf of CDO Plus) by $250,000.00, Wachovia provided CDO Plus with a Notice of Collateral Demand, which stated the additional amount of collateral that CDO Plus was required to deposit with Wachovia.

**ANSWER:**

Plaintiff denies the allegations of paragraph 77 of the Counterclaim, except admits that Wachovia delivered one or more documents titled as Notice of Collateral Demand.

78.     Beginning in the summer of 2007, CDO Plus began to object to Wachovia's Collateral Calls. Specifically, CDO Plus objected to Wachovia's calculation of Exposure.

**ANSWER:**

Plaintiff denies the allegations of paragraph 78 of the Counterclaim except admits that, beginning in the summer of 2007, Plaintiff began to object to Wachovia's demands for collateral in excess of the Independent Amount and questioned Wachovia's purported calculation of the value of the Reference Obligation.

79.     CDO Plus understood Wachovia's Collateral Calls to be demands for

**Transfers of Eligible Credit Support, and not demands for payments of Floating Amounts.**

> <u>**ANSWER:**</u>

Plaintiff denies the allegations set forth in paragraph 79 of the Counterclaim.

> **80.** **CDO Plus declined to invoke the Dispute Resolution provision of the Agreement for the first five months of the Transaction.**

> <u>**ANSWER:**</u>

Plaintiff admits the allegations set forth in paragraph 80 of the Counterclaim.

> **81.** **Wachovia's calculations of Exposure were commercially reasonable.**

> <u>**ANSWER:**</u>

Plaintiff denies the allegations set forth in paragraph 81 of the Counterclaim.

<u>CDO PLUS BREACHES THE AGREEMENT</u>

> **82.** **On November 21, 2007, Wachovia determined that the Credit Support Amount exceeded CDO Plus's Posted Credit Support by $550,000.00. Wachovia then sent CDO Plus a Notice of Collateral Demand requesting that CDO Plus deposit with Wachovia the outstanding collateral amount.**

> <u>**ANSWER:**</u>

Plaintiff denies the allegations set forth in paragraph 82 of the Counterclaim, except admits that on or about November 21, 2007, Wachovia transmitted a demand for additional collateral to Plaintiff.

> **83.** **CDO Plus refused to transfer the additional collateral and, in a letter dated November 21, 2007, invoked the Dispute Resolution provision of the Agreement.**

> <u>**ANSWER:**</u>

Plaintiff admits the allegations set forth in paragraph 83 of the Counterclaim.

84.     Because Wachovia's Collateral Calls are generated automatically, Wachovia continued to issue a Collateral Call every business day that CDO Plus failed to transfer the additional collateral due under the Agreement.

**ANSWER:**

Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 84 of the Counterclaim.

85.     Under the terms of the Dispute Resolution provision of the Agreement, if a party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount, it may notify the counterparty and the Valuation Agent that the Valuation Agent's calculation is disputed. The Valuation Agent then must recalculate the Exposure pursuant to the terms of paragraph 5 of the ISDA Credit Support Annex.

**ANSWER:**

Plaintiff responds that the allegations of paragraph 85 set forth a legal conclusion as to which no responsive pleading is required and respectfully refers the Court to the relevant transaction documents for a complete and accurate statement of their contents, and otherwise denies that it has any obligation to pay credit support pursuant to the ISDA Credit Support Annex.

86.     Pursuant to the terms of this Dispute Resolution provision, on November 26, 2007, Wachovia obtained four actual quotations at mid-market from Reference Market-makers for the purposes of calculating the Market Quotation. This valuation was the prescribed method for recalculating the Exposure pursuant to paragraph 5 of the ISDA Credit Support Annex.

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 86 of the Counterclaim, except

denies that it had any obligation to pay credit support pursuant to the ISDA Credit Support
Annex.

**87.     Based upon these quotations, Wachovia calculated the Market Quotation
as 96.5 percent.**

**ANSWER:**

Plaintiff denies knowledge or information sufficient to form a belief as to the
truth of the allegations in paragraph 87 of the Counterclaim.

**88.     A quotation of 96.5 percent of the Notional Amount, plus the Independent
Amount, meant that Wachovia was entitled to hold an additional $1,490,000 from CDO Plus
in collateral.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 88 of the Counterclaim.

**89.     The Market Quotation revealed that Wachovia's November 21, 2007
determination of Exposure was below the Market Quotation.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 89 of the Counterclaim.

**90.     The Market Quotation established that Wachovia's November 21, 2007
determination of Exposure was commercially reasonable.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 90 of the Counterclaim.

**91.     On November 26, 2007, Wachovia provided CDO Plus with copies of the four
quotations.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 91 of the Counterclaim.

92.     On November 27, 2007, Wachovia issued a Collateral Call to CDO Plus based upon the revised valuation of Exposure.

**ANSWER:**

Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 92 of the Counterclaim, except admits that on or around November 27, 2007, Wachovia yet again issued an improper demand for collateral.

93.     Under the terms of the Agreement, CDO Plus was required to meet the Collateral Call, by transferring to Wachovia the additional required collateral, by close of business on November 27, 2007.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 93 of the Counterclaim.

94.     CDO Plus failed to transfer the additional required collateral.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 94 of the Counterclaim.

95.     Instead, in an email dated November 27, 2007, CDO Plus stated: [w]ith regard to your email and margin call that we received today, we do not consider that the dispute resolution process we recently invoked to be resolved to our satisfaction. We are still in the process of securing our own market levels and analyzing the servicer's report. As the process is not complete, we are not ready to conclude as to a course of action."

**ANSWER:**

Plaintiff admits that it sent an e-mail to Wachovia on November 27, 2007 that stated the above quoted language.

96.     Under the terms of the Agreement, CDO Plus was required to transfer

the required collateral amount established by the Valuation Agent's revised calculation of Exposure, upon the demand made by Wachovia.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 96 of the Counterclaim.

**97.     CDO Plus breached the Agreement when it refused to transfer the additional collateral demanded by Wachovia on November 27, 2007.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 97 of the Counterclaim.

**98.     Under the terms of the Dispute Resolution provision of the Agreement, CDO Plus was not entitled to "seek [its] own market levels" as an alternative to the Valuation Agent's revised calculation; however, in an effort to remedy CDO Plus's breach of the Agreement, on November 27, 2007, Wachovia offered to review any additional market quotes that CDO Plus had obtained through its independent research.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 98 of the Counterclaim.

**99.     Wachovia requested that CDO Plus provide Wachovia with any additional market quotes by no later than 12 p.m., on Wednesday November 28, 2007.**

**ANSWER:**

Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegation set forth in paragraph 99 of the Counterclaim.

**100.     Despite Wachovia's efforts to remedy CDO Plus's breach of the Agreement, CDO Plus did not provide Wachovia with any additional market quotes.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 100 of the Counterclaim.

101.     Indeed, rather than provide Wachovia with any objective evidence that the Valuation Agent's revised calculation was incorrect, CDO Plus filed the Complaint in this action.

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 101 of the Counterclaim, except admits that Plaintiff brought the instant action to remedy Wachovia's persistent and unauthorized demands for collateral beyond the sums required to be paid in the form of the Independent Amount.

102.     Upon information and belief, CDO Plus never obtained any additional market quotes that were materially different from the quotes obtained by the Valuation Agent when it conducted the Dispute Resolution procedure.

**ANSWER:**

Plaintiff denies the allegations of paragraph 102 of the Counterclaim.

103.     CDO Plus's lawsuit against Wachovia constituted an Event of Default under the Agreement.

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 103 of the Counterclaim.

104.     On December 7, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Failure to Transfer. The Notice demanded that CDO Plus transfer the additional collateral due under the terms of the Agreement.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 104 of the Counterclaim, except admits that Wachovia wrongfully demanded that Plaintiff deposit additional sums as collateral

beyond the sums required to be paid in the form of the Independent Amount.

**105.    CDO Plus again refused to transfer the additional required collateral.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 105 of the Counterclaim.

**106.    On December 10, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Events of Default, which outlined the basis for CDO Plus's default on the Agreement.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 106 of the Counterclaim, except denies that Plaintiff was in fact in default under the swap agreement.

**107.    Under the terms of the Agreement, CDO Plus's default gave rise to an Event of Default, which gave Wachovia the right to cause an early termination of the Agreement.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 107 of the Counterclaim.

**108.    On December 13, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Early Termination for Event of Default. In that Notice, Wachovia designated December 18, 2007 as the Early Termination Date.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 108 of the Counterclaim, except admits that Wachovia unilaterally and without justification purported to terminate the swap agreement.

**109.    On the Early Termination Date, Wachovia calculated the amount due and payable by CDO Plus, pursuant to the terms of the Agreement.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 109 of the Counterclaim.

110.    **On December 20, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Amount Due Following Early Termination.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 110 of the Counterclaim, except admits that Wachovia unilaterally and without justification purported to terminate the swap agreement.

111.    **Based upon Wachovia's calculation, which was made in accordance with the terms of the Agreement, the amount due and payable to Wachovia was $9,999,000.00.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 111 of the Counterclaim.

112.    **Pursuant to the terms of the Agreement, CDO Plus was required to pay Wachovia $9,999,000.00, plus interest from the Early Termination Date.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 112 of the Counterclaim.

113.    **CDO Plus refused to pay the amount due as a result of the Early Termination of the Agreement.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 113 of the Counterclaim.

114.    **On December 27, 2007, Wachovia exercised its right to liquidate CDO Plus's Posted Collateral Amount (which was the sum of the Collateral Transferred to Wachovia, $8,920,000.00, plus Interest Amounts, $61,290.34) and apply the proceeds against the Settlement Amount due as a result of the Early Termination of the Agreement.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 114 of the Counterclaim, except admits that Wachovia improperly exercised a set-off against the sums that it had improperly collected and maintained as collateral.

115. **The liquidation proceeds due and payable to Wachovia were $8,968,138.88 (which was the difference of the Posted Collateral Amount, $8,981,290.34, and interest due and payable to Wachovia at the Default Rate, $13,151.46). Pursuant to paragraph 8 of the ISDA Credit Support Annex, Wachovia exercised its right to apply the proceeds against the Settlement Amount, $9,999,000.00. After liquidation of the Posted Collateral against the Settlement Amount, Wachovia is still owed $1,030,861.12 (which was the difference of $9,999,000.00 and $8,968,138.88).**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 115 of the Counterclaim.

116. **On December 27, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with formal Notice of Amount Due Following Application of Collateral, and requested that CDO Plus make immediate payment of the remaining unpaid Settlement Amount, which was $1,030,861.12.**

**ANSWER:**

Plaintiff denies the allegation set forth in paragraph 116 of the Counterclaim, except admits that Wachovia demanded that Plaintiff pay Wachovia the sum of $1,030,861.12 in violation of the swap agreement.

117. **The December 27, 2007 letter also placed CDO Plus on notice of its obligation, pursuant to paragraph 11 of the ISDA Credit Support Annex, to indemnify and hold harmless Wachovia for and against all reasonable out-of-pocket expenses, including**

**legal fees incurred by Wachovia by reason of enforcement and protection of its rights under the Agreement.**

    **ANSWER:**

    Plaintiff denies the allegation set forth in paragraph 117 of the Counterclaim, and otherwise respectfully refers the Court to the letter referenced therein for a complete and accurate statement of its contents.

    **118.    CDO Plus refused to pay the remaining unpaid Settlement Amount.**

    **ANSWER:**

    In response to the allegations set forth in paragraph 118 of the Counterclaim, Plaintiff admits that it has refused to pay the sums purportedly demanded as the "Settlement Amount," but denies that Wachovia had any right to close out and settle the swap.

    **119.    CDO Plus also refused to meet its indemnity obligations under the Agreement.**

    **ANSWER:**

    Plaintiff denies the allegation set forth in paragraph 119 of the Counterclaim.

    **120.    On January 30, 2008, the Reference Obligation experienced an Event of Default.**

    **ANSWER:**

    Plaintiff denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 120 of the Counterclaim.

    **121.    On February 8, 2008, Moody's downgraded the Reference Obligation to "Ca".**

    **ANSWER:**

    Plaintiff denies knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in paragraph 121 of the Counterclaim.

**FIRST CAUSE OF ACTION**

**122.   [Counterclaim] - Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.**

**ANSWER:**

Plaintiff/Counterclaim Defendant repeats and realleges the responses given to each and every one of the paragraphs of the Counterclaim set forth above, as if fully set forth herein.

**123.   Wachovia and CDO Plus entered into the Agreement in May 2007.**

**ANSWER:**

Plaintiff admits the allegations set forth in paragraph 123 of the Counterclaim, except responds that to the extent that Wachovia defines the "Agreement" as including an obligation to post Credit Support pursuant to the ISDA Credit Support Annex, Plaintiff denies that such an obligation existed, inasmuch as the Confirmation supersedes the ISDA Credit Support Annex.

**124.   Wachovia performed all of its obligations under the Agreement.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 124 of the Counterclaim.

**125.   At all times, Wachovia acted in good faith and in a commercially reasonable manner.**

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 125 of the Counterclaim.

**126.   CDO Plus breached the Agreement by, among other things: (1) refusing to transfer the Eligible Credit Support required under the Agreement; (2) refusing to pay the amount due following the Early Termination Event; (3) refusing to pay the remaining**

unpaid Settlement Amount, with interest thereon; and (4) refusing to indemnify Wachovia pursuant to the terms of the Agreement.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 126 of the Counterclaim.

127.    In addition, filing the Complaint in this action constituted an Event of Default pursuant to Section 5 of the ISDA Master.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 127 of the Counterclaim.

128.    As a result of CDO Plus's breach of the Contract, Wachovia has been damaged in an amount to be determined at trial.

**ANSWER:**

Plaintiff denies the allegations set forth in paragraph 128 of the Counterclaim.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

The allegations of the Counterclaim, in whole or in part, fail to state a claim for which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff's performance under the swap agreement should be excused on the ground of mistake, namely, that Plaintiff intended only to secure Wachovia against an actual credit default on the part of the reference obligation, and not against daily fluctuations in the mark-to-market valuation of the reference obligation.  Plaintiff's mistake was excusable because Wachovia did not alert Plaintiff of its intentions to demand the payment of sums other than Floating Payments when the Confirmation Letter was executed, as the result of which it would be unconscionable to require Plaintiff to pay Wachovia the notional amount of the reference obligation.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

The damages, if any, alleged to have been suffered by Wachovia are subject to offset by damages Wachovia caused to Plaintiff as the result of Wachovia's fraud and breach of the swap agreement. As more fully alleged in the Amended Complaint, Wachovia and its traders induced Plaintiff to enter into the swap by misrepresenting its intention to allow Plaintiff to collateralize the swap through the payment of an Independent Amount no greater than $750,000, with the undisclosed intention of securing the position later by demanding greater amounts of collateral. But for Wachovia's misrepresentation, Plaintiff would not have agreed to enter into the swap with Wachovia.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

The damages, if any, alleged to have been suffered by Wachovia were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of Wachovia or others over whom Wachovia exercised control.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

To the extent that Wachovia was entitled to demand collateral at all, Plaintiff was entitled to suspend its performance upon Wachovia's own breach of the swap agreement.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

Plaintiff has already paid all monies due and owing under the terms of the swap agreement.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

Wachovia has failed to mitigate any damages it has allegedly suffered.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

Plaintiff reserves the right to rely on such other additional defenses as may become available or apparent during discovery.

Dated: New York, New York
       March 6, 2008

**MINTZ & GOLD LLP**

/s/ Terence W. McCormick
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

To:    **HUNTON & WILLIAMS LLP**
       Patrick L. Robson, Esq.
       Bank of America Plaza, Suite 3500
       101 South Tryon Street
       Charlotte, North Carolina 28280

       Shawn Patrick Regan, Esq.
       200 Park Avenue
       New York, New York 10166-0091
       *Attorneys for Defendant*
       *Wachovia Bank, N.A.*

*EXHIBIT D TO ROBSON DECLARATION*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------X

CDO PLUS MASTER FUND LTD.,                                     :

                         Plaintiff,        :

        v.                                                   :

WACHOVIA BANK,                                                :
NATIONAL ASSOCIATION,                                         :

                    Defendant.        :
-----------------------------------------------------X

0 7 6 0 3 9 1 6

Index No. _____ / 2007

Date Purchased: November 28, 2007

**SUMMONS**

Plaintiff designates N.Y. County as
the place for trial

**FILED**
NOV 2 8 2007
NEW YORK
COUNTY CLERK'S OFFICE

*To:  The Above Named Defendant:*

    **YOU ARE HEREBY SUMMONED** to serve a copy of your answer on Plaintiff's attorney(s) within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

    The basis of venue is a written agreement between the parties fixing New York County as the place of trial.

Dated: New York, New York
       November 28, 2007

                          **MINTZ & GOLD LLP**

                          *Terence W. McCormick*

                          Steven G. Mintz
                          Steven W. Gold
                          Terence W. McCormick
                          470 Park Avenue South
                          10th Floor North
                          New York, New York 10016-6819
                          Tel: (212) 696-4848

Defendant's address:
Wachovia Bank, N.A.
301 South College Street, DC-8
Mailcode: NC0600
Charlotte, NC 28202-0600

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------X
CDO PLUS MASTER FUND LTD.,                  :

                                    Plaintiff,          :          Index No. _____/2007

                                                       :          **VERIFIED COMPLAINT**
            - against -                                 :

WACHOVIA BANK,                                          :          0 7 6 0 3 9 1 6
NATIONAL ASSOCIATION,
                                                       :

                                    Defendant.          :
-----------------------------------------------------------X

**FILED**

NOV 2 8 2007

NEW YORK
COUNTY CLERK'S OFFICE

### Introduction

1.      This action concerns a classic "bait and switch" by the Defendant,

Wachovia Bank, National Association ("Wachovia"), in which Wachovia fraudulently

induced the Plaintiff, CDO Plus Master Fund Ltd., to enter into a credit derivative

transaction, or "swap," through the offer of more favorable margin terms than Wachovia

actually intended to honor.  In reliance upon Wachovia's representations, Plaintiff

entered into the trade and deposited $750,000 to collateralize the swap.  Within weeks of

the trade, however, Wachovia demanded unreasonably high amounts of additional margin

even though there had been no principal or interest default or a write-down in the

underlying instrument (an investment-grade collateralized debt obligation, or "CDO").

Perhaps in a panic over recent turmoil in the debt markets caused by a crisis in sub-prime

mortgage defaults, Wachovia purportedly determined, without any reasonable basis, that

the creditworthiness of the reference obligation had drastically deteriorated in the scant

weeks that had passed since it entered into the swap with the Plaintiff.

2.    Wachovia calculated the amount of required margin in bad faith, demanding far more security than could conceivably be needed to protect the position – all at the expense of Plaintiff's liquidity and, hence, its ability profitably to use its capital to trade elsewhere and realize profits for Plaintiff's investors. Plaintiff seeks rescission of the swap transaction, the return of all sums Plaintiff deposited as collateral, damages and/or a permanent injunction against further violations by Wachovia.

### The Parties

3.    Plaintiff is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

4.    Upon information and belief, Wachovia is a national banking association with a principal place of business at 301 South College Street, Charlotte, North Carolina.

### Jurisdiction and Venue

5.    In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

### Substantive Allegations

6.    Plaintiff is a hedge fund with approximately $50,000,000 of funds under management.

7.    On or about May 21, 2007, Plaintiff entered into a credit default swap transaction with Wachovia.

8.    A credit default swap is a contract under which two financial institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this case, a CDO. A credit default swap bears some similarities to an insurance policy, except that neither

2

counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

9.      In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007 Class 1-A, which were issued pursuant to an Indenture dated April 11, 2007.[1]

10.     The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

11.     By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA documents, the terms of the Confirmation Letter control, unless otherwise stated.

---

[1]      Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's credit risk, the amount of the debt obligation on which the fee is calculated (and for which the seller agrees to undertake credit exposure in return) is termed the "notional" amount.

12.    When Plaintiff and Wachovia executed the swap, Plaintiff paid Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the "independent amount." For purposes of clarity, however, this Complaint instead refers to the deposit of $750,000 as the "initial margin." The purpose of the initial margin was to secure Wachovia against the credit risk of the counterparty (Plaintiff).

13.    Under the Confirmation Letter, the only payments that Wachovia may demand from Plaintiff *after* the initial margin are "Floating Payments." Wachovia may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Wachovia) that: (i.) the obligor on the reference obligation (the CDO) had failed to make a required principal or a scheduled interest payment or (ii) a write-down had taken place according to the method prescribed by the reference obligation's governing instrument – *not* on the basis of the perceived creditworthiness of the counterparty (Plaintiff).

14.    Apart from the initial margin, the Confirmation Letter does not otherwise authorize Wachovia to demand payments of any kind to secure Wachovia against the credit risk of the counterparty.

15.    In or about April 2007, before the parties entered into the swap agreement, Wachovia had originally demanded initial margin in the amount of $1,500,000, but Plaintiff informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial margin were reduced to $750,000.

16.    Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms, knowing at the time that it would simply contrive later to demand more

4

collateral on the pretext of a decline in the mark-to-market value of the reference

obligation, *i.e.*, once Plaintiff was locked into to the trade. (The CDO matures in 2053).

17.    Plaintiff wired the $750,000 of initial margin to Wachovia's account on or

about May 30, 2007.

18.    However, less than three weeks later, Wachovia demanded an additional

amount of collateral, requiring a deposit of $320,000 on or about June 18, 2007. Several

days later, Wachovia requested an additional $430,000. Tellingly, the sum of the initial

margin and these two latter deposits comes to a total of $1,500,000 – precisely the

amount that Wachovia had wanted in the first instance and that Plaintiff had thought it

had bargained down to $750,000.

19.    Nor was Wachovia finished at $1,500,000. Wachovia continued to

ratchet up its demands for margin over the weeks that followed:

| Date | Amount |
|---|---|
| May 30, 2007 | $750,000 (initial deposit) |
| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |
| July 20, 2007 | $740,000 |
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, 2007 | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |

| October 30, 2007 | $850,000 |
|---|---|
| November 1, 2007 | $620,000 |

20.    In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a period

of five months purportedly to secure Wachovia against a total credit risk of $10,000,000

from an investment-grade debt instrument.

21.    However, upon information and belief, during the entire period described

in the table above, and as of the date of this Complaint, the reference obligation (Forge

ABS High Grade CDO Ltd, 2007 Class 1-A) had not experienced any shortfall in

principal or interest payments whatsoever.

22.    Also upon information and belief, during the same period, no write-down

had taken place according to the reference obligation's controlling documents resulting in

any reduction of the outstanding principal amount of the reference obligation, nor had

any other write-down taken place such that Plaintiff could properly have been required to

make any payment to Wachovia.  Upon information and belief, from the date when

Wachovia and Plaintiff first entered into the credit default swap, and as of the date of this

Complaint, the reference obligation has at all times been and continues to be an

investment grade debt instrument.

23.    Under paragraph 6(b) of the Confirmation Letter, Wachovia, as

calculation agent, was obliged to determine Plaintiff's obligation to post additional

margin *solely* upon the basis of a report of the servicer of the underlying reference

obligation.[2]

---

[2]    Under a collateralized debt obligation, a servicer (which is often the originator of the debt
instruments pooled in the CDO) performs the ministerial task of calculating payment amounts and
preparing reports regarding the interest and principal due to be paid on the CDO.

6

24.    At first, Plaintiff delivered the additional collateral requested by Wachovia without protest. However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over *40%* of the notional amount.

25.    Although the overall CDO market had certainly experienced considerable turmoil during the summer of 2007, no deterioration of the credit risk of the reference obligation had occurred of such magnitude that Plaintiff should have been required to deposit in excess of $4,000,000 in collateral to secure Wachovia.

26.    While one rating agency, Fitch, had downgraded the reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not constitute a credit event within the meaning of the swap documents. No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

27.    Moreover, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

28.    In such an event, Wachovia would be required to *return* a portion of the collateral to Plaintiff, and certainly not to demand more. Even assuming that Wachovia faced exposure on the reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of such exposure would in every case call for a payment by Plaintiff to Wachovia. Indeed, Plaintiff's calculations clearly show that a return of some of the posted collateral should have been returned by Wachovia.

7

29.     In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

30.     Wachovia admitted that it had *not* used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

31.     Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

32.     Thus, the margin calls have been expressly used to secure Wachovia not against any objectively verifiable credit risk of the reference obligation but the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

33.     As of the date of this Complaint, Plaintiff has delivered $8,920,000 in collateral against the notional amount of $10,000,000.

34.     On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

35.     Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

36.     In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

37.     At first, Wachovia did not respond to the November 21 letter.

8

38.     Instead, on the next business day, which was the day after Thanksgiving, Wachovia sent a new margin call, this time in the amount of $810,000.

39.     Intriguingly, the margin call for November 23, 2007, which demanded $260,000 more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the following Collateral Movement as of Close of Business of 22 November 2007," which was Thanksgiving Day.

40.     As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved.

41.     On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000.

42.     It was not until later in the day that Wachovia finally held a conference call with Plaintiff's principals to attempt a resolution of the dispute.

43.     When asked why Wachovia had suddenly started sending daily margin calls, Wachovia's counsel responded that Wachovia marked the position to market daily (even though Wachovia had never issued daily margin calls to Plaintiff before).

44.     On November 27, 2007, Wachovia sent yet another margin call, this time calling for $1,490,000 of additional collateral, for a total of $10,410,000 – almost half a million dollars *more* than the notional amount of the swap!

9

45.    Wachovia also sent four market quotations of the swap, expressed in "points upfront," which purported to justify Wachovia's exorbitant margin calls, *i.e.*, on the ground that the swap (not the reference obligation) was essentially worthless.

46.    At the same time, Wachovia finally included a copy of the servicer's report, which revealed that none of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

47.    Upon reviewing the servicer's report, it became apparent to Plaintiff that Wachovia had not calculated its exposure on the basis of the data in the servicer's report, as it was required to by the terms of the Confirmation Letter, and has therefore overstated its requirement for collateral.

48.    The creditworthiness of the reference obligation has not been impaired, and certainly not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

49.    The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO is commercially unreasonable – indeed, absurd – and unnecessarily ties up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

50.    At the same time, it allows Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

10

## AS AND FOR A FIRST CAUSE OF ACTION
### (For Rescission)

51.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

52.     Wachovia made numerous false representations to, and concealed material existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure Wachovia against its perceived counterparty risk.

53.     In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

54.     The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

55.     But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia.

56.     By reason of the foregoing, Plaintiff is entitled to rescission of the swap, restitution by Wachovia of all sums paid by Plaintiff to date, including without limitation the initial margin and all further sums paid as collateral, and incidental damages incurred in connection with the negotiation, execution and consummation of the swap.

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Damages from Wachovia's Fraud)

57.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

58.     The misrepresentations and omissions set forth herein were engaged in by Wachovia with intent to deceive Plaintiff and constitute fraud under principles of

11

common law entitling Plaintiff to an award of compensatory damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

59.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

60.     Plaintiff has performed all of its obligations under the swap agreement.

61.     Wachovia has breached the agreement, *inter alia*, by demanding the deposit of collateral far in excess of the amount actually required.

62.     Plaintiff has been thereby damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

63.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

64.     By gradually making oppressive margin demands without justification, Wachovia acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap agreement, namely, the premium to be paid by Wachovia on the notional amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually required to secure counterparty risk and credit risk.

65.     To the extent that the swap agreement gave Wachovia any discretion as calculation agent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Wachovia not to act arbitrarily or irrationally in exercising that discretion.

66.     By extracting collateral from Plaintiff far in excess of what Wachovia actually required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

12

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

67.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

68.     By extracting an unnecessarily large amount of collateral from Plaintiff, Wachovia received money properly belonging to the Plaintiff.

69.     Wachovia has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Wachovia should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (For a Permanent Injunction)

70.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

71.     Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

72.     If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

73.     The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

74.     The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Conversion)

75.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

76.     Wachovia has retained, and willfully and unlawfully continues to retain, the excess collateral properly belonging to Plaintiff.

77.     Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.


**WHEREFORE,** Plaintiff demands judgment as follows:

A.     On the Second, Third, Fourth and Seventh Causes of Action, damages in an amount to be determined at trial, including an award of punitive damages, plus interest and costs, against Wachovia;

B.     On the First and Fifth Causes of Action, restitution of the sums paid by Plaintiff to Wachovia under the swap agreement;

C.     On the First Cause of Action, an equitable rescission of the swap agreement;

D.     On the Sixth Cause of Action, an order permanently enjoining Wachovia from future breaches of the swap agreement; and

14

E.    Such other and further relief as to the Court may seem proper and

equitable, including an award of reasonable attorney's fees.

Dated: New York, New York
       November 28, 2007

                                        Respectfully submitted,

                                        **MINTZ & GOLD LLP**

                                        *Terence W. McCormick*
                                        _____
                                        Steven G. Mintz
                                        Steven W. Gold
                                        Terence W. McCormick
                                        470 Park Avenue South
                                        10th Floor North
                                        New York, New York 10016-6819
                                        Tel: (212) 696-4848
                                        Fax: (212) 696-1231
                                        *Counsel for Plaintiff*
                                        *CDO Plus Master Fund Ltd.*

15

## VERIFICATION

STATE OF FLORIDA )
                             ) ss.:
COUNTY OF PALM BEACH )

      The undersigned, Don Uderitz, being duly sworn, deposes and says:

      1.     I am Director of CDO Plus Master Fund Ltd., the Plaintiff described in the above-captioned complaint.

      2.     I have read the foregoing Verified Complaint and I know its contents to be true as to all matters within my personal knowledge. As to those matters not within my personal knowledge, I believe the contents to be true.

Dated: New York, New York
       November 27, 2007

                                      _____
                                    Don Uderitz

Subscribed and sworn to before me this 27th day
of November, 2007.

_____
Notary Public

ANDREA MILLER
Notary Public - State of Florida
My Commission Expires May 2, 2008
Commission # DD310533
Bonded By National Notary Assn.

16

ORIGINAL

ALL-STATE LEGAL®
07181-BF • 07182-BL • 07183-GY • 07194-WH
800.222.0510 www.aslegal.com

*Index No.* _____    *Year* 20 **07**

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

CDO PLUS MASTER FUND LTD.,

Plaintiff,

- against -

WACHOVIA BANK,
NATIONAL ASSOCIATION,

Defendant.

## SUMMONS AND COMPLAINT

*Attorney(s) for*   *Plaintiff*

*Office Address & Tel. No.:*
**MINTZ & GOLD LLP**
470 Park Avenue South – 10th Floor North
New York, NY 10016
(212) 696-4848

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:* November 28, 2007    Signature *Terence W. McCormick*

Print Signer's Name............ **Terence W. McCormick**

*Service of a copy of the within* _____    *is hereby admitted.*

*Dated:*

_____
*Attorney(s) for*

## PLEASE TAKE NOTICE

☐ **NOTICE OF ENTRY**   *that the within is a (certified) true copy of a*
*entered in the office of the clerk of the within-named Court on*    20

☐ **NOTICE OF SETTLEMENT**   *that an Order of which the within is a true copy will be presented for settlement to the Hon.*    *, one of the judges of the within-named Court,*
*at*
*on*    20    *, at*    *M.*

*Dated:*

*Attorney(s) for*

*EXHIBIT E TO ROBSON DECLARATION*

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of May 4, 2007

**WACHOVIA BANK,**                      and   **CDO PLUS MASTER FUND LTD.**
**NATIONAL ASSOCIATION**                       ("Party B")
("Party A")

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**WACHOVIA BANK, NATIONAL ASSOCIATION**

By: _Alexis S. Alpert_
Name: Alexis S. Alpert
Title: Vice President

**CDO PLUS MASTER FUND LTD.**

By: _____
Name: DONALD S. UPERITZ.
Title: DIRECTOR.

ISDA® 1992

(Multicurrency—Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................

...................................................................... and ................................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

## 1.    Interpretation

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.    Obligations

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

      (i)    in the same currency; and

      (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

      (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

          (1)    promptly notify the other party ("Y") of such requirement;

          (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

          (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

          (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

             (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

             (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability*. If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)   any other documents specified in the Schedule or any Confirmation; and

   (iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)     *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)     *Credit Support Default.*

        (1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)     *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)     *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **_Effect of Designation._**

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **_Calculations._**

(i) **_Statement._** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) **_Payment Date._** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **_Payments on Early Termination._** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) **_Events of Default._** If the Early Termination Date results from an Event of Default:—

(1) **_First Method and Market Quotation._** If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) **_First Method and Loss._** If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) **_Second Method and Market Quotation._** If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)  *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

## 9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)   if sent by telex, on the date the recipient's answerback is received;

    (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

........................................
(Name of Party)

........................................
(Name of Party)

By: ....................................
    Name:
    Title:
    Date:

By: ....................................
    Name:
    Title:
    Date:

ISDA® 1992

(Multicurrency—Cross Border)



International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## Master Agreement

dated as of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

between . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   and  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

               ("Party A")                                                      ("Party B")

## Part 1. Termination Provisions.

(a)   *"Specified Entity"* means in relation to Party A for the purpose of:—

      Section 5(a)(v), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(a)(vi), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(a)(vii), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(b)(iv), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                            and in relation to Party B for the purpose of:—

      Section 5(a)(v), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(a)(vi), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(a)(vii), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Section 5(b)(iv), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(b)   *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

      another meaning is specified here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(c)   The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A

                                                 will/will not * apply to Party B

      If such provisions apply:—

      *"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

      another meaning is specified here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

_____
   * Delete as applicable.

ISDA® 1992

*"Threshold Amount"* means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A

will/will not * apply to Party B

(e)    The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A

will/will not * apply to Party B

(f)    *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement:—

(i)    Market Quotation/Loss * will apply.

(ii)    The First Method/The Second Method * will apply.

(g)    *"Termination Currency"* means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., if such currency is specified and freely available, and otherwise United States Dollars.

(h)    *Additional Termination Event* will/will not apply*. The following shall constitute an Additional

Termination Event:— . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties shall be:— . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Part 2. Tax Representations.

(a)    *Payer Representations.* For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the following representation and Party B will/will not* make the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    *Payee Representations.* For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

(i)    The following representation will/will not* apply to Party A and will/will not* apply to Party B:—

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the Specified Treaty with respect to any payment described in such provisions and received or to be received

---

* Delete as applicable.

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then:—

*"Specified Treaty"* means with respect to Party A ....................................................................

*"Specified Jurisdiction"* means with respect to Party A ..........................................................

*"Specified Treaty"* means with respect to Party B ....................................................................

*"Specified Jurisdiction"* means with respect to Party B ..........................................................

(ii)   The following representation will/will not* apply to Party A and will/will not* apply to Party B:—

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then:—

*"Specified Jurisdiction"* means with respect to Party A ..........................................................

*"Specified Jurisdiction"* means with respect to Party B ..........................................................

(iii)   The following representation will/will not* apply to Party A and will/will not* apply to Party B:—

(A)   It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)   Other Payee Representations:—   ...............................................................................

.................................................................................................................................

.................................................................................................................................

.................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

* Delete as applicable.

ISDA® 1992

**Part 3. Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a) Tax forms, documents or certificates to be delivered are:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ................... | ............................. | ............................................. |
| ................... | ............................. | ............................................. |
| ................... | ............................. | ............................................. |
| ................... | ............................. | ............................................. |
| ................... | ............................. | ............................................. |

(b) Other documents to be delivered are:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ................... | ............................. | ................... | Yes/No* |
| ................... | ............................. | ................... | Yes/No* |
| ................... | ............................. | ................... | Yes/No* |
| ................... | ............................. | ................... | Yes/No* |
| ................... | ............................. | ................... | Yes/No* |

**Part 4. Miscellaneous.**

(a) *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address:    ...............................................................................

Attention:    ...............................................................................

Telex No.:    .................................... Answerback: ...........................

Facsimile No.:    .................................... Telephone No.: ...........................

Electronic Messaging System Details:    ...............................................

Address for notices or communications to Party B:—

Address:    ...............................................................................

Attention:    ...............................................................................

Telex No.:    .................................... Answerback: ...........................

---

* Delete as applicable.

ISDA® 1992

Facsimile No.: .................................... Telephone No.: ........................

Electronic Messaging System Details: ...............................................................

(b)  *Process Agent.* For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent ...................................................................

Party B appoints as its Process Agent ...................................................................

(c)  *Offices.* The provisions of Section 10(a) will/will not* apply to this Agreement.

(d)  *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:—

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices:—

..........................     ..........................     ..............................

..........................     ..........................     ..............................

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices:—

..........................     ..........................     ..............................

..........................     ..........................     ..............................

(e)  *Calculation Agent.* The Calculation Agent is ..........................., unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)  *Credit Support Document.* Details of any Credit Support Document:— ..........................
.......................................................................................................
.......................................................................................................
.......................................................................................................

(g)  *Credit Support Provider.* Credit Support Provider means in relation to Party A, ....................
.......................................................................................................
.......................................................................................................

Credit Support Provider means in relation to Party B, ...................................
.......................................................................................................
.......................................................................................................

(h)  *Governing Law.* This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference to choice of law doctrine) *.

---

* Delete as applicable.

23                                                                    ISDA® 1992

(i)  *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from . . . . . . . . . . . . . . . . . . . . . . . . . . *). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(j)  *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Part 5. Other Provisions.**

---
* Delete as applicable.

ISDA® 1992

*EXHIBIT F TO ROBSON DECLARATION*

SCHEDULE
to the
MASTER AGREEMENT
dated as of May 4, 2007 between
WACHOVIA BANK, NATIONAL ASSOCIATION ("Party A")
and CDO PLUS MASTER FUND LTD. ("Party B")

Part 1. **Termination Provisions**

(a)    "Specified Entity" means each party's Affiliates for purposes of Section 5(a)(v), and in addition, with respect to Party B, Specified Entity means any Investment Vehicle (as hereinafter defined) for purposes of Section 5(a)(vii).

(b)    "Specified Transaction". The definition of *"Specified Transaction"* in Section 14 of this Agreement is hereby amended by: (1) deleting in the second through the fifth lines thereof the words "between one party ... which is a" and replacing them with the words "(i) in the case of Party A, between Party A and Party B (or any Credit Support Provider of such party or any applicable Specified Entity of such party), and (ii) in the case of Party B, between Party B (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and any other person or entity, including without limitation Party A, including without limitation any" and (2) adding the text "commodity transaction, credit derivative transaction, repurchase or reverse repurchase transaction, forward bond purchase transaction, buy/sell-back transaction, securities lending transaction, exchange-traded futures transaction, prime brokerage or margin lending transaction," after the words "foreign exchange transaction," in the sixth line thereof.

(c)    "Cross Default" applies to both parties.

       "Specified Indebtedness" means any obligation (whether present, future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money or relating to the payment or delivery of funds, securities or other property (including, without limitation, collateral), other than indebtedness in respect of any bank deposits received in the ordinary course of business.

       "Threshold Amount" means, with respect to Party A, an amount (including its equivalent in another currency) equal to 2% of its stockholders' equity as reflected on its most recent financial statements or call reports, and with respect to Party B, the lower of $10,000,000 or 2% of the Net Asset Value of Party B, provided that for any Specified Indebtedness payable by Party B (or any Specified Entity or Credit Support Provider of Party B) to Party A or to any of Party A's Affiliates, Threshold Amount means any amount of such Specified Indebtedness.

(d)    "Credit Event Upon Merger" applies to both parties.

(e)    "Automatic Early Termination" does not apply to either party.

       (i) Notwithstanding the foregoing, if the bankruptcy or insolvency laws of the jurisdiction in which the Defaulting Party is organized or formed do not expressly permit the Non-defaulting Party to exercise its rights under Section 6(a) for an Event of Default under Section 5(a)(vii)(4) or (5) with respect to the Defaulting Party, then Automatic Early Termination shall apply to the Defaulting Party.

       (ii) In addition to the provisions of Section 6(e)(iii), if an Early Termination Date occurs under Section 6(a) as the result of Automatic Early Termination, and if the Non-defaulting Party determines that it either sustained or incurred a loss or damage or benefited from a gain in respect of any Transaction, as a result of any change in one or more rates, prices, yields, quotations, volatilities, spreads or other measures of

19

economic value or risk relevant to that Transaction or to any related hedge of the Non-defaulting Party between that Early Termination Date and the date upon which the Non-defaulting Party first becomes aware of the occurrence of that Early Termination Date, then the Termination Currency Equivalent of the amount of such loss or damage shall be added to the amount due by the Defaulting Party or deducted from the amount due by the Non-defaulting Party, as the case may be (in both cases pursuant to Section 6(e)(i)(3)), or the Termination Currency Equivalent of the amount of such gain shall be deducted from the amount due by the Defaulting Party or added to the amount due by the Non-defaulting Party, as the case may be (in both cases pursuant to Section 6(e)(i)(3)).

(f)   **Payments on Early Termination.** Except as otherwise provided herein or in a Confirmation with respect to a Transaction, "Market Quotation" and the "Second Method" apply.

(g)   **"Termination Currency"** means U.S. Dollars.

(h)   **Bankruptcy.** The Bankruptcy provisions of Section 5(a)(vii) shall apply to Party A and Party B, provided that, with respect to Party B, such provisions shall be amended by deleting the number "30" appearing in clauses (4)(B) and (7) thereof and substituting "0" in lieu thereof.

(i)   **"Additional Termination Event"** applies to Party B and shall mean the occurrence of any of the following events (and for such purpose, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions):

(i)    Party B fails to notify Party A of Party B's Net Asset Value in accordance with the terms of Part 3 of this Schedule.

(ii)    On any date, Party B's Net Asset Value declines by 15% or more (x) during the prior 30 days or (y) since the preceding calendar month-end.

(iii)    On any date, Party B's Net Asset Value declines by 20% or more (x) during the prior 90 days or (y) since Party B's preceding fiscal quarter-end.

(iv)    On any date, Party B's Net Asset Value declines by 30% or more (x) during the prior 365 days, or (y) since Party B's preceding fiscal year-end.

(v)    On any date, the Net Asset Value of Party B is less than the greater of (A) USD 13,000,000 or (B) 60% of the highest fiscal year end Net Asset Value of Party B at any fiscal year end, beginning with the audited annual financial statements for the fiscal year ended December 31, 2007.

(vi)    (A) rékon advisors llc (the "Investment Manager") ceases to be the Investment Manager, (B) the Investment Manager becomes, in the reasonable opinion of Party A, incapable of performing its duties as Investment Manager or otherwise fails to act on behalf of Party B in principally the same or similar capacity as that held as of the date of this Agreement, or an event of the type specified in Section 5(a)(vii) occurs with respect to the Investment Manager, or (C) Party B appoints another investment manager, and in the case of (A), (B) and (C) above, such investment manager shall not have been replaced with another person or entity satisfactory to Party A, as evidenced in writing by Party A and thereafter, the term "Investment Manager" shall refer to such successor.

(vii)    (A) any of Party B's Operative Documents are terminated or cease to be in full force and effect, or (B) there is a change to or modification of Party B's Operative Documents, investment policies or guidelines or to the nature of Party B's business, if Party A determines that such action has had, or will have, a material adverse effect on Party B, the creditworthiness of Party B or the ability of Party B to perform its obligations under this Agreement.

20

(viii)    Donald Uderitz or Jorge Rodriquez-Lugo dies, is declared incompetent or is no longer an employee or in control of Party B or the Investment Manager or ceases to be involved in the investment decisions of Party B, in principally the same or similar capacity as that held as of the date of this Agreement

(j)    **Events of Default.** An Event of Default shall not occur with respect to a party under Section 5(a)(v)(1) or (2) or Section 5(a)(vi) when the failure to pay or deliver, or the default, event of default or other similar condition or event, as the case may be, arises solely (i) out of a wire transfer problem or an operational or administrative error or omission (so long as the required funds or property required to make that payment or delivery were otherwise available to that party), or (ii) from the general unavailability of the relevant currency due to exchange controls or other similar governmental action, but in either case only if the payment or delivery is made within three Local Business Days after the problem has been corrected, the error or omission has been discovered or the currency becomes generally available.

(k)    **Optional Early Termination.**  (A) Unless a Confirmation of a Transaction provides otherwise, and subject to the prior exercise of any early termination, optional termination or cash settlement provisions contained in such Confirmation, either party may elect to designate any Optional Termination Date as an "Early Termination Date" for that Transaction by giving notice to the other party of such election, provided that (i) such Transaction does not otherwise become a Terminated Transaction on or before such Optional Termination Date under Section 6(e) of this Agreement, and (ii) an Event of Default, a Potential Event of Default or a Termination Event does not exist with respect to the party making the election. Any such notice shall be in writing, shall identify the relevant Transaction and Optional Termination Date being designated, shall be given at least five (5) New York Business Days prior to the designated Optional Termination Date for that Transaction, and may be given no more than once with respect to the same Transaction. As used herein, "Optional Termination Date" for a Transaction means the second anniversary of the Trade Date of that Transaction and any New York Business Day thereafter prior to the Termination Date of such Transaction, subject in each case to the Modified Following Business Day Convention.

(B) Unless the parties otherwise agree on the early termination date and the amount, due date and payer of the early termination payment to be made, any Transaction for which an election is made in accordance with clause (A) above will terminate in accordance with Section 6(c)(ii) of this Agreement and be replaced by an obligation of one party to make a payment for that Transaction under Section 6(e) of this Agreement. For that purpose, a "Termination Event" shall be deemed to occur on the Optional Termination Date with respect to that Transaction as the "Terminated Transaction", and the party making such election shall be the sole "Affected Party". Such payment will be due in accordance with Section 6(d)(ii) of this Agreement.

**Part 2. Tax Representations**

(a)    **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, each party makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.

In making this representation, a party may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that

21

it shall not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   **Payee Tax Representations.**   For the purpose of Section 3(f) of this Agreement:

(i) Party A makes the following representation(s):

(A) It is a national banking association organized or formed under the laws of the United States and is a United States resident for United States federal income tax purposes.

(B) Party A makes no other Payee Tax Representations.

(ii) Party B makes the following representation(s):

(A) It is an exempt company organized under the laws of Jersey.

(B) It is a "non-U.S. branch of a foreign person" as that term is used in Section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" as that term is used in Section 1.6041-4(a)(4) of the United States Treasury Regulations.

(C) Each payment received or to be received by it in connection with this Agreement will not be effectively connected with its conduct of a trade or business in the United States.

(D) In the case of any payment under this Agreement that would be treated as interest for United States federal income tax purposes, it is not a bank that receives or will receive such payment on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, within the meaning of section 881(c)(3)(A) of the United States Internal Revenue Code of 1986, as amended.

(E) It is not (I) a 10% shareholder of Wachovia Corporation within the meaning of section 871(h)(3)(B) of the United States Internal Revenue Code of 1986, as amended, or (II) a controlled foreign corporation with respect to Wachovia Corporation within the meaning of Section 881(c)(3)(C) of the United States Internal Revenue Code of 1986, as amended.

**Part 3. Documents**

(a)   **Tax Forms.**

(i) **Delivery of Tax Forms.**   For the purpose of Section 4(a)(i), and without limiting Section 4(a)(iii), each party agrees to duly complete, execute and deliver to the other party the tax forms specified below with respect to it (A) before the first Payment Date under this Agreement, (B) promptly upon reasonable demand by the other party and (C) promptly upon learning that any such form previously provided by the party has become obsolete or incorrect.

In addition, in the case of any tax form that is a Periodic Tax Form required to be delivered by Party B hereunder, Party B agrees to renew such tax form prior to its expiration by completing, executing and delivering to Party A that tax form ("Renewal Tax Form") in each succeeding third year following the year of execution of any such tax form or Renewal Tax Form delivered by Party B to Party A hereunder, so that Party A receives each Renewal Tax Form not later than December 31 of the relevant year. "Periodic Tax Form" means (i) any IRS Form W-8BEN, W-8IMY or W-8EXP that is delivered by Party B to Party A without a U.S. Taxpayer Identification Number, or (ii) any IRS form W-8ECI.

22

**(ii) Tax Forms to be Delivered by Party A:**

    None specified.

**(iii) Tax forms to be Delivered by Party B:**

    A correct, complete and duly executed U.S. Internal Revenue Service Form W-8BEN (or successor thereto), with Part III thereof marked, together with appropriate attachments, that eliminates U.S. federal withholding and backup withholding tax on payments to Party B under this Agreement.

**(b)**    **Delivery of Documents.** When it delivers this Agreement, each party shall also deliver its closing documents to the other party in form and substance reasonably satisfactory to the other party.

| Party required to deliver document | Document to be delivered | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | | Yes |
| Party A | A duly executed certificate of the secretary or assistant secretary of Party A certifying the name, true signature and authority of each person authorized to execute this Agreement (including Confirmations and the Credit Support Annex) and enter into Transactions for Party A. | Upon execution of this Agreement, and for any Confirmation, promptly upon request. | |
| Party B | A copy, certified by the secretary or assistant secretary of Party B, of the resolutions of Party B's board of directors authorizing the execution, delivery and performance by Party B of this Agreement (including Confirmations and the Credit Support Annex) and authorizing Party B to enter into Transactions hereunder. | Upon execution of this Agreement, and for any Confirmation, promptly upon request. | Yes |
| Party B | A copy of the Investment Management Agreement evidencing the authority of the Investment Manager to act on behalf of Party B and copies of its other Operative Documents including any amendments, modifications or supplements. | Upon execution of this Agreement and with respect to any subsequent amendment, at or prior to the time of such amendment, modification or supplement. | Yes |
| Party B | Copies of its most recent audited annual financial statements, certified without qualification by | Within 120 days after the close of each of Party B's fiscal years. | Yes |

23

| | | | |
|---|---|---|---|
| | independent public accountants of recognized standing and prepared in accordance with GAAP and on a basis consistent with prior periods. | | |
| Party B | Copies of its most recent quarterly unaudited financial statements prepared in accordance with United States GAAP and on a basis consistent with prior periods. | Within 45 days after the close of each of Party B's fiscal quarters. | Yes |
| Party B | Copies of its unaudited month-end calculation of Net Asset Value and Net Asset Value per share and its most recent monthly report of performance, subscriptions, redemptions and ending net assets. | Within 15 days after the end of each calendar month to which such calculation relates. | Yes |
| Party B | Oral reports of its Net Asset Value. | Within 1 day of a request by Party A. | Yes |
| Party B | Information regarding Party B's portfolio including information regarding asset allocation, leverage, liquidity and measure of portfolio risk (VaR or its equivalent) and such other information respecting the condition or operations, financial or otherwise, of Party B. | Promptly upon reasonable request by Party A from time to time. | Yes |
| Party B | Notice of any new Investment Vehicle as hereinafter defined together with constitutional documents, investment disclosure materials, and any other documentation concerning such Investment Vehicle as Party A may request | Notice and documentation to be provided within (5) days of the addition of a new Investment Vehicle and additional documentation to be provided within five (5) days of the request by Party A. | Yes |

## Part 4. Miscellaneous

(a)     **Addresses for Notices.** For purposes of Section 12(a) of this Agreement, all notices to a party shall, with respect to any particular Transaction, be sent to its address, telex number or facsimile number specified in the relevant Confirmation (or as specified below if not specified in the relevant Confirmation), provided that any notice under Section 5 or 6 of this Agreement, and any notice under this Agreement not related to a particular Transaction, shall be sent to a party at its address specified below, provided further that any notice under the Credit Support Annex shall be sent to a party at its address, telex number or facsimile number specified in the Credit Support Annex.

24

RECEIVED TIME MAY.17. 3:50PM [Eastern Daylight Time] * SVR:CLTFAXBS04/5 * DNIS:7150087 * CSID: * DURATION (mm-ss):04-46

MAY. 17. 2007   3:03PM

To Party A:

**WACHOVIA BANK, NATIONAL ASSOCIATION**
301 South College Street, DC-8
Mailcode: NC0600
Charlotte, NC 28202-0600

Attention: Derivative Documentation Group

Fax: (704) 383-0575
Phone: (704) 383-8778

To Party B:

**CDO PLUS MASTER FUND LTD.**
Le Masurier House, 2nd floor
La Rue Masurier
St. Helier, Jersey
Channel Islands, JE24YE

With copy to:

**CDO PLUS MASTER FUND LTD.**
c/o rēkon advisors llc
407 SE 1st St,
Delray Beach, FL 33483

Attention: Robert H. Fasulo

Fax: (561) 330-8006
Phone: (561) 330-6999

(b)    **Process Agent.**

    (i) For the purpose of Section 13(c) of this Agreement, Party B irrevocably appoints as its Process Agent for service of process in New York the firm identified below:

    rēkon advisors llc

(c)    **Offices.** Section 10(a) applies.

(d)    **Multibranch Party.**

    (i) Party A is a Multibranch Party and may act through the following Offices: its Charlotte Head Office and its London Branch.

    (ii) Party B is not a Multibranch Party.

(e)    **"Calculation Agent"** means Party A.

25

MAY. 17. 2007  3:03PM

(f)  "**Credit Support Document**" means the Credit Support Annex hereto dated as of the date hereof executed and delivered by Party A and Party B.

(g)  "**Credit Support Provider**" does not apply.

(h)  **Governing Law.** To the extent not otherwise preempted by U.S. Federal law, this Agreement will be governed by and construed in accordance with the law of the State of New York (without giving effect to any provision of New York law that would cause another jurisdiction's laws to be applied).

(i)  **Waiver of Jury Trial.** To the extent permitted by applicable law, each party irrevocably waives any and all right to trial by jury in any legal proceeding in connection with this Agreement, any Credit Support Document to which it is a party, or any Transaction.

(j)  **Netting of Payments.** Section 2(c)(ii) will apply in respect of all Transactions from the date of this Agreement, provided that Section 2(c)(ii) will not apply with respect to any Transactions or group of Transactions for which the parties mutually agree shall be netted operationally.

(k)  "**Affiliate**" has its meaning as defined in Section 14.

Part 5. <u>Other Provisions</u>

(a)  **ISDA Publications.**

(i) **2000 ISDA Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (including its Annex) published by the International Swaps and Derivatives Association, Inc. (together, the "2000 ISDA Definitions") and will be governed by the provisions of the 2000 ISDA Definitions. The provisions of the 2000 ISDA Definitions are incorporated by reference in, and shall form part of, this Agreement and each Confirmation. Any reference to a "Swap Transaction" in the 2000 ISDA Definitions is deemed to be a reference to a "Transaction" for purposes of this Agreement or any Confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for purposes of the 2000 ISDA Definitions. The provisions of this Agreement (exclusive of the 2000 ISDA Definitions) shall prevail in the event of any conflict between such provisions and the 2000 ISDA Definitions.

(ii) **EMU Protocol.** If a present or future European Union member state adopts the euro as its lawful currency to replace its national currency (including, without limitation, Sterling, Danish Krone and Swedish Krona), then Annexes 1 through 5 (inclusive) and Section 6 of the EMU Protocol published on May 6, 1998 by the International Swaps and Derivatives Association, Inc. (i) shall be deemed to apply to any Transaction involving that member state's national currency (which shall be considered a Legacy Transaction under the EMU Protocol), (ii) shall be construed in a manner consistent with the purpose of the EMU Protocol notwithstanding that the start of the third stage of European Economic and Monetary Union has already occurred, and (iii) are hereby incorporated by reference in, and shall form part of, this Agreement. References in the EMU Protocol to "ISDA Master Agreement" will be deemed references to this Agreement.

(b)  **Scope of Agreement.** Any Specified Transaction (other than a repurchase transaction, reverse repurchase transaction, securities lending transaction, exchange-traded futures transaction, buy/sell-back transaction, prime brokerage or margin lending transaction) now existing or hereafter entered into between the parties (whether or not evidenced by a Confirmation) shall constitute a "Transaction" under this Agreement and shall be subject to, governed by, and construed in accordance with the terms of this Agreement, unless the confirming document(s) for that Specified Transaction provide(s) otherwise. For any such Specified Transaction not evidenced by a Confirmation, Section 2(a)(i) of this Agreement is amended to read as

26

MAY. 17. 2007    3:03PM

follows: "(i) Each party will make each payment or delivery to be made by it under each Transaction, as specified in each Confirmation (or otherwise in accordance with the terms of that Transaction if not evidenced by a Confirmation), subject to the other provisions of this Agreement."

(c)    **Additional Representations.** Section 3 is amended by adding the following Sections 3(g), (h), (i) and (j):

"(g) **Non-Reliance.** For any Relevant Agreement: (i) it acts as principal and not as agent, (ii) it acknowledges that the other party acts only at arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, (iii) it is relying solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) and upon advice from its own professional advisors, (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, and (v) it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation) from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder).

"Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating to any of the foregoing.

(h) **Eligibility.** It is an "eligible contract participant" within the meaning of the Commodity Exchange Act (as amended by the Commodity Futures Modernization Act of 2000).

(i) **FDIC Requirements.** If it is a bank subject to the requirements of 12 U.S.C. § 1823(e), its execution, delivery and performance of this Agreement (including the Credit Support Annex and each Confirmation) have been approved by its board of directors or its loan committee, such approval is reflected in the minutes of said board of directors or loan committee, and this Agreement (including the Credit Support Annex and each Confirmation) will be maintained as one of its official records continuously from the time of its execution (or in the case of any Confirmation, continuously until such time as the relevant Transaction matures and the obligations therefor are satisfied in full).

(j) **ERISA.** It is not (i) an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), subject to Title I of ERISA or Section 4975 of the Code, or a plan as so defined but which is not subject to Title I of ERISA or Section 4975 of the Code but is subject to another law materially similar to Title I of ERISA or Section 4975 of the Code (each of which, an "ERISA Plan"), (ii) a person or entity acting on behalf of an ERISA Plan, or (iii) a person or entity the assets of which constitute assets of an ERISA Plan."

(d)    **Set-off.** Any amount ("Early Termination Amount") payable to one party ("Payee") by the other party ("Payer") under Section 6(e), in circumstances where there is a Defaulting Party, or one Affected Party in the case where a Termination Event under Section 5(b)(iv) or 5(b)(v) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by means of set off against any amount(s) ("Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer or to any Affiliate of the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer (or between the Payee and any Affiliate of the Payer) or instrument(s) or undertaking(s) issued or

27

MAY. 17. 2007    3:03PM

executed by the Payee to, or in the favor of, the Payer or any Affiliate of the Payer (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this paragraph.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

Nothing in this paragraph shall be effective to create a charge or other security interest. This paragraph shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(e)    **Escrow.** If payments denominated in different currencies are due hereunder by both parties on the same day and a party has reasonable cause to believe that the other party will not meet its payment obligation, then as reasonable assurance of performance the party may notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with any escrow agent selected by the party giving the notice from among major commercial banks independent of either party (and its affiliates), accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on the same date, to return the payment deposited to the party that paid in escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall make arrangements to provide that the intended recipient of the amount due to be deposited first shall be entitled to interest on the deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(f)    **Change of Account.** Any account designated by a party pursuant to Section 2(b) shall be in the same legal and tax jurisdiction as the original account.

(g)    **Recorded Conversations.** Each party and any of its Affiliates may electronically record any of its telephone conversations with the other party or with any of the other party's Affiliates in connection with this Agreement or any Transaction, and any such recordings may be submitted in evidence in any proceeding to establish any matters pertinent to this Agreement or any Transaction.

(h)    **Confirmation Procedures.** Upon receipt thereof, Party B shall examine the terms of each Confirmation sent by Party A, and unless Party B objects to the terms within three New York business days after receipt of that Confirmation, those terms shall be deemed accepted and correct absent manifest error, in which case that Confirmation will be sufficient to form a binding supplement to this Agreement. Notwithstanding the foregoing, the first sentence of Section 9(e)(ii) remains in full force and effect.

(i)    **Additional Agreements of Party B.** Section 4 is hereby amended by adding the following new agreement:

28

(i) Party B represents to, and covenants and agrees with, Party A on and as of the date hereof and at all times until the termination of this Agreement that with respect to this Agreement and each Transaction, it will be in full compliance with, all Operative Documents and this Agreement and each Transaction is, and will be, authorized and permissible transactions and investments thereunder.

(ii) Party B represents that (A) it is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise); (B) the persons executing this Agreement on its behalf have been authorized to do so; and (C) it has granted the Investment Manager the authority to execute and deliver this Agreement on its behalf and to act on its behalf in all matters related to this Agreement, including, without limitation, on a fully discretionary basis negotiating, entering into, amending, transferring and terminating Transactions.

(iii) Party B will provide Party A, promptly upon becoming aware of the same, with written notice of (A) any amendment, or modification or supplement to any Operative Document and (B) any Potential Event of Default, Event of Default or Termination Event, or event or condition that, with the giving of notice or the passage of time or both, could constitute a Termination Event with respect to Party B.

(j)  **Definitions.** As used in this Schedule:

(i)  "Net Asset Value" means, with respect to Party B, the gross assets of Party B less the aggregate amount of all liabilities of Party B, including without limitation, all absolute and contingent liabilities of any kind, and shall be determined in accordance with generally accepted accounting principles in the United States and on a basis consistent with prior periods.

(ii)  "Operative Documents" means the Investment Management Agreement, dated August 31, 2006, Confidential Memorandum, trust indenture, corporate charter, partnership agreement, by-laws or other similar documents, instruments or other constitutive documents of Party B, as applicable, any written investment policies, procedures, restrictions or guidelines of Party B and the then-current disclosure document of Party B.

(iii)  "Investment Vehicle" means any entity organized as a feeder fund in a master/feeder structure where such feeder fund invests all, or substantially all of its assets in Party B as the master fund.

**Part 6.  Additional Terms for FX Transactions and Currency Options**

(a)  **ISDA FX and Currency Option Definitions.** The 1998 FX and Currency Option Definitions published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 FX and Currency Option Definitions") are hereby incorporated by reference in, and shall form part of, this Agreement and each Confirmation relating to any "Currency Option Transaction" or "FX Transaction" as defined in the FX and Currency Option Definitions, except as otherwise specifically provided herein or in the relevant Confirmation.

(b)  **FX Transactions.**

**Netting of FX Transactions.** Section 2(c) shall not apply to FX Transactions. Instead, the following provision will apply to FX Transactions:

If amounts in the same currency would be due by both parties in respect of the same Settlement Date (or other payment or delivery date) under two or more FX Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those amounts will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party on that Settlement Date or date.

29

(c)     **Currency Option Transactions.**

(i)  **Currency Option Transaction Premiums.**  If any Premium of a Currency Option Transaction is not received on the Premium Payment Date, then the Seller may elect to either (A) accept late payment of that Premium, or (B) give written notice of that nonpayment and, if that payment is not received within three Local Business Days of that notice, either (1) treat the related Currency Option Transaction as void, or (2) treat that non-payment as an Event of Default under Section 5(a)(i) of this Agreement.  If the Seller elects to act under clause (A) or (B)(1) of the preceding sentence, then the Buyer shall pay on demand all out-of-pocket costs and actual damages incurred by the Seller in connection with that unpaid or late Premium or void Currency Option Transaction, including, without limitation, interest on that Premium in the same currency as that Premium at the Default Rate and any other costs or expenses incurred by the Seller to compensate it for its loss of bargain, cost of funding or loss incurred as a result of terminating, liquidating, obtaining or re-establishing a delta hedge or other related trading position with respect to that Currency Option Transaction.

(ii) **Netting of Currency Option Transactions.**  Section 2(c) of this Agreement shall not apply to Currency Option Transactions.  Instead, the following provisions will apply to Currency Option Transactions:

(A) If Premiums in the same currency would be due by both parties in respect of the same Premium Payment Date under two or more Currency Option Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those Premiums will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party.

(B) If amounts in the same currency (other than Premiums) would be due by both parties in respect of the same Settlement Date (or other payment or delivery date) under two or more Currency Option Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those amounts will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party on that Settlement Date or date.

(C) For matching Currency Option Transactions, any unexercised Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against any unexercised Call or Put, respectively, written by the other party upon the payment in full of both Currency Option Transaction Premiums. Currency Option Transactions are "matching" only if both (i) are granted for the same Put Currency, Call Currency, Expiration Date, Expiration Time, and Strike Price, (ii) have the same exercise style (e.g., American, European or Asian), and (iii) are entered into by the same pair of Offices of the parties.  For any partial termination and discharge (where the Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction shall continue to be a Currency Option Transaction under this Agreement.

(d)     **Notice of Exercise.**  Notwithstanding Section 3.5 (g) of the 1998 FX and Currency Option Definitions, a Notice of Exercise may be delivered by facsimile for purposes of exercising a Currency Option only if, after reasonable efforts have been made by the Buyer to deliver such Notice of Exercise orally by telephone, Buyer is unable to reach an appropriate person at the Seller by telephone on the relevant day for purposes of exercising such Currency Option on that day.  Whenever a Notice of Exercise has been given orally by telephone, a confirmation of such Notice of Exercise may be delivered in writing by facsimile or by any other means specified therefore in the relevant Confirmation.

(e)  **Payments on Early Termination.** For purposes of Section 6(e), if "Market Quotation" is specified in this Schedule as applying, a Market Quotation shall not be determined or included under clause (a) of the definition of Settlement Amount for any FX Transactions and Currency Option Transactions, and instead a "Loss" shall be determined and included under clause (b) of the definition of Settlement Amount for any FX Transactions and Currency Option Transactions.

**IN WITNESS WHEREOF**, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _Alexis S. Alpert_
Name: Alexis S. Alpert
Title: Vice President

CDO PLUS MASTER FUND LTD.

By: _____
Name: DONALD S. UDERITZ.
Title: DIRECTOR.

31

*EXHIBIT G TO ROBSON DECLARATION*

**(Bilateral Form)**

**(ISDA Agreements Subject to New York Law Only)**

# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

### ISDA MASTER AGREEMENT

dated as of May 4, 2007

between

## WACHOVIA BANK, NATIONAL ASSOCIATION ("Party A")

and

## CDO PLUS MASTER FUND LTD. ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above (this "Agreement"), is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows: ~

### Paragraphs 1 – 12. Incorporation

Paragraphs 1 through 12 inclusive of the ISDA Credit Support Annex (Bilateral Form) (ISDA Agreements Subject to New York Law Only) published in 1994 by the International Swaps and Derivatives Association, Inc. are incorporated herein by reference and made a part hereof.

### Paragraph 13. Elections and Variables

(a)    *Security Interest for "Obligations"*.  The term *"Obligations"* as used in this Annex includes no additional obligations with respect to Party A and Party B.

(b)    *Credit Support Obligations*.

    (i)    *Delivery Amount, Return Amount and Credit Support Amount*.

        (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

1

(C)  *"Credit Support Amount"* has the meaning specified in Paragraph 3, provided that "Credit Support Amount" shall mean the higher of (i) the amount calculated as provided in the definition of that term in Paragraph 3(b) and (ii) the sum of the Pledgor's Independent Amounts.

(ii)  *Eligible Collateral.* The following items will qualify as *"Eligible Collateral"* for the party specified, provided that the Secured Party shall be entitled at any time, and from time to time, not to accept as Eligible Collateral any of the following which constitute Ineligible Securities as defined below:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | *Cash:* U.S. Dollars in depositary account form. | YES | YES | 100% |
| (B) | *Treasury Bills:* negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of not more than one year. | YES | YES | 98% |
| (C) | *Treasury Notes:* negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than one year but not more than 10 years. | YES | YES | 98% |
| (D) | *Treasury Bonds:* negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than 10 years but not more than 30 years. | YES | YES | 98% |
| (E) | *Agency Securities:* negotiable debt obligations of the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corporation (FHLMC), Federal Home Loan Banks (FHLB), Federal Farm Credit Banks (FFCB), Student Loan Marketing Association (SLMA), or Tennessee Valley Authority (TVA) having a remaining maturity of not more than 30 years. | YES | YES | 92% |
| (F) | *FHLMC Certificates.* Mortgage participation certificates issued by FHLMC evidencing undivided interests or participations in pools of first lien conventional or FHA/VA residential mortgages or deeds of trust, guaranteed by FHLMC, and having a remaining maturity of not more than 30 years. | YES | YES | 92% |
| (G) | *FNMA Certificates.* Mortgage-backed pass-through certificates issued by FNMA evidencing undivided interests in pools of first lien mortgages or deeds of trust on residential properties, guaranteed by FNMA, and having a remaining maturity of not more than 30 years. | YES | YES | 92% |

2

|  |  |  | YES | YES | 92% |

(H)    *GNMA Certificates*. Mortgage-backed pass-through certificates issued by private entities, evidencing undivided interests in pools of first lien mortgages or deeds of trust on single family residences, guaranteed by the Government National Mortgage Association (GNMA) with the full faith and credit of the United States, and having a remaining maturity of not more than 30 years.

(I)    *Other Eligible Collateral*. With respect to a party, as may be agreed in writing between the parties for purposes of this Annex, together with the applicable Valuation Percentage.

(iii)    *Other Eligible Support*. Not applicable.

(iv)    *Thresholds*.

(A)    *"Independent Amount"* means for Party A: zero.

*"Independent Amount"* means with respect to Party B: the aggregate sum of each Independent Amount for each Transaction with respect to which Party B has any remaining obligations to Party A (including any obligations under Section 6(e) of this Agreement if that Transaction becomes a Terminated Transaction), as such Independent Amount is set forth in the Confirmation for that Transaction (as amended from time to time), or as otherwise agreed between the parties on the Trade Date of that Transaction if a Confirmation for that Transaction has not yet been executed and delivered. If the Confirmation for a Transaction does not specify an Independent Amount, the Independent Amount for that Transaction will be deemed to be zero unless otherwise agreed between the parties.

(B)    *"Threshold"* means for Party A: zero.
*"Threshold"* means for Party B: zero.

(C)    *"Minimum Transfer Amount"* means with respect to Party A: $250,000.
*"Minimum Transfer Amount"* means with respect to Party B: $250,000.

*provided* that if an Event of Default, Potential Event of Default or Termination Event exists with respect to a party, the Minimum Transfer Amount for that party shall be zero, *provided further* that if the Secured Party is holding Posted Collateral and the Credit Support Amount required to be maintained by the Pledgor is, or is deemed to be, zero for any day, then for purposes of Paragraph 3(b), the Secured Party's Minimum Transfer Amount for that day will be deemed to be zero with respect to that Posted Collateral.

(D)    **Rounding:** The Delivery Amount and the Return Amount will be rounded down to the nearest integral multiple of $10,000.

(c)    *Valuation and Timing*.

(i)    *"Valuation Agent"* means Party A. Prior to any Party B Valuation Date, Party B shall request that the Valuation Agent calculate the Exposure and the Value of any Posted Credit Support as of the

Valuation Time. Such request shall be made not later than 4:00 p.m., New York time, on the Local Business Day preceding such Party B Valuation Date. Notwithstanding Paragraph 4(c), the Valuation Agent shall notify Party B of such calculations not later than the Notification Time on the Local Business Day immediately following the date of such request. In making any such calculations, the Valuation Agent shall be acting in an administrative capacity and not as an agent, advisor or fiduciary. "Party B Valuation Date" means any day on which Party B will be making any demand pursuant to Paragraph 3, any substitution pursuant to Paragraph 4(d)(ii), or any Transfer pursuant to Paragraph 6(d).

(ii)     *"Valuation Date"* means any Local Business Day on which a demand is made before 5:00 p.m., New York time, pursuant to Paragraph 3.

(iii)    *"Valuation Time"* means the close of business in New York City on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)     *"Notification Time"* means 11:00 a.m., New York time, on a Local Business Day.

(d)     *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|                                  | Party A | Party B |
|----------------------------------|---------|---------|
| Additional Termination Events    | NO      | YES     |

(e)     *Substitution.*

(i)      *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

(ii)     *Consent.* The Pledgor is not required to obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)     *Dispute Resolution.*

(i)      *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii)     *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated based upon the mid-point between the bid and offered purchase rates or prices for that Posted Credit Support as reported on the Bloomberg electronic service as of the Resolution Time, or if unavailable, as quoted to the Valuation Agent as of the Resolution Time by a dealer in that Posted Credit Support of recognized standing selected in good faith by the Valuation Agent, which calculation shall include any unpaid interest on that Posted Credit Support.

(iii)    *Alternative.* The provisions of Paragraph 5 will apply.

(g)     *Holding and Using Posted Collateral.*

(i)      *Eligibility to Hold Posted Collateral; Custodians.* Subject to paragraph 6(c),

(A)     Party A will be entitled to hold Posted Collateral itself or through a Custodian pursuant to

4

Paragraph 6(b), *provided* that the following conditions applicable to it are satisfied:

    (1)    Party A is not a Defaulting Party.

    (2)    Posted Collateral may be held only in the following jurisdictions: New York and North Carolina.

    (3)    The party or entity holding the Collateral maintains a Credit Rating of at least BBB+ from S&P and Baa1 from Moody's.

    (4)    The Custodian is a bank or trust company having total assets in excess of $10 billion.

(B)    Party B will be entitled to hold Posted Collateral itself or through its Custodian pursuant to Paragraph 6(b), *provided* that the following conditions applicable to it are satisfied:

    (1)    Party B is not a Defaulting Party.

    (2)    Posted Collateral may be held only in the following jurisdictions: New York.

    (3)    The party or entity holding the Collateral maintains a Credit Rating of at least BBB+ from S&P and Baa1 from Moody's.

    (4)    The Custodian is a bank or trust company having total assets in excess of $10 billion.

(ii)    *Use of Posted Collateral.* The provisions of Paragraph 6(c) will apply to both parties.

(h)    **Interest Amount.**

    (i)    *Interest Rate.* The *"Interest Rate"* for any day will be the Federal Funds (Effective) rate published in N.Y. Federal Reserve Statistical Release H.15(519) for that day (or if that day is not a New York Business Day, then for the next preceding New York Business Day).

    For the purpose of computing the Interest Amount, the amount of interest computed for each day of the Interest Period shall not be subject to compounding.

    (ii)    *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii)    *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply.

(i)    *Additional Representation(s).* Not applicable.

(j)    *Other Eligible Support and Other Posted Support.* Not applicable.

(k)    *Demands and Notices.* All demands, specifications and notices under this Annex will be made to a party as follows unless otherwise specified from time to time by that party for purposes of this Annex in a written notice given to the other party:

To Party A:

**WACHOVIA BANK, NATIONAL ASSOCIATION**
201 South College Street
9th Floor, Mail Code NC0672
Charlotte, NC 28288-0672

Attention: Collateral Management Group

Phone:   704-383-9529
Fax:       704-383-3394

To Party B:

**CDO PLUS MASTER FUND LTD.**
c/o rékon advisors llc
407 SE 1st St,
Delray Beach, FL 33483

Attention: Robert H. Fasulo

Fax:      (561) 330-8006
Phone:   (561) 330-6999

(l)    *Addresses for Transfers.*

  (i)   For each Transfer hereunder to Party A, instructions will be provided by Party A for that specific Transfer.

  (ii)  For each Transfer hereunder to Party B, instructions will be provided by Party B for that specific Transfer.

(m)   *Other Provisions.*

  (i)   *Additional Definitions.* As used in this Annex, the following terms have the following meanings:

  *"Credit Rating"* means, for a party or entity on any date of determination, (a) the Long-Term Senior Debt rating then assigned to it by Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. ("S&P") or the Long Term Senior Debt or Long Term Bank Deposits rating, as the case may be, then assigned to it by Moody's Investors Service ("Moody's"), or (b) if a party does not have either a Long-Term Senior Debt rating assigned to it by S&P or a Long Term Senior Debt or Long Term Bank Deposits rating, assigned to it by Moody's, then its Credit Rating will be the respective rating then assigned to its unsecured and unsubordinated long-term debt or deposit obligations by either S&P or Moody's. If such ratings are assigned by both S&P and Moody's, then its Credit Rating will be the lower of such ratings.

  *"Ineligible Securities"* means any obligations, securities, certificates or instruments that (i) are denominated in a currency other than U.S. Dollars, (ii) are issued other than in Federal Reserve book entry form, or (iii) constitute or include structured notes or other structured debt instruments, real estate mortgage investment conduits, collateralized mortgage obligations, guaranteed mortgage certificates, interest-only securities, principal-only securities or any securities representing interests in,

6

or are composed in whole or in part of, residual or high risk mortgage derivatives or other derivatives.

(ii)   *Exposure.* All calculations of "Exposure" under this Annex shall include all Transactions (whether or not evidenced by a Confirmation).

(iii)   *Grace Period.* Clause (i) of Paragraph 7 is hereby amended by deleting the words "two Local Business Days" and substituting therefor "one Local Business Day".

IN WITNESS WHEREOF the parties have executed this Credit Support Annex as of the date hereof.

WACHOVIA BANK, NATIONAL                         CDO PLUS MASTER FUND LTD.
ASSOCIATION


By: _Alexis S. Alpert_                           By: _____
Name: Alexis S. Alpert                           Name: DONALD S. UDERITZ
Title: Vice President                            Title: DIRECTOR.

Eastern Daylight Time] * SVR:CI TFAXRS04/5 * DNIS:7150087 * CSID: * DURATION (mm-ss):04-46

**(Bilateral Form)**                              **(ISDA Agreements Subject to New York Law Only)**



# CREDIT SUPPORT ANNEX

to the Schedule to the

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

dated as of . . . . . . . . . . . . . . .

between

. . . . . . . . . . . . . . . . . . . . . . . . .  and  . . . . . . . . . . . . . . . . . . . . . . . . .

("Party A")                                      ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

### Paragraph 1. Interpretation

(a)     *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

### Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA® 1994

(d)    **Substitutions.**

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**ISDA® 1994**

**Paragraph 6. Holding and Using Posted Collateral**

(a)     *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA® 1994

(b)   *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)   *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)   *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA® 1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA® 1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by

> (y) the Interest Rate in effect for that day; divided by

> (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

"**Minimum Transfer Amount**" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"**Notification Time**" has the meaning specified in Paragraph 13.

"**Obligations**" means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

"**Other Eligible Support**" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"**Other Posted Support**" means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

"**Pledgor**" means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

"**Posted Collateral**" means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

"**Posted Credit Support**" means Posted Collateral and Other Posted Support.

"**Recalculation Date**" means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

"**Resolution Time**" has the meaning specified in Paragraph 13.

"**Return Amount**" has the meaning specified in Paragraph 3(b).

"**Secured Party**" means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

"**Specified Condition**" means, with respect to a party, any event specified as such for that party in Paragraph 13.

"**Substitute Credit Support**" has the meaning specified in Paragraph 4(d)(i).

"**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

"**Threshold**" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"**Transfer**" means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

"*Valuation Agent*" has the meaning specified in Paragraph 13.

"*Valuation Date*" means each date specified in or otherwise determined pursuant to Paragraph 13.

"*Valuation Percentage*" means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

"*Valuation Time*" has the meaning specified in Paragraph 13.

"*Value*" means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i) Eligible Collateral or Posted Collateral that is:

(A) Cash, the amount thereof; and

(B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

**Paragraph 13. Elections and Variables**

(a)    *Security Interest for "Obligations"*. The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A: ...............................................................

With respect to Party B: ...............................................................

(b)    *Credit Support Obligations.*

(i) *Delivery Amount, Return Amount and Credit Support Amount.*

(A) *"Delivery Amount"* has the meaning specified in Paragraph 3(a), unless otherwise specified here: ...............................................................

(B) *"Return Amount"* has the meaning specified in Paragraph 3(b), unless otherwise specified here: ...............................................................

(C) *"Credit Support Amount"* has the meaning specified in Paragraph 3, unless otherwise specified here: ...............................................................

(ii) *Eligible Collateral.* The following items will qualify as *"Eligible Collateral"* for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [ ] | [ ] | [ ]% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [ ] | [ ] | [ ]% |
| (C) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [ ] | [ ] | [ ]% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [ ] | [ ] | [ ]% |
| (E) | other: ................................ | [ ] | [ ] | [ ]% |

(iii) *Other Eligible Support.* The following items will qualify as *"Other Eligible Support"* for the party specified:

|  |  | Party A | Party B |
|---|---|---|---|
| (A) | ........................................ | [ ] | [ ] |
| (B) | ........................................ | [ ] | [ ] |

ISDA® 1994

(iv) *Thresholds.*

    (A)    *"Independent Amount"* means with respect to Party A: $ .....................
              *"Independent Amount"* means with respect to Party B: $ ......................

    (B)    *"Threshold"* means with respect to Party A: $ .............................
              *"Threshold"* means with respect to Party B: $ .............................

    (C)    *"Minimum Transfer Amount"* means with respect to Party A: $ ..................
              *"Minimum Transfer Amount"* means with respect to Party B: $ ..................

    (D)    **Rounding.** The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . ./up and down to the nearest integral multiple of $. . . ., respectively˙].

(c)    *Valuation and Timing.*

    (i)    *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here:  ..........

    (ii)    *"Valuation Date"* means:  ...............................................

    (iii)    *"Valuation Time"* means:

        [  ]    the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

        [  ]    the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

    *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv) *"Notification Time"* means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: .................................................................

(d)    *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

| | Party A | Party B |
|---|---|---|
| Illegality | [ ] | [ ] |
| Tax Event | [ ] | [ ] |
| Tax Event Upon Merger | [ ] | [ ] |
| Credit Event Upon Merger | [ ] | [ ] |
| Additional Termination Event(s):[1] | | |
| ............................ | [ ] | [ ] |
| ............................ | [ ] | [ ] |

---

˙  Delete as applicable.

[1]  If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

ISDA® 1994

(e) **Substitution.**

(i) **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) **Consent.** If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable*]²

(f) **Dispute Resolution.**

(i) **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) **Value.** For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(iii) **Alternative.** The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(g) **Holding and Using Posted Collateral.**

(i) **Eligibility to Hold Posted Collateral; Custodians.** Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: . . . . . . . . . . . . . . . . . .

(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Initially, the **Custodian** for Party A is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: . . . . . . . . . . . . . . . . . .

(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Initially, the **Custodian** for Party B is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) **Use of Posted Collateral.** The provisions of Paragraph 6(c) will not apply to the [party/parties*] specified here:

[ ] Party A

[ ] Party B

and [that party/those parties*] will not be permitted to: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

* Delete as applicable.

² Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.*, where a party to the Annex is the New York branch of an English bank).

ISDA® 1994

(h)  *Distributions and Interest Amount.*

    (i) *Interest Rate.* The **"Interest Rate"** will be:  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    (ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    (iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here:  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(i)  *Additional Representation(s).*

[Party A/Party B*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    (ii)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(j)  *Other Eligible Support and Other Posted Support.*

    (i) **"Value"** with respect to Other Eligible Support and Other Posted Support means: . . . . . . . . . . .

    (ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: . . . . . . . . .

(k)  *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

    Party A: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    Party B: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(l)  *Addresses for Transfers.*

    Party A: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    Party B: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(m)  *Other Provisions.*

---

*  Delete as applicable.

ISDA® 1994

*EXHIBIT H TO ROBSON DECLARATION*

 **WACHOVIA**

Date:              May 30, 2007

To:                CDO Plus Master Fund Ltd. ("Party B")
Attn:              Alyssa D'Amore
Fax No.:           561-330-8006

From:              Wachovia Bank, N.A. ("Party A")

RE:                Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or
                   Physical Settlement

Reference No.: 5076772

---

Dear Alyssa D'Amore:

The purpose of this letter (the "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction relating to a collateralized debt obligation reference obligation entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation shall govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of May 04, 2007, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

References in this Confirmation to the "Reference Obligation" shall be to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as amended from time to time unless otherwise specified below.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      General Terms:

        Trade Date:                      May 21, 2007

        Effective Date:                  May 24, 2007

        Scheduled Termination Date:      The Legal Final Maturity Date of the Reference
                                         Obligation, subject to adjustment in accordance with
                                         the Following Business Day Convention.

Copyright ©June 2006 by International Swaps & Derivatives Association, Inc.

| Termination Date: | The last to occur of: |
| --- | --- |
| | (a) the fifth Business Day following the Effective Maturity Date; |
| | (b) the last Floating Rate Payer Payment Date; |
| | (c) the last Delivery Date; and |
| | (d) the last Additional Fixed Amount Payment Date. |
| Floating Rate Payer: | Party B (the "Seller"). |
| Fixed Rate Payer: | Party A (the "Buyer"). |
| Calculation Agent: | Party A |
| Calculation Agent City: | New York |
| Business Day: | New York and London |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Forge ABS High Grade CDO LTD 2007-1A |
| Reference Obligation: | The obligation identified as follows: |

Issuer:                                    The Reference Entity

CUSIP/ISIN:                    34630BAS1
Bloomberg ID:                  FORGE 2007-1A B
Legal final maturity date:     October 05, 2053
Original Principal Amount:      USD 25,500,000.00
Initial Factor:                1.0
Coupon:                        3 Month LIBOR+0.58%
                               With No Cap

Section 2.30 of the Credit Derivatives Definitions shall not apply.

| Reference Policy: | Not Applicable |
| --- | --- |
| Reference Price: | 100% |
| Applicable Percentage: | On any day, a percentage equal to A divided by B. |

"A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal

2

balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.

"B" means the product of the Original Principal Amount and the Initial Factor;

    (a)    as increased by the outstanding principal balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and

    (b)    as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity.

| | |
|---|---|
| Initial Face Amount: | USD 10,000,000.00 |
| Reference Obligation Notional Amount: | On the Effective Date, the product of: |

    (a)    the Original Principal Amount;

    (b)    the Initial Factor; and

    (c)    the Applicable Percentage.

Following the Effective Date, the Reference Obligation Notional Amount will be:

    (i)    decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;

    (ii)    decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;

    (iii)    decreased on each day on which a Writedown occurs by the relevant Writedown Amount;

    (iv)    increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or (iii) of the definition of "Writedown Reimbursement"; and

    (v)    decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph

3

(b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is negative) with effect from such Delivery Date;

provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero.

For the avoidance of doubt, the Reference Obligation Notional Amount shall not be increased by any deferral or capitalization of interest during the Term of this Transaction or decreased by payment of any portion of the principal balance of the Reference Obligation that is attributable to deferral or capitalization of interest during the Term of this Transaction.

| | |
|---|---|
| Initial Payment: | Not applicable |

2.  Fixed Payments:

| | |
|---|---|
| Fixed Rate Payer: | Buyer |
| Fixed Rate: | 2.75% per annum |
| Fixed Rate Payer Period End Date: | The first day of each Reference Obligation Calculation Period. |
| Fixed Rate Payer Payment Dates: | Each day falling five Business Days after a Reference Obligation Payment Date; provided that the final Fixed Rate Payer Payment Date shall fall on the fifth Business Day following the Effective Maturity Date. |
| Fixed Amount: | With respect to any Fixed Rate Payer Payment Date, an amount equal to the product of: |

(a)    the Fixed Rate;

(b)    an amount determined by the Calculation Agent equal to:

(i)    the sum of the Reference Obligation Notional Amount as at 5:00 p.m. in the Calculation Agent City on each day in the related Fixed Rate Payer Calculation Period; divided by

(ii)    the actual number of days in the related

4

|  |  |
|--|--|
|  | Fixed Rate Payer Calculation Period; and |
|  | (c) the actual number of days in the related Fixed Rate Payer Calculation Period divided by 360. |
| Additional Fixed Amount Payment Dates: | (a) Each Fixed Rate Payer Payment Date; and |
|  | (b) in relation to each Additional Fixed Payment Event occurring after the second Business Day prior to the last Fixed Rate Payer Payment Date, the fifth Business Day after Buyer has received notification from Seller or the Calculation Agent of the occurrence of such Additional Fixed Payment Event. |
| Additional Fixed Payments: | Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Payment Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties or by Seller to Buyer stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date. |
| Additional Fixed Payment Event: | The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement. |
| Additional Fixed Amount: | With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of: |
|  | (a) the Writedown Reimbursement Payment Amount (if any); |
|  | (b) the Principal Shortfall Reimbursement Payment Amount (if any); and |
|  | (c) the Interest Shortfall Reimbursement Payment Amount (if any). |
|  | For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall |

5

be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

**3.    Floating Payments:**

Floating Rate Payer:                         Seller

Floating Rate Payer Payment Dates:           In relation to a Floating Amount Event, the first Fixed Rate Payer Payment Date falling at least two Business Days (or in the case of a Floating Amount Event that occurs on the Legal Final Maturity Date or the Final Amortization Date, the fifth Business Day) after delivery of a notice by the Calculation Agent to the parties or a notice by Buyer to Seller that the related Floating Amount is due and showing in reasonable detail how such Floating Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the Effective Maturity Date.

Floating Payments:                           If a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, Seller will pay the relevant Floating Amount to Buyer. For the avoidance of doubt, the Conditions to Settlement are not required to be satisfied in respect of a Floating Payment.

Implied Writedown:                           Applicable.

Floating Amount Event:                        A Writedown, a Failure to Pay Principal or an Interest Shortfall.

Floating Amount:                             With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of:

(a) . the relevant Writedown Amount (if any);

(b)    the relevant Principal Shortfall Amount (if any); and

(c)    the relevant Interest Shortfall Payment Amount (if any).

For the avoidance of doubt, each Writedown Amount, Principal Shortfall Amount or Interest Shortfall Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

6

| Conditions to Settlement: | Credit Event Notice |
|---|---|

Notifying Party: Buyer

Notice of Physical Settlement

Notice of Publicly Available Information: Applicable

| Public Sources: | The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources. |
|---|---|

Specified Number:    1

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Conditions to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement and, in relation to the Failure to Pay Interest Credit Event, the Additional Condition to Settlement specified below.

| Additional Condition to Settlement for Failure to Pay Interest: | In addition to the Conditions to Settlement above, in respect of the Failure to Pay Interest Credit Event, if the Reference Obligation is PIK-able, it shall be a Condition to Settlement that a period of at least 360 calendar days has elapsed since the occurrence of the Credit Event without the relevant Interest Shortfall having been reimbursed in full. For the avoidance of doubt, if it is not explicitly made clear in the Servicer Report whether or not, or to what extent, a particular Interest Shortfall has been reimbursed but the Calculation Agent determines that such Interest Shortfall has been reimbursed by a certain amount on the basis of information in such Servicer Report, then the relevant Interest Shortfall reimbursement shall be calculated by the Calculation Agent on the basis of such information. |
|---|---|

| Additional agreements relating to Physical Settlement: | The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions: |
|---|---|

7

(a)     the Conditions to Settlement may be satisfied on more than one occasion;

(b)     multiple Physical Settlement Amounts may be payable by Seller;

(c)     Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d)     if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e)     any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the Effective Maturity Date.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Credit Events:          The following Credit Events shall apply to this Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Failure to Pay Interest

    Payment Requirement: USD 10,000

Distressed Ratings Downgrade

The definition of "Payment Requirement" in Section 4.8(d) of the Credit Derivatives Definitions shall be amended so that the words "Failure to Pay" are deleted

8

and replaced by the words "Failure to Pay Interest".

**Obligation:**   Reference Obligation Only

4.   **Interest Shortfall:**

**Interest Shortfall Payment Amount:**   In respect of an Interest Shortfall, the relevant Interest Shortfall Amount; provided that, if Interest Shortfall Cap is applicable and the Interest Shortfall Amount exceeds the Interest Shortfall Cap Amount, the Interest Shortfall Payment Amount in respect of such Interest Shortfall shall be the Interest Shortfall Cap Amount.

**Interest Shortfall Cap:**   Applicable

**Interest Shortfall Cap Amount:**   As set out in the Interest Shortfall Cap Annex.

**Actual Interest Amount:**   With respect to any Reference Obligation Payment Date, payment by or on behalf of the Issuer of an amount in respect of interest due under the Reference Obligation (including, without limitation, any deferred interest or defaulted interest relating to the Term of this Transaction but excluding payments in respect of prepayment penalties, yield maintenance provisions or principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

**Expected Interest Amount:**   With respect to any Reference Obligation Payment Date, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of the Reference Obligation equal to:

(a)   the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to the Reference Obligation; minus

(b)   the Aggregate Implied Writedown Amount (if any),

and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments.

Except as provided in (a) in the previous sentence, the Expected Interest Amount shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference Obligation Payment Dates; (ii) any prepayment penalties or yield maintenance provisions; and (iii) the effect of any provisions (however described) of such Underlying Instruments that otherwise permit the limitation

9

of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation, or that provide for the extinguishing or reduction of such payments or distributions (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments).

**Interest Shortfall:**   With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

For the avoidance of doubt, the occurrence of an event within (a) or (b) shall be determined taking into account any payment made under the Reference Policy, if applicable.

**Interest Shortfall Amount:**   With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)   zero; and

(b)   the amount equal to the product of:

(i)   (A)   the Expected Interest Amount;

minus

(B)   the Actual Interest Amount; and

(ii)   the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x)   the number of days in the first Fixed Rate Payer Calculation Period; over

(y)   the number of days in the first Reference Obligation Calculation Period.

**Interest Shortfall Reimbursement:**   With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

**Interest Shortfall Reimbursement Amount:**   With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage.

**Interest Shortfall Reimbursement Payment**   With respect to an Additional Fixed Amount Payment Date, (a) if Interest Shortfall Cap is not applicable, the relevant

10

Amount:

Interest Shortfall Reimbursement Amount, and (b) if Interest Shortfall Cap is applicable, the amount determined pursuant to the Interest Shortfall Cap Annex; provided, in either case, that the aggregate of all Interest Shortfall Reimbursement Payment Amounts (determined for this purpose on the basis that Interest Shortfall Compounding is not applicable) at any time shall not exceed the aggregate of Interest Shortfall Payment Amounts paid by Seller in respect of Interest Shortfalls occurring prior to such Additional Fixed Amount Payment Date.

5.   Settlement Terms:

Settlement Method:              Physical Settlement.

Terms Relating to Physical Settlement:

Physical Settlement Period:     Five Business Days

Deliverable Obligations:        Exclude Accrued Interest

Deliverable Obligations:        Deliverable Obligation Category:

Reference Obligation Only

Physical Settlement Amount:     An amount equal to:

(a)    the product of the Exercise Amount and the Reference Price; minus

(b)    the sum of:

(i)    if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

(ii)   the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage,

provided that if the Physical Settlement Amount would exceed the product of:

(1)    the Reference Obligation Notional Amount as of
11

the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2)     the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

**Delayed Payment;**

With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following the receipt of such Servicer Report.

**Escrow:**

Applicable

**Non-delivery by Buyer or occurrence of the Effective Maturity Date:**

If Buyer has delivered a Notice of Physical Settlement and:

(a)     Buyer does not Deliver in full the Deliverable Obligations specified in that Notice of Physical Settlement on or prior to the Physical Settlement Date; or

(b)     the Effective Maturity Date occurs after delivery of the Notice of Physical Settlement but before Buyer Delivers the Deliverable Obligations specified in that Notice of Physical Settlement;

then such Notice of Physical Settlement shall be deemed not to have been delivered and any reference in this Confirmation to a previously delivered Notice of Physical Settlement shall exclude any Notice of Physical Settlement that is deemed not to have been delivered.  Sections 9.2(c)(ii) (except for the first sentence thereof), 9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives Definitions shall not apply.

12

6.    Additional Provisions:

(a)    *Delivery of Servicer Report*

If either party makes a request in writing, the Calculation Agent agrees to provide such party with a copy of the most recent Servicer Report promptly following receipt of such request, if and to the extent such Servicer Report is reasonably available to the Calculation Agent (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation Agent or the party that notifies the other party that the relevant Floating Payment or Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of any Servicer Report relevant to such payment that is requested by the party that is not the Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and to the extent that such Servicer Report is reasonably available to the Notifying Party (whether or not the Notifying Party is a holder of the Reference Obligation).

(b)    *Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating (i) the Fixed Amount payable on each Fixed Rate Payer Payment Date; (ii) the occurrence of a Floating Amount Event and the related Floating Amount and (iii) the occurrence of an Additional Fixed Payment Event and the related Additional Fixed Amount; provided that notwithstanding the above, each of Buyer and Seller shall be entitled to determine and calculate the above amounts to the extent that Buyer or Seller, as applicable, has the right to deliver a notice to the other party demanding payment of such amount. The Calculation Agent or Buyer or Seller, as applicable, shall make such determinations and calculations based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are reasonably available to the Calculation Agent or such party. The Calculation Agent or Buyer or Seller, as applicable, shall, as soon as practicable after making any of the determinations or calculations specified in (i) and (ii) above, notify the parties or the other party, as applicable, of such determinations and calculations. For the avoidance of doubt, if an Interest Shortfall Amount is not explicitly set out in the Servicer Report but the Calculation Agent determines that an Interest Shortfall has occurred on the basis of information in such Servicer Report, then the relevant Interest Shortfall Amount shall be calculated by the Calculation Agent on the basis of such information.

(c)    *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to this Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

7.    Independent Amount:

The Independent Amount for Party B for this Transaction is 7.50% of the Initial Face Amount.

13

8.    Offices:

The Office of Buyer for this Transaction is Charlotte.

The Office of Seller for this Transaction is Delray Beach.

9.    Notice and Account Details:

Telephone, Telex and/or
Facsimile Numbers and
Contact Details for Notices:

Buyer:    Wachovia Bank, N.A.
Phone:  (704) 383-4599
Fax:  (704) 383-9139

Seller:    Please advise.

Account Details:

Account Details of Buyer:    Wachovia Bank, N.A.
CIB Group, ABA 053000219
Ref:  Derivative Desk (Trade No:5076772)
Account No: 04659360006116

Account Details of Seller:    Please advise.

10.    Additional Definitions and Amendments to the Credit Derivatives Definitions:

(a)    References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b)    (i)    The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

        (ii)    The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

        (iii)    The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

(c)    For the purposes of this Transaction only, the following terms have the meanings given below:

14

"Actual Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"Aggregate Implied Writedown Amount" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts, provided that if Implied Writedown is not applicable, the Aggregate Implied Writedown Amount shall be deemed to be zero.

"Current Factor" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report or such specified factor includes deferred or capitalized interest relating to the Term of this Transaction, then the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"Current Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i)     zero; and

(ii)    the product of:

    (A)    the Implied Writedown Percentage; and

    (B)    the greater of:

        (1)    zero; and

        (2)    the lesser of (x) the Pari Passu Amount and (y) the product of (I) the Pari Passu Amount plus the Senior Amount; and (II) an amount equal to one minus the Overcollateralization Ratio.

"Delayed Payment" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"Delayed Payment Amount" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i)     if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

15

(ii)    if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii)   if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date.  The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of "Writedown" or paragraphs (ii)(B) or (iii) of "Writedown Reimbursement", respectively) as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000.  The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount.  For the avoidance of doubt: (a) if any capitalization of interest in respect of the Reference Obligation occurred during the Term of this Transaction and has not been recovered by holders of the Reference Obligation pursuant to the terms of the Underlying Instruments, then, for the purposes of determining the amount of Deliverable Obligations to be Delivered, the Exercise Amount (determined above by reference to the original face amount) will represent an outstanding principal balance of the Reference Obligation to be Delivered by Buyer that includes the proportion of unrecovered interest attributable to the Reference Obligation to be Delivered and (b) notwithstanding the foregoing, the Physical Settlement Amount payable by Seller in relation to such Exercise Amount shall not include any amount in respect of such unrecovered interest.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding capitalized interest) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in

accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Interest" means the occurrence of an Interest Shortfall Amount or Interest Shortfall Amounts (calculated on a cumulative basis) in excess of the relevant Payment Requirement.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero, provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the product of the Pari Passu Amount and the Implied Writedown Percentage.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of

17

the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i)    all payments of principal;

(ii)    all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii)    forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv)    any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v)    any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition.

For the avoidance of doubt, the Outstanding Principal Amount shall not include any portion of the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

"Overcollateralization Ratio" means, in respect of a Reference Obligation Calculation Period:

(i)    if the most recent Servicer Report sets out a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations on the Reference Obligation (subject to certain adjustments as described in the Underlying Instruments) to (B) the Pari Passu Amount plus the Senior Amount, then such ratio; or

(ii)    if the ratio cannot be determined under (i) but the most recent Servicer Report for one or more senior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the senior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation to (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iii)    if the ratio cannot be determined under (ii) but the most recent Servicer Report for one or more junior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the junior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation (including the Reference Obligation) and (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

18

(iv)     if the ratio cannot be determined under (iii), then a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations under the Reference Obligation to (B) the Pari Passu Amount plus the Senior Amount.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking *pari passu* in priority with the Reference Obligation.

"PIK-able" means, in relation to a Reference Obligation, that the Underlying Instruments include provisions that provide for capitalization or deferral of interest on such Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period.

"Principal Payment" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"Principal Payment Amount" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"Principal Shortfall Amount" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i)     zero; and

(ii)     the amount equal to the product of:

   (A)     the Expected Principal Amount minus the Actual Principal Amount;

   (B)     the Applicable Percentage; and

   (C)     the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"Principal Shortfall Reimbursement" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"Principal Shortfall Reimbursement Amount" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Principal Shortfall Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation

19

Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"Rating Agencies" means Fitch, Moody's and Standard & Poor's.

"Reference Obligation Calculation Period" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Related Obligation" means, in relation to the Reference Obligation, an obligation of the Reference Entity that is also secured by the Underlying Assets but ranks senior or junior to the Reference Obligation in priority of payment. In relation to a Related Obligation, the terms "Servicer", "Servicer Report" and "Underlying Instruments" shall have the meanings set out in this Confirmation but with references in the definitions of those terms to "Reference Obligation" being deemed, solely for this purpose, to be references to the Related Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest-accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub-servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports in relation to the Reference Obligation pursuant to the Underlying Instruments.

"Servicer Report" means a periodic statement or report regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

20

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i)    (A)    a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

    (B)    the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii)    the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii)    if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i)    a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii)    (A)    an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

    (B)    a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii)    if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i)    the sum of all Writedown Reimbursements on that day;

(ii)    the Applicable Percentage; and

(iii)    the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occuring prior to such Additional Fixed Amount Payment Date.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

Wachovia Bank  N.A.

By: _____

Name:   Tracey Bissell
Title:    Vice President

Confirmed as of the date first above written:

CDO Plus Master Fund Ltd

By: _____

Name: Donald Uderitz
Title: Director

Wachovia Reference No.: 5076772

22

Interest Shortfall Cap Annex

If Interest Shortfall Cap is applicable, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | Fixed Cap |

Interest Shortfall Cap Amount:  If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred.

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a)   the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs;

(b)   the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c)   the actual number of days in such Fixed Rate Payer Calculation Period divided by 360.

Interest Shortfall Compounding:    Applicable.

Interest Shortfall Reimbursement Payment Amount:    If Interest Shortfall Cap is applicable, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of:

(a)   zero; and

(b)   the amount equal to:

(i)   the product of:

(A)   the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference

23

Obligation Payment Date; and

(B)    either:

(1)    if Interest Shortfall Compounding is applicable, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

(2)    if Interest Shortfall Compounding is not applicable, 1;

minus

(ii)    the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

**Cumulative Interest Shortfall Amount:**    With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)    zero; and

(b)    an amount equal to:

(i)    the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

(ii)    the Interest Shortfall Amount (if any) in respect of such Reference Obligation

24

Payment Date; plus

(iii)    either:

(A)    if Interest Shortfall Compounding is applicable, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

(B)    if Interest Shortfall Compounding is not applicable, 0; minus

(iv)    the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Amount:

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a)    zero; and

(b)    the amount equal to:

(i)    the sum of:

(A)    the Interest Shortfall Payment

25

Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Payment Date; and

(B)   the product of:

(1)   the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Payment Date); and

(2)   either:

(AA)   if Interest Shortfall Compounding is applicable, the relevant Cumulative Interest Shortfall Payment Compounding Factor; or

(BB)   if Interest Shortfall Compounding is not applicable, 1;

minus

(ii)   any Interest Shortfall Reimbursement Payment Amount paid on such Fixed Rate Payer Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x)   the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)   any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative

26

Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

| | |
|---|---|
| Cumulative Interest Shortfall Payment Compounding Factor: | With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of: |

(a)     1.0;

plus

(b)     the product of:

(i)     the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

(ii)    the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be 1.0 during the period from but excluding the Effective Maturity Date to and including the Termination Date.

| | |
|---|---|
| Relevant Rate: | With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if: |

(a)     the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b)     the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c)     the following terms applied:

(i)     the Floating Rate Option were the Rate Source;

(ii)    the Designated Maturity were the period that corresponds to the usual length of a

27

Fixed Rate Payer Calculation Period; and

(iii)   the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Rate Source:        USD-LIBOR-BBA

28



CDO Plus Master Fund Ltd.

fax: 561 330 8006
andrea@rekonadvisors.com

| | | | |
|---|---|---|---|
| **To:** | Derivative Documentation | **From:** | Andrea Miller |
| **Fax:** | 704.383.9139 | **Pages:** | 29 |
| **Phone:** | | **Date:** | 6/15/2007 |
| **Re:** | | **CC:** | |

**Comments:**