**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

CDO PLUS MASTER FUND LTD.,       :    **07 CV 11078 (LTS)(AJP)**

        : 

        Plaintiff,      :    **DECLARATION OF**

        :    **TERENCE W. McCORMICK**

     - against -      :    **IN OPPOSITION TO**

        :    **WACHOVIA'S MOTION FOR**

WACHOVIA BANK,      :    **JUDGMENT ON THE**

NATIONAL ASSOCIATION,      :    **PLEADINGS**

        : 

        Defendant.      : 

-----------------------------------------------------------X

      **TERENCE W. McCORMICK** makes the following Declaration under the

penalty of perjury pursuant to 28 U.S.C. §1746 that the following is true and

correct:

      1.      I am an associate of the law firm of Mintz & Gold LLP, litigation

counsel to Plaintiff CDO Plus Master Fund, Ltd. ("CDO Plus"), in the above-

captioned action. I respectfully submit this Declaration in opposition to the

motion of Defendant Wachovia Bank, N.A. ("Wachovia"), for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).

      2.      Annexed to this Declaration as Exhibit 1 is a true copy of the

Wachovia confirmation letter, dated May 30, 2007, governing the swap

transaction at issue in this action.

3.      Annexed to this Declaration as <u>Exhibit 2</u> is a true copy of the 1992 Master Agreement of the International Swaps and Derivatives Association ("<u>ISDA</u>"), dated as of May 4, 2007 (the "<u>ISDA Master Agreement</u>"), entered into between Wachovia as "Party A" and CDO Plus as "Party B."

4.      Annexed to this Declaration as <u>Exhibit 3</u> is a true copy of the Schedule to the foregoing ISDA Master Agreement, executed and delivered by Wachovia and CDO Plus, dated as of May 4, 2006.

5.      Annexed to this Declaration as <u>Exhibit 4</u> is a true copy of the Credit Support Annex entered into between Wachovia and CDO Plus, dated as of May 4, 2007. The document cross-references paragraphs 1 through 12 of the 1994 standard form ISDA Credit Support Annex (*see* <u>Exhibit 5</u>, below).

6.      Annexed to this Declaration as <u>Exhibit 5</u> is a true copy of the standard form 1994 ISDA Credit Support Annex (Bilateral Form – ISDA Agreements Subject to New York Law). I obtained this document from the International Swaps and Derivatives Association in New York on June 11, 2008.

7.      Annexed to this Declaration as <u>Exhibit 6</u> is a copy of the decision in *High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*, Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005)(Ira Gammerman, *J.S.C.*)

8.      Annexed to this Declaration as <u>Exhibit 7</u> is a copy of the decision by the High Court of Justice, Queen's Bench Division, in *Peregrine Fixed Income*

2

*Limited (In Liquidation) v. Robinson Dep't Store Public Company Limited*, [2000]

EWHC (QB) Commercial 99 (Eng.).

Executed at New York, New York on this 28th day of August, 2008

_____

Terence W. McCormick



# FAX TRANSMITTAL

| | |
|---|---|
| **TO:** | Alyssa D'Amore |
| **COMPANY:** | CDO Plus Master Fund Ltd |
| **FAX:** | 15613308006 |
| **TOTAL PAGES:** | 29            (INCLUDING COVERPAGE) |
| **FROM:** | Derivative Documentation |
| **TELEPHONE:** | (704) 383-4599 Credit Default; (704) 715-7051 Fixed Income |
| **FAX#** | 704-383-9139 |
| **DATE:** | Wednesday, June 06, 2007 3:24:38 PM |
| **RE:** | |

Wachovia has entered into a transaction with you per the document (the "Confirmation") attached. Please review the Confirmation containing the terms and conditions of the transaction.

If you agree with the terms specified therein, please arrange for the Confirmation to be signed by your authorized signatories and return via facsimile to the number above. For questions or concerns, please contact the Documentation Group at (704) 383-4599 for Credit Default confirms and (704) 715-7051 for Fixed Income.

Your prompt attention is appreciated.

Kind Regards,
Derivative Documentation


**WACHOVIA**

Date:            May 30, 2007

To:              CDO Plus Master Fund Ltd  ("Party B")
Attn:            Alyssa D'Amore
Fax No.:         561-330-8006

From:            Wachovia Bank, N.A. ("Party A")

RE:              Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or
                 Physical Settlement

Reference No.:   5076772

---

Dear Alyssa D'Amore:

      The purpose of this letter (the "Confirmation") is to confirm the terms and conditions of the
Credit Derivative Transaction relating to a collateralized debt obligation reference obligation entered into
between us on the Trade Date specified below (the "Transaction").   This Confirmation constitutes a
"Confirmation" as referred to in the ISDA Master Agreement specified below.

      The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the
"Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association,
Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit
Derivatives Definitions and this Confirmation, this Confirmation shall govern.

      This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement,
dated as of May 04, 2007, as amended and supplemented from time to time (the "Agreement"), between
you and us.  All provisions contained in the Agreement govern this Confirmation except as expressly
modified below.

      References in this Confirmation to the "Reference Obligation" shall be to the terms of the
Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as
amended from time to time unless otherwise specified below.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      General Terms:

        Trade Date:              May 21, 2007

        Effective Date:          May 24, 2007

        Scheduled Termination Date:    The Legal Final Maturity Date of the Reference
                                       Obligation, subject to adjustment in accordance with
                                       the Following Business Day Convention.

Copyright ©June 2006 by International Swaps & Derivatives Association, Inc.

| Termination Date: | The last to occur of: |
|---|---|

| | (a) | the fifth Business Day following the Effective Maturity Date; |
|---|---|---|
| | (b) | the last Floating Rate Payer Payment Date; |
| | (c) | the last Delivery Date; and |
| | (d) | the last Additional Fixed Amount Payment Date. |

| Floating Rate Payer: | Party B (the "Seller"). |
|---|---|
| Fixed Rate Payer: | Party A (the "Buyer"). |
| Calculation Agent: | Party A |
| Calculation Agent City: | New York |
| Business Day: | New York and London |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Forge ABS High Grade CDO LTD 2007-1A |
| Reference Obligation: | The obligation identified as follows: |

| | Issuer: | The Reference Entity |
|---|---|---|
| | CUSIP/ISIN: | 34630BAS1 |
| | Bloomberg ID: | FORGE 2007-1A B |
| | Legal final maturity date: | October 05, 2053 |
| | Original Principal Amount: | USD 25,500,000.00 |
| | Initial Factor: | 1.0 |
| | Coupon: | 3 Month LIBOR+0.58% With No Cap |

Section 2.30 of the Credit Derivatives Definitions shall not apply.

| Reference Policy: | Not Applicable |
|---|---|
| Reference Price: | 100% |
| Applicable Percentage: | On any day, a percentage equal to A divided by B. |

"A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal

balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.

"B" means the product of the Original Principal Amount and the Initial Factor;

    (a)    as increased by the outstanding principal balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and

    (b)    as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity.

| | |
|---|---|
| Initial Face Amount: | USD 10,000,000.00 |
| Reference Obligation Notional Amount: | On the Effective Date, the product of: |

    (a)    the Original Principal Amount;

    (b)    the Initial Factor; and

    (c)    the Applicable Percentage.

Following the Effective Date, the Reference Obligation Notional Amount will be:

    (i)    decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;

    (ii)    decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;

    (iii)    decreased on each day on which a Writedown occurs by the relevant Writedown Amount;

    (iv)    increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or (iii) of the definition of "Writedown Reimbursement"; and

    (v)    decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph

3

(b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is negative) with effect from such Delivery Date;

provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero.

For the avoidance of doubt, the Reference Obligation Notional Amount shall not be increased by any deferral or capitalization of interest during the Term of this Transaction or decreased by payment of any portion of the principal balance of the Reference Obligation that is attributable to deferral or capitalization of interest during the Term of this Transaction.

| | |
|---|---|
| Initial Payment: | Not applicable |

2.     Fixed Payments:

| | |
|---|---|
| Fixed Rate Payer: | Buyer |
| Fixed Rate: | 2.75% per annum |
| Fixed Rate Payer Period End Date: | The first day of each Reference Obligation Calculation Period. |
| Fixed Rate Payer Payment Dates: | Each day falling five Business Days after a Reference Obligation Payment Date; provided that the final Fixed Rate Payer Payment Date shall fall on the fifth Business Day following the Effective Maturity Date. |
| Fixed Amount: | With respect to any Fixed Rate Payer Payment Date, an amount equal to the product of: |

(a)     the Fixed Rate;

(b)     an amount determined by the Calculation Agent equal to:

(i)     the sum of the Reference Obligation Notional Amount as at 5:00 p.m. in the Calculation Agent City on each day in the related Fixed Rate Payer Calculation Period; divided by

(ii)     the actual number of days in the related

4

Fixed Rate Payer Calculation Period; and

(c) the actual number of days in the related Fixed Rate Payer Calculation Period divided by 360.

Additional Fixed Amount Payment Dates:

(a) Each Fixed Rate Payer Payment Date; and

(b) in relation to each Additional Fixed Payment Event occurring after the second Business Day prior to the last Fixed Rate Payer Payment Date, the fifth Business Day after Buyer has received notification from Seller or the Calculation Agent of the occurrence of such Additional Fixed Payment Event.

Additional Fixed Payments:

Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Payment Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties or by Seller to Buyer stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date.

Additional Fixed Payment Event:

The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement.

Additional Fixed Amount:

With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(a) the Writedown Reimbursement Payment Amount (if any);

(b) the Principal Shortfall Reimbursement Payment Amount (if any); and

(c) the Interest Shortfall Reimbursement Payment Amount (if any).

For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall

be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

3.  Floating Payments:

    Floating Rate Payer:                In relation to a Floating Amount Event, the first Fixed

    Floating Rate Payer:                Seller

    Floating Rate Payer Payment         In relation to a Floating Amount Event, the first Fixed
    Dates:                              Rate Payer Payment Date falling at least two Business
                                        Days (or in the case of a Floating Amount Event that
                                        occurs on the Legal Final Maturity Date or the Final
                                        Amortization Date, the fifth Business Day) after
                                        delivery of a notice by the Calculation Agent to the
                                        parties or a notice by Buyer to Seller that the related
                                        Floating Amount is due and showing in reasonable
                                        detail how such Floating Amount was determined;
                                        provided that any such notice must be given on or prior
                                        to the fifth Business Day following the Effective
                                        Maturity Date.

    Floating Payments:                  If a Floating Amount Event occurs, then on the relevant
                                        Floating Rate Payer Payment Date, Seller will pay the
                                        relevant Floating Amount to Buyer. For the avoidance
                                        of doubt, the Conditions to Settlement are not required
                                        to be satisfied in respect of a Floating Payment.

    Implied Writedown:                  Applicable.

    Floating Amount Event:              A Writedown, a Failure to Pay Principal or an Interest
                                        Shortfall.

    Floating Amount:                    With respect to each Floating Rate Payer Payment
                                        Date, an amount equal to the sum of:

                                        (a)   the relevant Writedown Amount (if any);

                                        (b)   the relevant Principal Shortfall Amount (if any);
                                              and

                                        (c)   the relevant Interest Shortfall Payment Amount
                                              (if any).

                                        For the avoidance of doubt, each Writedown Amount,
                                        Principal Shortfall Amount or Interest Shortfall
                                        Payment Amount (as applicable) shall be calculated
                                        using the Applicable Percentage which takes into
                                        account the aggregate adjustment made to the
                                        Applicable Percentage in respect of all Delivery Dates
                                        that have occurred prior to the date of such calculation.

| Conditions to Settlement: | Credit Event Notice |
|---|---|
| | Notifying Party: Buyer |
| | Notice of Physical Settlement |
| | Notice of Publicly Available Information: Applicable |

| | Public Sources: | The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources. |
|---|---|---|
| | Specified Number: | 1 |

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Conditions to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement and, in relation to the Failure to Pay Interest Credit Event, the Additional Condition to Settlement specified below.

| Additional Condition to Settlement for Failure to Pay Interest: | In addition to the Conditions to Settlement above, in respect of the Failure to Pay Interest Credit Event, if the Reference Obligation is PIK-able, it shall be a Condition to Settlement that a period of at least 360 calendar days has elapsed since the occurrence of the Credit Event without the relevant Interest Shortfall having been reimbursed in full. For the avoidance of doubt, if it is not explicitly made clear in the Servicer Report whether or not, or to what extent, a particular Interest Shortfall has been reimbursed but the Calculation Agent determines that such Interest Shortfall has been reimbursed by a certain amount on the basis of information in such Servicer Report, then the relevant Interest Shortfall reimbursement shall be calculated by the Calculation Agent on the basis of such information. |
|---|---|

| Additional agreements relating to Physical Settlement: | The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions: |
|---|---|

(a)     the Conditions to Settlement may be satisfied on more than one occasion;

(b)     multiple Physical Settlement Amounts may be payable by Seller;

(c)     Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d)     if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e)     any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the Effective Maturity Date.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Credit Events:

The following Credit Events shall apply to this Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Failure to Pay Interest

    Payment Requirement: USD 10,000

Distressed Ratings Downgrade

The definition of "Payment Requirement" in Section 4.8(d) of the Credit Derivatives Definitions shall be amended so that the words "Failure to Pay" are deleted

and replaced by the words "Failure to Pay Interest".

Obligation:                    Reference Obligation Only

4.    Interest Shortfall:

Interest Shortfall Payment        In respect of an Interest Shortfall, the relevant Interest
Amount:                          Shortfall Amount; provided that, if Interest Shortfall Cap is
                                 applicable and the Interest Shortfall Amount exceeds the
                                 Interest Shortfall Cap Amount, the Interest Shortfall
                                 Payment Amount in respect of such Interest Shortfall shall
                                 be the Interest Shortfall Cap Amount.

Interest Shortfall Cap:           Applicable

Interest Shortfall Cap Amount:    As set out in the Interest Shortfall Cap Annex.

Actual Interest Amount:           With respect to any Reference Obligation Payment Date,
                                 payment by or on behalf of the Issuer of an amount in
                                 respect of interest due under the Reference Obligation
                                 (including, without limitation, any deferred interest or
                                 defaulted interest relating to the Term of this Transaction
                                 but excluding payments in respect of prepayment penalties,
                                 yield maintenance provisions or principal, except that the
                                 Actual Interest Amount shall include any payment of
                                 principal representing capitalized interest) to the holder(s) of
                                 the Reference Obligation in respect of the Reference
                                 Obligation.

Expected Interest Amount:         With respect to any Reference Obligation Payment Date, the
                                 amount of current interest that would accrue during the
                                 related Reference Obligation Calculation Period calculated
                                 using the Reference Obligation Coupon on a principal
                                 balance of the Reference Obligation equal to:

                                 (a)    the Outstanding Principal Amount taking into account
                                        any reductions due to a principal deficiency balance
                                        or realized loss amount (however described in the
                                        Underlying Instruments) that are attributable to the
                                        Reference Obligation; minus

                                 (b)    the Aggregate Implied Writedown Amount (if any),

                                 and that will be payable on the related Reference Obligation
                                 Payment Date assuming for this purpose that sufficient funds
                                 are available therefor in accordance with the
                                 Underlying Instruments.

                                 Except as provided in (a) in the previous sentence, the
                                 Expected Interest Amount shall be determined without
                                 regard to (i) unpaid amounts in respect of accrued interest on
                                 prior Reference Obligation Payment Dates; (ii) any
                                 prepayment penalties or yield maintenance provisions; and
                                 (iii) the effect of any provisions (however described) of such
                                 Underlying Instruments that otherwise permit the limitation

9

of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation, or that provide for the extinguishing or reduction of such payments or distributions (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments).

Interest Shortfall:

With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

For the avoidance of doubt, the occurrence of an event within (a) or (b) shall be determined taking into account any payment made under the Reference Policy, if applicable.

Interest Shortfall Amount:

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to the product of:

    (i)     (A)     the Expected Interest Amount;

                minus

        (B)     the Actual Interest Amount; and

    (ii)     the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x)     the number of days in the first Fixed Rate Payer Calculation Period; over

(y)     the number of days in the first Reference Obligation Calculation Period.

Interest Shortfall
Reimbursement:

With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

Interest Shortfall
Reimbursement Amount:

With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage.

Interest Shortfall
Reimbursement Payment

With respect to an Additional Fixed Amount Payment Date, (a) if Interest Shortfall Cap is not applicable, the relevant

10

Amount:

Interest Shortfall Reimbursement Amount, and (b) if Interest Shortfall Cap is applicable, the amount determined pursuant to the Interest Shortfall Cap Annex; provided, in either case, that the aggregate of all Interest Shortfall Reimbursement Payment Amounts (determined for this purpose on the basis that Interest Shortfall Compounding is not applicable) at any time shall not exceed the aggregate of Interest Shortfall Payment Amounts paid by Seller in respect of Interest Shortfalls occurring prior to such Additional Fixed Amount Payment Date.

5. Settlement Terms:

Settlement Method:             Physical Settlement.

Terms Relating to Physical Settlement:

Physical Settlement Period:    Five Business Days

Deliverable Obligations:       Exclude Accrued Interest

Deliverable Obligations:       Deliverable Obligation Category:

                               Reference Obligation Only

Physical Settlement Amount:    An amount equal to:

(a) the product of the Exercise Amount and the Reference Price; minus

(b) the sum of:

(i) if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

(ii) the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage,

provided that if the Physical Settlement Amount would exceed the product of:

(1) the Reference Obligation Notional Amount as of .

11

the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2)    the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

| | |
|---|---|
| Delayed Payment: | With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following the receipt of such Servicer Report. |
| Escrow: | Applicable |
| Non-delivery by Buyer or occurrence of the Effective Maturity Date: | If Buyer has delivered a Notice of Physical Settlement and: |

(a)    Buyer does not Deliver in full the Deliverable Obligations specified in that Notice of Physical Settlement on or prior to the Physical Settlement Date; or

(b)    the Effective Maturity Date occurs after delivery of the Notice of Physical Settlement but before Buyer Delivers the Deliverable Obligations specified in that Notice of Physical Settlement;

then such Notice of Physical Settlement shall be deemed not to have been delivered and any reference in this Confirmation to a previously delivered Notice of Physical Settlement shall exclude any Notice of Physical Settlement that is deemed not to have been delivered. Sections 9.2(c)(ii) (except for the first sentence thereof), 9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives Definitions shall not apply.

6.  Additional Provisions:

(a)  *Delivery of Servicer Report*

If either party makes a request in writing, the Calculation Agent agrees to provide such party with a copy of the most recent Servicer Report promptly following receipt of such request, if and to the extent such Servicer Report is reasonably available to the Calculation Agent (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation Agent or the party that notifies the other party that the relevant Floating Payment or Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of any Servicer Report relevant to such payment that is requested by the party that is not the Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and to the extent that such Servicer Report is reasonably available to the Notifying Party (whether or not the Notifying Party is a holder of the Reference Obligation).

(b)  *Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating (i) the Fixed Amount payable on each Fixed Rate Payer Payment Date; (ii) the occurrence of a Floating Amount Event and the related Floating Amount and (iii) the occurrence of an Additional Fixed Payment Event and the related Additional Fixed Amount; provided that notwithstanding the above, each of Buyer and Seller shall be entitled to determine and calculate the above amounts to the extent that Buyer or Seller, as applicable, has the right to deliver a notice to the other party demanding payment of such amount. The Calculation Agent or Buyer or Seller, as applicable, shall make such determinations and calculations based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are reasonably available to the Calculation Agent or such party. The Calculation Agent or Buyer or Seller, as applicable, shall, as soon as practicable after making any of the determinations or calculations specified in (i) and (ii) above, notify the parties or the other party, as applicable, of such determinations and calculations. For the avoidance of doubt, if an Interest Shortfall Amount is not explicitly set out in the Servicer Report but the Calculation Agent determines that an Interest Shortfall has occurred on the basis of information in such Servicer Report, then the relevant Interest Shortfall Amount shall be calculated by the Calculation Agent on the basis of such information.

(c)  *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to this Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

7.  Independent Amount:

The Independent Amount for Party B for this Transaction is 7.50% of the Initial Face Amount.

8.    Offices:

The Office of Buyer for this Transaction is Charlotte.

The Office of Seller for this Transaction is Delray Beach.

9.    Notice and Account Details:

Telephone, Telex and/or
Facsimile Numbers and
Contact Details for Notices:

|  |  |  |
|---|---|---|
| Buyer: | Wachovia Bank, N.A. |
|  | Phone:  (704) 383-4599 |
|  | Fax:  (704) 383-9139 |
| Seller: | Please advise. |

Account Details:

| Account Details of Buyer: | Wachovia Bank, N.A. |
|---|---|
|  | CIB Group, ABA 053000219 |
|  | Ref:  Derivative Desk (Trade No:5076772) |
|  | Account No:  04659360006116 |
| Account Details of Seller: | Please advise. |

10.    Additional Definitions and Amendments to the Credit Derivatives Definitions:

(a)    References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b)    (i)    The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

(ii)    The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

(iii)    The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

(c)    For the purposes of this Transaction only, the following terms have the meanings given below:

14

"Actual Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"Aggregate Implied Writedown Amount" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts, provided that if Implied Writedown is not applicable, the Aggregate Implied Writedown Amount shall be deemed to be zero.

"Current Factor" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report or such specified factor includes deferred or capitalized interest relating to the Term of this Transaction, then the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"Current Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i)      zero; and

(ii)     the product of:

    (A)      the Implied Writedown Percentage; and

    (B)      the greater of:

        (1)      zero; and

        (2)      the lesser of (x) the Pari Passu Amount and (y) the product of (I) the Pari Passu Amount plus the Senior Amount; and (II) an amount equal to one minus the Overcollateralization Ratio.

"Delayed Payment" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"Delayed Payment Amount" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i)      if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

(ii)     if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii)     if publicly rated by Fitch, (A) is downgraded to "CCC") or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date. The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of "Writedown" or paragraphs (ii)(B) or (iii) of "Writedown Reimbursement", respectively) as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000. The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount. For the avoidance of doubt: (a) if any capitalization of interest in respect of the Reference Obligation occurred during the Term of this Transaction and has not been recovered by holders of the Reference Obligation pursuant to the terms of the Underlying Instruments, then, for the purposes of determining the amount of Deliverable Obligations to be Delivered, the Exercise Amount (determined above by reference to the original face amount) will represent an outstanding principal balance of the Reference Obligation to be Delivered by Buyer that includes the proportion of unrecovered interest attributable to the Reference Obligation to be Delivered and (b) notwithstanding the foregoing, the Physical Settlement Amount payable by Seller in relation to such Exercise Amount shall not include any amount in respect of such unrecovered interest.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding capitalized interest) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in

accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Interest" means the occurrence of an Interest Shortfall Amount or Interest Shortfall Amounts (calculated on a cumulative basis) in excess of the relevant Payment Requirement.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero, provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the product of the Pari Passu Amount and the Implied Writedown Percentage.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of

the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i)     all payments of principal;

(ii)    all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii)   forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv)    any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v)     any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition.

For the avoidance of doubt, the Outstanding Principal Amount shall not include any portion of the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

"Overcollateralization Ratio" means, in respect of a Reference Obligation Calculation Period:

(i)     if the most recent Servicer Report sets out a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations on the Reference Obligation (subject to certain adjustments as described in the Underlying Instruments) to (B) the Pari Passu Amount plus the Senior Amount, then such ratio; or

(ii)    if the ratio cannot be determined under (i) but the most recent Servicer Report for one or more senior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the senior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation to (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iii)   if the ratio cannot be determined under (ii) but the most recent Servicer Report for one or more junior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A)  the product of (1) such ratio determined with respect to the junior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation (including the Reference Obligation) and (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iv)     if the ratio cannot be determined under (iii), then a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations under the Reference Obligation to (B) the Pari Passu Amount plus the Senior Amount.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking *pari passu* in priority with the Reference Obligation.

"PIK-able" means, in relation to a Reference Obligation, that the Underlying Instruments include provisions that provide for capitalization or deferral of interest on such Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period.

"Principal Payment" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"Principal Payment Amount" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"Principal Shortfall Amount" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i)     zero; and

(ii)     the amount equal to the product of:

(A)     the Expected Principal Amount minus the Actual Principal Amount;

(B)     the Applicable Percentage; and

(C)     the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"Principal Shortfall Reimbursement" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"Principal Shortfall Reimbursement Amount" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Principal Shortfall Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation

Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"Rating Agencies" means Fitch, Moody's and Standard & Poor's.

"Reference Obligation Calculation Period" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Related Obligation" means, in relation to the Reference Obligation, an obligation of the Reference Entity that is also secured by the Underlying Assets but ranks senior or junior to the Reference Obligation in priority of payment. In relation to a Related Obligation, the terms "Servicer", "Servicer Report" and "Underlying Instruments" shall have the meanings set out in this Confirmation but with references in the definitions of those terms to "Reference Obligation" being deemed, solely for this purpose, to be references to the Related Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest-accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub-servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports in relation to the Reference Obligation pursuant to the Underlying Instruments.

"Servicer Report" means a periodic statement or report regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i)     (A)     a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

          (B)     the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii)     the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii)     if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i)     a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii)     (A)     an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

          (B)     a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii)     if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i)     the sum of all Writedown Reimbursements on that day;

(ii)     the Applicable Percentage; and

(iii)    the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

Wachovia Bank, N.A.

By: _____

Name:   Tracey Bissell
Title:   Vice President

Confirmed as of the date first above written:

CDO Plus Master Fund Ltd

By: _____

Name:
Title:

Wachovia Reference No.: 5076772

Interest Shortfall Cap Annex

If Interest Shortfall Cap is applicable, then the following provisions will apply:

Interest Shortfall Cap Basis: Fixed Cap

Interest Shortfall Cap Amount: If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred.

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a)     the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs;

(b)     the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c)     the actual number of days in such Fixed Rate Payer Calculation Period divided by 360.

Interest Shortfall
Compounding: Applicable.

Interest Shortfall
Reimbursement Payment
Amount: If Interest Shortfall Cap is applicable, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to:

(i)     the product of:

(A)     the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference

23

Obligation Payment Date; and

(B)    either:

    (1)    if Interest Shortfall Compounding is applicable, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

    (2)    if Interest Shortfall Compounding is not applicable, 1;

minus

(ii)    the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

**Cumulative Interest Shortfall Amount:**

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)    zero; and

(b)    an amount equal to:

    (i)    the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

    (ii)    the Interest Shortfall Amount (if any) in respect of such Reference Obligation

24

Payment Date; plus

(iii)    either:

(A)    if Interest Shortfall Compounding is applicable, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

(B)    if Interest Shortfall Compounding is not applicable, 0; minus

(iv)    the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Amount:

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a)    zero; and

(b)    the amount equal to:

(i)    the sum of:

(A)    the Interest Shortfall Payment

Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Payment Date; and

(B)     the product of:

(1)     the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Payment Date); and

(2)     either:

(AA)    if Interest Shortfall Compounding is applicable, the relevant Cumulative Interest Shortfall Payment Compounding Factor; or

(BB)    if Interest Shortfall Compounding is not applicable, 1;

minus

(ii)    any Interest Shortfall Reimbursement Payment Amount paid on such Fixed Rate Payer Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x)     the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)     any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative

Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Compounding Factor:

With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of:

(a)     1.0;

plus

(b)     the product of:

(i)     the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

(ii)    the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be 1.0 during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Relevant Rate:

With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a)     the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b)     the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c)     the following terms applied:

(i)     the Floating Rate Option were the Rate Source;

(ii)    the Designated Maturity were the period that corresponds to the usual length of a

27

Fixed Rate Payer Calculation Period; and

(iii)    the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Rate Source:               USD-LIBOR-BBA

(Multicurrency — Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of May 4, 2007

**WACHOVIA BANK,**
**NATIONAL ASSOCIATION**
**("Party A")**

and   **CDO PLUS MASTER FUND LTD.**
  **("Party B")**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1.　　　**Interpretation**

(a)　　*Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)　　*Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)　　*Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.　　　**Obligations**

(a)　　*General Conditions.*

(i)　　　Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)　　　Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)　　　Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)  promptly notify the other party ("Y") of such requirement;

        (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)    *Liability.* If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through

ISDA® 1992

which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

        (i)      *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

        (ii)      *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

        (iii)      *Credit Support Default.*

                (1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

                (2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

                (3)  the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

        (iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

        (v)      *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

        (vi)      *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to

Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding- up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

ISDA® 1992

(i)     *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

> (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

> (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)     *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)     *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)     *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)     *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.     Early Termination**

(a)     *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event.*

(i)     *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)     *Right to Terminate.* If: —

(1)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is

then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)     *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non- defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount

(determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) **Termination Events.** If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) **Adjustment for Bankruptcy.** In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) **Pre-Estimate.** The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

ISDA® 1992

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non- exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

ISDA® 1992

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that

would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)      the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**ISDA® 1992**

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross- currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a. m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of

such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**WACHOVIA BANK, NATIONAL ASSOCIATION**

By: _Alexis S. Alpert_
Name: Alexis S. Alpert
Title:   Vice President

**CDO PLUS MASTER FUND LTD.**

By: _____
Name: _Director_
Title:  _CDO Plus Master Fund, LTD_

18                                                   **ISDA® 1992**

**SCHEDULE**
to the
**MASTER AGREEMENT**
dated as of May 4, 2007 between
**WACHOVIA BANK, NATIONAL ASSOCIATION** ("Party A")
and **CDO PLUS MASTER FUND LTD.** ("Party B")

Part 1. **Termination Provisions**

(a)     **"Specified Entity"** means each party's Affiliates for purposes of Section 5(a)(v), and in addition, with respect to Party B, Specified Entity means any Investment Vehicle (as hereinafter defined) for purposes of Section 5(a)(vii).

(b)     **"Specified Transaction".** The definition of *"Specified Transaction"* in Section 14 of this Agreement is hereby amended by: (1) deleting in the second through the fifth lines thereof the words "between one party ... which is a" and replacing them with the words "(i) in the case of Party A, between Party A and Party B (or any Credit Support Provider of such party or any applicable Specified Entity of such party), and (ii) in the case of Party B, between Party B (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and any other person or entity, including without limitation Party A, including without limitation any" and (2) adding the text "commodity transaction, credit derivative transaction, repurchase or reverse repurchase transaction, forward bond purchase transaction, buy/sell-back transaction, securities lending transaction, exchange-traded futures transaction, prime brokerage or margin lending transaction," after the words "foreign exchange transaction," in the sixth line thereof.

(c)     **"Cross Default"** applies to both parties.

        **"Specified Indebtedness"** means any obligation (whether present, future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money or relating to the payment or delivery of funds, securities or other property (including, without limitation, collateral), other than indebtedness in respect of any bank deposits received in the ordinary course of business.

        **"Threshold Amount"** means, with respect to Party A, an amount (including its equivalent in another currency) equal to 2% of its stockholders' equity as reflected on its most recent financial statements or call reports, and with respect to Party B, the lower of $10,000,000 or 2% of the Net Asset Value of Party B, provided that for any Specified Indebtedness payable by Party B (or any Specified Entity or Credit Support Provider of Party B) to Party A or to any of Party A's Affiliates, Threshold Amount means any amount of such Specified Indebtedness.

(d)     **"Credit Event Upon Merger"** applies to both parties.

(e)     **"Automatic Early Termination"** does not apply to either party.

        (i) Notwithstanding the foregoing, if the bankruptcy or insolvency laws of the jurisdiction in which the Defaulting Party is organized or formed do not expressly permit the Non-defaulting Party to exercise its rights under Section 6(a) for an Event of Default under Section 5(a)(vii)(4) or (6) with respect to the Defaulting Party, then Automatic Early Termination shall apply to the Defaulting Party.

        (ii) In addition to the provisions of Section 6(e)(iii), if an Early Termination Date occurs under Section 6(a) as the result of Automatic Early Termination, and if the Non-defaulting Party determines that it either sustained or incurred a loss or damage or benefited from a gain in respect of any Transaction, as a result

19

of any change in one or more rates, prices, yields, quotations, volatilities, spreads or other measures of economic value or risk relevant to that Transaction or to any related hedge of the Non-defaulting Party between that Early Termination Date and the date upon which the Non-defaulting Party first becomes aware of the occurrence of that Early Termination Date, then the Termination Currency Equivalent of the amount of such loss or damage shall be added to the amount due by the Defaulting Party or deducted from the amount due by the Non-defaulting Party, as the case may be (in both cases pursuant to Section 6(e)(i)(3)), or the Termination Currency Equivalent of the amount of such gain shall be deducted from the amount due by the Defaulting Party or added to the amount due by the Non-defaulting Party, as the case may be (in both cases pursuant to Section 6(e)(i)(3)).

(f)      **Payments on Early Termination.** Except as otherwise provided herein or in a Confirmation with respect to a Transaction, "Market Quotation" and the "Second Method" apply.

(g)      **"Termination Currency"** means U.S. Dollars.

(h)      **Bankruptcy.** The Bankruptcy provisions of Section 5(a)(vii) shall apply to Party A and Party B, provided that, with respect to Party B, such provisions shall be amended by deleting the number "30" appearing in clauses (4)(B) and (7) thereof and substituting "0" in lieu thereof.

(i)      **"Additional Termination Event"** applies to Party B and shall mean the occurrence of any of the following events (and for such purpose, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions):

(i)      Party B fails to notify Party A of Party B's Net Asset Value in accordance with the terms of Part 3 of this Schedule.

(ii)     On any date, Party B's Net Asset Value declines by 15% or more (x) during the prior 30 days or (y) since the preceding calendar month-end.

(iii)    On any date, Party B's Net Asset Value declines by 20% or more (x) during the prior 90 days or (y) since Party B's preceding fiscal quarter-end.

(iv)     On any date, Party B's Net Asset Value declines by 30% or more (x) during the prior 365 days, or (y) since Party B's preceding fiscal year-end.

(v)      On any date, the Net Asset Value of Party B is less than the greater of (A) USD 13,000,000 or (B) 60% of the highest fiscal year end Net Asset Value of Party B at any fiscal year end, beginning with the audited annual financial statements for the fiscal year ended December 31, 2007.

(vi)     (A) rékon advisors llc (the "Investment Manager") ceases to be the Investment Manager, (B) the Investment Manager becomes, in the reasonable opinion of Party A, incapable of performing its duties as Investment Manager or otherwise fails to act on behalf of Party B in principally the same or similar capacity as that held as of the date of this Agreement, or an event of the type specified in Section 5(a)(vii) occurs with respect to the Investment Manager, or (C) Party B appoints another investment manager, and in the case of (A), (B) and (C) above, such investment manager shall not have been replaced with another person or entity satisfactory to Party A, as evidenced in writing by Party A and thereafter, the term "Investment Manager" shall refer to such successor.

(vii)    (A) any of Party B's Operative Documents are terminated or cease to be in full force and effect, or (B) there is a change to or modification of Party B's Operative Documents, investment policies or guidelines or to the nature of Party B's business, if Party A determines that such action has had, or will

have, a material adverse effect on Party B, the creditworthiness of Party B or the ability of Party B to perform its obligations under this Agreement.

(viii)     Donald Uderitz or Jorge Rodriquez-Lugo dies, is declared incompetent or is no longer an employee or in control of Party B or the Investment Manager or ceases to be involved in the investment decisions of Party B, in principally the same or similar capacity as that held as of the date of this Agreement

(j)     **Events of Default.**  An Event of Default shall not occur with respect to a party under Section 5(a)(v)(1) or (2) or Section 5(a)(vi) when the failure to pay or deliver, or the default, event of default or other similar condition or event, as the case may be, arises solely (i) out of a wire transfer problem or an operational or administrative error or omission (so long as the required funds or property required to make that payment or delivery were otherwise available to that party), or (ii) from the general unavailability of the relevant currency due to exchange controls or other similar governmental action, but in either case only if the payment or delivery is made within three Local Business Days after the problem has been corrected, the error or omission has been discovered or the currency becomes generally available.

(k)     **Optional Early Termination.**  (A) Unless a Confirmation of a Transaction provides otherwise, and subject to the prior exercise of any early termination, optional termination or cash settlement provisions contained in such Confirmation, either party may elect to designate any Optional Termination Date as an "Early Termination Date" for that Transaction by giving notice to the other party of such election, provided that (i) such Transaction does not otherwise become a Terminated Transaction on or before such Optional Termination Date under Section 6(e) of this Agreement, and (ii) an Event of Default, a Potential Event of Default or a Termination Event does not exist with respect to the party making the election.  Any such notice shall be in writing, shall identify the relevant Transaction and Optional Termination Date being designated, shall be given at least five (5) New York Business Days prior to the designated Optional Termination Date for that Transaction, and may be given no more than once with respect to the same Transaction. As used herein, "Optional Termination Date" for a Transaction means the second anniversary of the Trade Date of that Transaction and any New York Business Day thereafter prior to the Termination Date of such Transaction, subject in each case to the Modified Following Business Day Convention.

(B) Unless the parties otherwise agree on the early termination date and the amount, due date and payer of the early termination payment to be made, any Transaction for which an election is made in accordance with clause (A) above will terminate in accordance with Section 6(c)(ii) of this Agreement and be replaced by an obligation of one party to make a payment for that Transaction under Section 6(e) of this Agreement.  For that purpose, a "Termination Event" shall be deemed to occur on the Optional Termination Date with respect to that Transaction as the "Terminated Transaction", and the party making such election shall be the sole "Affected Party".  Such payment will be due in accordance with Section 6(d)(ii) of this Agreement.

Part 2.  <u>**Tax Representations**</u>

(a)     **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, each party makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.

21

In making this representation, a party may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.**   For the purpose of Section 3(f) of this Agreement:

(i) Party A makes the following representation(s):

(A) It is a national banking association organized or formed under the laws of the United States and is a United States resident for United States federal income tax purposes.

(B) Party A makes no other Payee Tax Representations.

(ii) Party B makes the following representation(s):

(A) It is  an exempt company organized under the laws of Jersey.

(B) It is a "non-U.S. branch of a foreign person" as that term is used in Section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" as that term is used in Section 1.6041-4(a)(4) of the United States Treasury Regulations.

(C) Each payment received or to be received by it in connection with this Agreement will not be effectively connected with its conduct of a trade or business in the United States.

(D) In the case of any payment under this Agreement that would be treated as interest for United States federal income tax purposes, it is not a bank that receives or will receive such payment on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, within the meaning of section 881(c)(3)(A) of the United States Internal Revenue Code of 1986, as amended.

(E) It is not (I) a 10% shareholder of Wachovia Corporation within the meaning of section 871(h)(3)(B) of the United States Internal Revenue Code of 1986, as amended, or (II) a controlled foreign corporation with respect to Wachovia Corporation within the meaning of Section 881(c)(3)(C) of the United States Internal Revenue Code of 1986, as amended.

Part 3.  **Documents**

(a)    **Tax Forms.**

(i) **Delivery of Tax Forms.**  For the purpose of Section 4(a)(i), and without limiting Section 4(a)(iii), each party agrees to duly complete, execute and deliver to the other party the tax forms specified below with respect to it (A) before the first Payment Date under this Agreement, (B) promptly upon reasonable demand by the other party and (C) promptly upon learning that any such form previously provided by the party has become obsolete or incorrect.

In addition, in the case of any tax form that is a Periodic Tax Form required to be delivered by Party B hereunder, Party B agrees to renew such tax form prior to its expiration by completing, executing and delivering to Party A that tax form ("Renewal Tax Form") in each succeeding third year following the year of execution of any such tax form or Renewal Tax Form delivered by Party B to Party A hereunder, so that Party A receives each Renewal Tax Form not later than December 31 of the relevant year. "Periodic Tax Form" means (i) any IRS Form W-8BEN, W-8IMY or W-8EXP that is delivered by Party B to Party A without a U.S. Taxpayer Identification Number, or (ii) any IRS form W-8ECI.

(ii) **Tax Forms to be Delivered by Party A:**

None specified.

(iii) **Tax forms to be Delivered by Party B**:

A correct, complete and duly executed U.S. Internal Revenue Service Form W-8BEN (or successor thereto), with Part III thereof marked, together with appropriate attachments, that eliminates U.S. federal withholding and backup withholding tax on payments to Party B under this Agreement.

(b)     **Delivery of Documents.** When it delivers this Agreement, each party shall also deliver its closing documents to the other party in form and substance reasonably satisfactory to the other party.

| Party required to deliver document | Document to be delivered | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | A duly executed certificate of the secretary or assistant secretary of Party A certifying the name, true signature and authority of each person authorized to execute this Agreement (including Confirmations and the Credit Support Annex) and enter into Transactions for Party A. | Upon execution of this Agreement, and for any Confirmation, promptly upon request. | Yes |
| Party B | A copy, certified by the secretary or assistant secretary of Party B, of the resolutions of Party B's board of directors authorizing the execution, delivery and performance by Party B of this Agreement (including Confirmations and the Credit Support Annex) and authorizing Party B to enter into Transactions hereunder. | Upon execution of this Agreement, and for any Confirmation, promptly upon request. | Yes |
| Party B | A copy of the Investment Management Agreement evidencing the authority of the Investment Manager to act on behalf of Party B | Upon execution of this Agreement and with respect to any subsequent amendment, at or prior to | Yes |

| | and copies of its other Operative Documents including any amendments, modifications or supplements. | the time of such amendment, modification or supplement. | |
|---|---|---|---|
| Party B | Copies of its most recent audited annual financial statements, certified without qualification by independent public accountants of recognized standing and prepared in accordance with GAAP and on a basis consistent with prior periods. | Within 120 days after the close of each of Party B's fiscal years. | Yes |
| Party B | Copies of its most recent quarterly unaudited financial statements prepared in accordance with United States GAAP and on a basis consistent with prior periods. | Within 45 days after the close of each of Party B's fiscal quarters. | Yes |
| Party B | Copies of its unaudited month-end calculation of Net Asset Value and Net Asset Value per share and its most recent monthly report of performance, subscriptions, redemptions and ending net assets. | Within 15 days after the end of each calendar month to which such calculation relates. | Yes |
| Party B | Oral reports of its Net Asset Value. | Within 1 day of a request by Party A. | Yes |
| Party B | Information regarding Party B's portfolio including information regarding asset allocation, leverage, liquidity and measure of portfolio risk (VaR or its equivalent) and such other information respecting the condition or operations, financial or otherwise, of Party B. | Promptly upon reasonable request by Party A from time to time. | Yes |
| Party B | Notice of any new Investment Vehicle as hereinafter defined together with constitutional documents, investment disclosure materials, and any other documentation concerning such Investment Vehicle as Party A may request | Notice and documentation to be provided within (5) days of the addition of a new Investment Vehicle and additional documentation to be provided within five (5) days of the request by Party A. | Yes |

Part 4. **Miscellaneous**

(a)     **Addresses for Notices.** For purposes of Section 12(a) of this Agreement, all notices to a party shall, with respect to any particular Transaction, be sent to its address, telex number or facsimile number specified in the relevant Confirmation (or as specified below if not specified in the relevant Confirmation), provided that any notice under Section 5 or 6 of this Agreement, and any notice under this Agreement not related to a particular Transaction, shall be sent to a party at its address specified below, provided further that any notice under the Credit Support Annex shall be sent to a party at its address, telex number or facsimile number specified in the Credit Support Annex.

**To Party A:**

**WACHOVIA BANK, NATIONAL ASSOCIATION**
301 South College Street, DC-8
Mailcode: NC0600
Charlotte, NC 28202-0600

Attention: Derivative Documentation Group

Fax: (704) 383-0575
Phone: (704) 383-8778

**To Party B:**

**CDO PLUS MASTER FUND LTD.**
Le Masurier House, 2nd floor
La Rue Masurier
St. Helier, Jersey
Channel Islands, JE24YE

With copy to:

**CDO PLUS MASTER FUND LTD.**
c/o rékon advisors llc
407 SE 1st St,
Delray Beach, FL 33483

Attention: Robert H. Fasulo

Fax: (561) 330-8006
Phone: (561) 330-6999

(b)     **Process Agent.**

(i) For the purpose of Section 13(c) of this Agreement, Party B irrevocably appoints as its Process Agent for service of process in New York the firm identified below:

rékon advisors llc

25

(c)    **Offices.**  Section 10(a) applies.

(d)    **Multibranch Party.**

(i) Party A is a Multibranch Party and may act through the following Offices: its Charlotte Head Office and its London Branch.

(ii) Party B is not a Multibranch Party.

(e)    **"Calculation Agent"** means Party A.

(f)    **"Credit Support Document"** means the Credit Support Annex hereto dated as of the date hereof executed and delivered by Party A and Party B.

(g)    **"Credit Support Provider"** does not apply.

(h)    **Governing Law.**  To the extent not otherwise preempted by U.S. Federal law, this Agreement will be governed by and construed in accordance with the law of the State of New York (without giving effect to any provision of New York law that would cause another jurisdiction's laws to be applied).

(i)    **Waiver of Jury Trial.**  To the extent permitted by applicable law, each party irrevocably waives any and all right to trial by jury in any legal proceeding in connection with this Agreement, any Credit Support Document to which it is a party, or any Transaction.

(j)    **Netting of Payments.**  Section 2(c)(ii) will apply in respect of all Transactions from the date of this Agreement, provided that Section 2(c)(ii) will not apply with respect to any Transactions or group of Transactions for which the parties mutually agree shall be netted operationally.

(k)    **"Affiliate"** has its meaning as defined in Section 14.

Part 5. <u>**Other Provisions**</u>

(a)    **ISDA Publications.**

(i) **2000 ISDA Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (including its Annex) published by the International Swaps and Derivatives Association, Inc. (together, the "2000 ISDA Definitions") and will be governed by the provisions of the 2000 ISDA Definitions. The provisions of the 2000 ISDA Definitions are incorporated by reference in, and shall form part of, this Agreement and each Confirmation. Any reference to a "Swap Transaction" in the 2000 ISDA Definitions is deemed to be a reference to a "Transaction" for purposes of this Agreement or any Confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for purposes of the 2000 ISDA Definitions. The provisions of this Agreement (exclusive of the 2000 ISDA Definitions) shall prevail in the event of any conflict between such provisions and the 2000 ISDA Definitions.

(ii) **EMU Protocol.** If a present or future European Union member state adopts the euro as its lawful currency to replace its national currency (including, without limitation, Sterling, Danish Krone and Swedish Krona), then Annexes 1 through 5 (inclusive) and Section 6 of the EMU Protocol published on May 6, 1998 by the International Swaps and Derivatives Association, Inc. (i) shall be deemed to apply to any Transaction involving that member state's national currency (which shall be considered a Legacy Transaction under the EMU Protocol), (ii) shall be construed in a manner consistent with the purpose of

the EMU Protocol notwithstanding that the start of the third stage of European Economic and Monetary Union has already occurred, and (iii) are hereby incorporated by reference in, and shall form part of, this Agreement. References in the EMU Protocol to "ISDA Master Agreement" will be deemed references to this Agreement.

(b)  **Scope of Agreement.** Any Specified Transaction (other than a repurchase transaction, reverse repurchase transaction, securities lending transaction, exchange-traded futures transaction, buy/sell-back transaction, prime brokerage or margin lending transaction) now existing or hereafter entered into between the parties (whether or not evidenced by a Confirmation) shall constitute a "Transaction" under this Agreement and shall be subject to, governed by, and construed in accordance with the terms of this Agreement, unless the confirming document(s) for that Specified Transaction provide(s) otherwise.  For any such Specified Transaction not evidenced by a Confirmation, Section 2(a)(i) of this Agreement is amended to read as follows: "(i) Each party will make each payment or delivery to be made by it under each Transaction, as specified in each Confirmation (or otherwise in accordance with the terms of that Transaction if not evidenced by a Confirmation), subject to the other provisions of this Agreement."

(c)  **Additional Representations.**  Section 3 is amended by adding the following Sections 3(g), (h), (i) and (j):

"(g)  **Non-Reliance.**  For any Relevant Agreement: (i) it acts as principal and not as agent, (ii) it acknowledges that the other party acts only at arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, (iii) it is relying solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) and upon advice from its own professional advisors, (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, and (v) it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation) from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder).

"Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating to any of the foregoing.

(h) **Eligibility.**  It is an "eligible contract participant" within the meaning of the Commodity Exchange Act (as amended by the Commodity Futures Modernization Act of 2000).

(i) **FDIC Requirements.**  If it is a bank subject to the requirements of 12 U.S.C. § 1823(e), its execution, delivery and performance of this Agreement (including the Credit Support Annex and each Confirmation) have been approved by its board of directors or its loan committee, such approval is reflected in the minutes of said board of directors or loan committee, and this Agreement (including the Credit Support Annex and each Confirmation) will be maintained as one of its official records continuously from the time of its execution (or in the case of any Confirmation, continuously until such time as the relevant Transaction matures and the obligations therefor are satisfied in full).

(j) **ERISA.**  It is not (i) an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), subject to Title I of ERISA or Section 4975 of the Code, or a plan as so defined but which is not subject to Title I of ERISA or Section 4975 of the Code

27

but is subject to another law materially similar to Title I of ERISA or Section 4975 of the Code (each of which, an "ERISA Plan"), (ii) a person or entity acting on behalf of an ERISA Plan, or (iii) a person or entity the assets of which constitute assets of an ERISA Plan."

(d)    **Set-off.**    Any amount ("Early Termination Amount") payable to one party ("Payee") by the other party ("Payer") under Section 6(e), in circumstances where there is a Defaulting Party, or one Affected Party in the case where a Termination Event under Section 5(b)(iv) or 5(b)(v) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by means of set off against any amount(s) ("Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer or to any Affiliate of the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer (or between the Payee and any Affiliate of the Payer) or instrument(s) or undertaking(s) issued or executed by the Payee to, or in the favor of, the Payer or any Affiliate of the Payer (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this paragraph.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

Nothing in this paragraph shall be effective to create a charge or other security interest. This paragraph shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(e)    **Escrow.**    If payments denominated in different currencies are due hereunder by both parties on the same day and a party has reasonable cause to believe that the other party will not meet its payment obligation, then as reasonable assurance of performance the party may notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with any escrow agent selected by the party giving the notice from among major commercial banks independent of either party (and its affiliates), accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on the same date, to return the payment deposited to the party that paid in escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall make arrangements to provide that the intended recipient of the amount due to be deposited first shall be entitled to interest on the deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(f)    **Change of Account.**    Any account designated by a party pursuant to Section 2(b) shall be in the same legal and tax jurisdiction as the original account.

(g)  **Recorded Conversations.**  Each party and any of its Affiliates may electronically record any of its telephone conversations with the other party or with any of the other party's Affiliates in connection with this Agreement or any Transaction, and any such recordings may be submitted in evidence in any proceeding to establish any matters pertinent to this Agreement or any Transaction.

(h)  **Confirmation Procedures.**  Upon receipt thereof, Party B shall examine the terms of each Confirmation sent by Party A, and unless Party B objects to the terms within three New York business days after receipt of that Confirmation, those terms shall be deemed accepted and correct absent manifest error, in which case that Confirmation will be sufficient to form a binding supplement to this Agreement. Notwithstanding the foregoing, the first sentence of Section 9(e)(ii) remains in full force and effect.

(i)  **Additional Agreements of Party B**. Section 4 is hereby amended by adding the following new agreement:

(i) Party B represents to, and covenants and agrees with, Party A on and as of the date hereof and at all times until the termination of this Agreement that with respect to this Agreement and each Transaction, it will be in full compliance with, all Operative Documents and this Agreement and each Transaction is, and will be, authorized and permissible transactions and investments thereunder.

(ii) Party B represents that (A) it is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise); (B) the persons executing this Agreement on its behalf have been authorized to do so; and (C) it has granted the Investment Manager the authority to execute and deliver this Agreement on its behalf and to act on its behalf in all matters related to this Agreement, including, without limitation, on a fully discretionary basis negotiating, entering into, amending, transferring and terminating Transactions.

(iii) Party B will provide Party A, promptly upon becoming aware of the same, with written notice of (A) any amendment, or modification or supplement to any Operative Document and (B) any Potential Event of Default, Event of Default or Termination Event, or event or condition that, with the giving of notice or the passage of time or both, could constitute a Termination Event with respect to Party B.

(j)  **Definitions.**  As used in this Schedule:

(i)  "Net Asset Value" means, with respect to Party B, the gross assets of Party B less the aggregate amount of all liabilities of Party B, including without limitation, all absolute and contingent liabilities of any kind, and shall be determined in accordance with generally accepted accounting principles in the United States and on a basis consistent with prior periods.

(ii)  "Operative Documents" means the Investment Management Agreement, dated August 31, 2006, Confidential Memorandum, trust indenture, corporate charter, partnership agreement, by-laws or other similar documents, instruments or other constitutive documents of Party B, as applicable, any written investment policies, procedures, restrictions or guidelines of Party B and the then-current disclosure document of Party B.

(iii)  "Investment Vehicle" means any entity organized as a feeder fund in a master/feeder structure where such feeder fund invests all, or substantially all of its assets in Party B as the master fund.

Part 6.  **Additional Terms for FX Transactions and Currency Options**

(a)  **ISDA FX and Currency Option Definitions.**  The 1998 FX and Currency Option Definitions published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 FX and Currency Option Definitions") are hereby

29

incorporated by reference in, and shall form part of, this Agreement and each Confirmation relating to any "Currency Option Transaction" or "FX Transaction" as defined in the FX and Currency Option Definitions, except as otherwise specifically provided herein or in the relevant Confirmation.

(b)     **FX Transactions.**

**Netting of FX Transactions.**  Section 2(c) shall not apply to FX Transactions.  Instead, the following provision will apply to FX Transactions:

If amounts in the same currency would be due by both parties in respect of the same Settlement Date (or other payment or delivery date) under two or more FX Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those amounts will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party on that Settlement Date or date.

(c)     **Currency Option Transactions.**

(i) **Currency Option Transaction Premiums**.  If any Premium of a Currency Option Transaction is not received on the Premium Payment Date, then the Seller may elect to either (A) accept late payment of that Premium, or (B) give written notice of that nonpayment and, if that payment is not received within three Local Business Days of that notice, either (1) treat the related Currency Option Transaction as void, or (2) treat that non-payment as an Event of Default under Section 5(a)(i) of this Agreement.  If the Seller elects to act under clause (A) or (B)(1) of the preceding sentence, then the Buyer shall pay on demand all out-of-pocket costs and actual damages incurred by the Seller in connection with that unpaid or late Premium or void Currency Option Transaction, including, without limitation, interest on that Premium in the same currency as that Premium at the Default Rate and any other costs or expenses incurred by the Seller to compensate it for its loss of bargain, cost of funding or loss incurred as a result of terminating, liquidating, obtaining or re-establishing a delta hedge or other related trading position with respect to that Currency Option Transaction.

(ii) **Netting of Currency Option Transactions.**  Section 2(c) of this Agreement shall not apply to Currency Option Transactions.  Instead, the following provisions will apply to Currency Option Transactions:

(A) If Premiums in the same currency would be due by both parties in respect of the same Premium Payment Date under two or more Currency Option Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those Premiums will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party.

(B) If amounts in the same currency (other than Premiums) would be due by both parties in respect of the same Settlement Date (or other payment or delivery date) under two or more Currency Option Transactions between the same pair of Offices of the parties (assuming satisfaction of each condition precedent), then the obligations of the parties for those amounts will be discharged automatically, and if one party's obligation in that currency would have been greater, replaced by an obligation of that party to pay or deliver the amount of that difference to the other party on that Settlement Date or date.

(C) For matching Currency Option Transactions, any unexercised Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against any

unexercised Call or Put, respectively, written by the other party upon the payment in full of both Currency Option Transaction Premiums. Currency Option Transactions are "matching" only if both (i) are granted for the same Put Currency, Call Currency, Expiration Date, Expiration Time, and Strike Price, (ii) have the same exercise style (e.g., American, European or Asian), and (iii) are entered into by the same pair of Offices of the parties.  For any partial termination and discharge (where the Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction shall continue to be a Currency Option Transaction under this Agreement.

(d)     **Notice of Exercise.**  Notwithstanding Section 3.5 (g) of the 1998 FX and Currency Option Definitions, a Notice of Exercise may be delivered by facsimile for purposes of exercising a Currency Option only if, after reasonable efforts have been made by the Buyer to deliver such Notice of Exercise orally by telephone, Buyer is unable to reach an appropriate person at the Seller by telephone on the relevant day for purposes of exercising such Currency Option on that day.  Whenever a Notice of Exercise has been given orally by telephone, a confirmation of such Notice of Exercise may be delivered in writing by facsimile or by any other means specified therefore in the relevant Confirmation.

(e)     **Payments on Early Termination.**  For purposes of Section 6(e), if "Market Quotation" is specified in this Schedule as applying, a Market Quotation shall not be determined or included under clause (a) of the definition of Settlement Amount for any FX Transactions and Currency Option Transactions, and instead a "Loss" shall be determined and included under clause (b) of the definition of Settlement Amount for any FX Transactions and Currency Option Transactions.

**IN WITNESS WHEREOF**, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

**WACHOVIA BANK, NATIONAL ASSOCIATION**

**CDO PLUS MASTER FUND LTD.**

By: _Alexis S. Alpert_
Name: Alexis S. Alpert
Title: Vice President

By: _____
Name: Donald Uderitz
Title: Director, CDO Plus Master Fund LTD

(Bilateral Form)                    (ISDA Agreements Subject to New York Law Only)

# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

### ISDA MASTER AGREEMENT

dated as of May 4, 2007

between

### WACHOVIA BANK, NATIONAL ASSOCIATION ("Party A")

and

### CDO PLUS MASTER FUND LTD. ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above (this "Agreement"), is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:-

**Paragraphs 1 - 12.  Incorporation**

Paragraphs 1 through 12 inclusive of the ISDA Credit Support Annex (Bilateral Form) (ISDA Agreements Subject to New York Law Only) published in 1994 by the International Swaps and Derivatives Association, Inc. are incorporated herein by reference and made a part hereof.

**Paragraph 13.  Elections and Variables**

(a)     ***Security Interest for "Obligations"***.  The term ***"Obligations"*** as used in this Annex includes no additional obligations with respect to Party A and Party B.

(b)     ***Credit Support Obligations.***

    (i)     ***Delivery Amount, Return Amount and Credit Support Amount.***

        (A)     ***"Delivery Amount"*** has the meaning specified in Paragraph 3(a).

        (B)     ***"Return Amount"*** has the meaning specified in Paragraph 3(b).

1

(C) *"Credit Support Amount"* has the meaning specified in Paragraph 3, provided that "Credit Support Amount" shall mean the higher of (i) the amount calculated as provided in the definition of that term in Paragraph 3(b) and (ii) the sum of the Pledgor's Independent Amounts.

(ii) *Eligible Collateral.* The following items will qualify as *"Eligible Collateral"* for the party specified, provided that the Secured Party shall be entitled at any time and from time to time, not to accept as Eligible Collateral any of the following which constitute Ineligible Securities as defined below:

| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | *Cash:* U.S. Dollars in depositary account form. | YES | YES | 100% |
| (B) | *Treasury Bills*: negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of not more than one year. | YES | YES | 98% |
| (C) | *Treasury Notes*: negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than one year but not more than 10 years. | YES | YES | 98% |
| (D) | *Treasury Bonds*: negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than 10 years but not more than 30 years. | YES | YES | 98% |
| (E) | *Agency Securities*: negotiable debt obligations of the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corporation (FHLMC), Federal Home Loan Banks (FHLB), Federal Farm Credit Banks (FFCB), Student Loan Marketing Association (SLMA), or Tennessee Valley Authority (TVA) having a remaining maturity of not more than 30 years. | YES | YES | 92% |
| (F) | *FHLMC Certificates.* Mortgage participation certificates issued by FHLMC evidencing undivided interests or participations in pools of first lien conventional or FHA/VA residential mortgages or deeds of trust, guaranteed by FHLMC, and having a remaining maturity of not more than 30 years. | YES | YES | 92% |
| (G) | *FNMA Certificates.* Mortgage-backed pass-through certificates issued by FNMA evidencing undivided interests in pools of first lien mortgages or deeds of trust on residential properties, guaranteed by FNMA, and having a remaining maturity of not more than 30 years. | YES | YES | 92% |

| | | | | | |
|---|---|---|---|---|---|
| (H) | *GNMA Certificates.* Mortgage-backed pass-through certificates issued by private entities, evidencing undivided interests in pools of first lien mortgages or deeds of trust on single family residences, guaranteed by the Government National Mortgage Association (GNMA) with the full faith and credit of the United States, and having a remaining maturity of not more than 30 years. | YES | YES | 92% |

(I)    *Other Eligible Collateral.* With respect to a party, as may be agreed in writing between the parties for purposes of this Annex, together with the applicable Valuation Percentage.

(iii)    ***Other Eligible Support.***  Not applicable.

(iv)    ***Thresholds.***

    (A)    ***"Independent Amount"*** means for Party A: zero.

        ***"Independent Amount"*** means with respect to Party B: the aggregate sum of each Independent Amount for each Transaction with respect to which Party B has any remaining obligations to Party A (including any obligations under Section 6(e) of this Agreement if that Transaction becomes a Terminated Transaction), as such Independent Amount is set forth in the Confirmation for that Transaction (as amended from time to time), or as otherwise agreed between the parties on the Trade Date of that Transaction if a Confirmation for that Transaction has not yet been executed and delivered.  If the Confirmation for a Transaction does not specify an Independent Amount, the Independent Amount for that Transaction will be deemed to be zero unless otherwise agreed between the parties.

    (B)    ***"Threshold"*** means for Party A: zero.
        ***"Threshold"*** means for Party B: zero.

    (C)    ***"Minimum Transfer Amount"*** means with respect to Party A: $250,000.
        ***"Minimum Transfer Amount"*** means with respect to Party B: $250,000.

        *provided* that if an Event of Default, Potential Event of Default or Termination Event exists with respect to a party, the Minimum Transfer Amount for that party shall be zero, *provided further* that if the Secured Party is holding Posted Collateral and the Credit Support Amount required to be maintained by the Pledgor is, or is deemed to be, zero for any day, then for purposes of Paragraph 3(b), the Secured Party's Minimum Transfer Amount for that day will be deemed to be zero with respect to that Posted Collateral

    (D)    **Rounding:**  The Delivery Amount and the Return Amount will be rounded down to the nearest integral multiple of $10,000.

(c)    ***Valuation and Timing.***

(i)    ***"Valuation Agent"*** means Party A. Prior to any Party B Valuation Date, Party B shall request that the Valuation Agent calculate the Exposure and the Value of any Posted Credit Support as of the

Valuation Time. Such request shall be made not later than 4:00 p.m., New York time, on the Local Business Day preceding such Party B Valuation Date. Notwithstanding Paragraph 4(c), the Valuation Agent shall notify Party B of such calculations not later than the Notification Time on the Local Business Day immediately following the date of such request. In making any such calculations, the Valuation Agent shall be acting in an administrative capacity and not as an agent, advisor or fiduciary. "Party B Valuation Date" means any day on which Party B will be making any demand pursuant to Paragraph 3, any substitution pursuant to Paragraph 4(d)(ii), or any Transfer pursuant to Paragraph 6(d).

(ii)     *"Valuation Date"* means any Local Business Day on which a demand is made before 5:00 p.m., New York time, pursuant to Paragraph 3.

(iii)    *"Valuation Time"* means the close of business in New York City on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    *"Notification Time"* means 11:00 a.m., New York time, on a Local Business Day.

(d)    ***Conditions Precedent and Secured Party's Rights and Remedies.*** The following Termination Event(s) will be a ***"Specified Condition"*** for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | **Party A** | **Party B** |
|---|---|---|
| Additional Termination Events | NO | YES |

(e)    ***Substitution.***

(i)     *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

(ii)    ***Consent.*** The Pledgor is not required to obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    ***Dispute Resolution.***

(i)     *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii)    ***Value.*** For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated based upon the mid-point between the bid and offered purchase rates or prices for that Posted Credit Support as reported on the Bloomberg electronic service as of the Resolution Time, or if unavailable, as quoted to the Valuation Agent as of the Resolution Time by a dealer in that Posted Credit Support of recognized standing selected in good faith by the Valuation Agent, which calculation shall include any unpaid interest on that Posted Credit Support.

(iii)    ***Alternative.*** The provisions of Paragraph 5 will apply.

(g)    ***Holding and Using Posted Collateral.***

(i)     ***Eligibility to Hold Posted Collateral; Custodians*** Subject to paragraph 6(c),

(A)    Party A will be entitled to hold Posted Collateral itself or through a Custodian pursuant to

4

Paragraph 6(b), *provided* that the following conditions applicable to it are satisfied:

(1)     Party A is not a Defaulting Party.

(2)     Posted Collateral may be held only in the following jurisdictions: New York and North Carolina.

(3)     The party or entity holding the Collateral maintains a Credit Rating of at least BBB+ from S&P and Baa1 from Moody's.

(4)     The Custodian is a bank or trust company having total assets in excess of $10 billion.

(B)     Party B will be entitled to hold Posted Collateral itself or through its Custodian pursuant to Paragraph 6(b), *provided* that the following conditions applicable to it are satisfied:

(1)     Party B is not a Defaulting Party.

(2)     Posted Collateral may be held only in the following jurisdictions: New York.

(3)     The party or entity holding the Collateral maintains a Credit Rating of at least BBB+ from S&P and Baa1 from Moody's.

(4)     The Custodian is a bank or trust company having total assets in excess of $10 billion.

(ii)     *Use of Posted Collateral.* The provisions of Paragraph 6(c) will apply to both parties.

(h)     *Interest Amount.*

(i)     *Interest Rate.* The *"Interest Rate"* for any day will be the Federal Funds (Effective) rate published in N.Y. Federal Reserve Statistical Release H.15(519) for that day (or if that day is not a New York Business Day, then for the next preceding New York Business Day).

For the purpose of computing the Interest Amount, the amount of interest computed for each day of the Interest Period shall not be subject to compounding.

(ii)     *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii)     *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply.

(i)     *Additional Representation(s).* Not applicable.

(j)     *Other Eligible Support and Other Posted Support.* Not applicable.

(k)     *Demands and Notices.* All demands, specifications and notices under this Annex will be made to a party as follows unless otherwise specified from time to time by that party for purposes of this Annex in a written notice given to the other party:

5

To Party A:

**WACHOVIA BANK, NATIONAL ASSOCIATION**
201 South College Street
9th Floor, Mail Code NC0672
Charlotte, NC 28288-0672

Attention: Collateral Management Group

Phone:  704-383-9529
Fax:    704-383-3394

**To Party B:**

**CDO PLUS MASTER FUND LTD.**
c/o rékon advisors llc
407 SE 1st St,
Delray Beach, FL 33483

Attention: Robert H. Fasulo

Fax:    (561) 330-8006
Phone:  (561) 330-6999

(l)    *Addresses for Transfers.*

    (i)    For each Transfer hereunder to Party A, instructions will be provided by Party A for that specific Transfer.

    (ii)   For each Transfer hereunder to Party B, instructions will be provided by Party B for that specific Transfer.

(m)    *Other Provisions.*

    (i)    *Additional Definitions.* As used in this Annex, the following terms have the following meanings:

        *"Credit Rating"* means, for a party or entity on any date of determination, (a) the Long-Term Senior Debt rating then assigned to it by Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. ("S&P") or the Long Term Senior Debt or Long Term Bank Deposits rating, as the case may be, then assigned to it by Moody's Investors Service ("Moody's"), or (b) if a party does not have either a Long-Term Senior Debt rating assigned to it by S&P or a Long Term Senior Debt or Long Term Bank Deposits rating, assigned to it by Moody's, then its Credit Rating will be the respective rating then assigned to its unsecured and unsubordinated long-term debt or deposit obligations by either S&P or Moody's. If such ratings are assigned by both S&P and Moody's, then its Credit Rating will be the lower of such ratings.

        *"Ineligible Securities"* means any obligations, securities, certificates or instruments that (i) are denominated in a currency other than U.S. Dollars, (ii) are issued other than in Federal Reserve book entry form, or (iii) constitute or include structured notes or other structured debt instruments, real estate mortgage investment conduits, collateralized mortgage obligations, guaranteed mortgage certificates, interest-only securities, principal-only securities or any securities representing interests in,

6

or are composed in whole or in part of, residual or high risk mortgage derivatives or other derivatives.

(ii)     *Exposure.*  All calculations of "Exposure" under this Annex shall <u>include</u> all Transactions (whether or not evidenced by a Confirmation).

(iii)    *Grace Period.*  Clause (i) of Paragraph 7 is hereby amended by deleting the words "two Local Business Days" and substituting therefor "one Local Business Day".

**IN WITNESS WHEREOF** the parties have executed this Credit Support Annex as of the date hereof.

**WACHOVIA BANK, NATIONAL ASSOCIATION**

By: _Alexis S. Alpert_
Name:  Alexis S. Alpert
Title:  Vice President

**CDO PLUS MASTER FUND LTD.**

By: _____
Name: _Donald Uderitz_
Title: _Director, CDO Plus Master Fund LTD._

7

**(Bilateral Form)**                    **(ISDA Agreements Subject to New York Law Only)**



# ISDA®
International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

dated as of . . . . . . . . . . . . . . .

between

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   and   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

("Party A")                                                   ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a)     *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    ***Delivery Amount.*** Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

> (i) the Credit Support Amount
>
> exceeds
>
> (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    ***Return Amount.*** Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

> (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party
>
> exceeds
>
> (ii) the Credit Support Amount.

***"Credit Support Amount"*** means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    ***Conditions Precedent.*** Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

> (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and
>
> (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    ***Transfer Timing.*** Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    ***Calculations.*** All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

**ISDA® 1994**

(d)    *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**ISDA® 1994**

**Paragraph 6. Holding and Using Posted Collateral**

(a)     *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

**ISDA® 1994**

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

**ISDA® 1994**

(b) **Pledgor's Rights and Remedies.** If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c) **Deficiencies and Excess Proceeds.** The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d) **Final Returns.** When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

6                                                                 **ISDA® 1994**

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred, to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**ISDA® 1994**

**Paragraph 12. Definitions**

As used in this Annex:—

"*Cash*" means the lawful currency of the United States of America.

"*Credit Support Amount*" has the meaning specified in Paragraph 3.

"*Custodian*" has the meaning specified in Paragraphs 6(b)(i) and 13.

"*Delivery Amount*" has the meaning specified in Paragraph 3(a).

"*Disputing Party*" has the meaning specified in Paragraph 5.

"*Distributions*" means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

"*Eligible Collateral*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Eligible Credit Support*" means Eligible Collateral and Other Eligible Support.

"*Exposure*" means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

"*Independent Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Interest Amount*" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by
>
> (y) the Interest Rate in effect for that day; divided by
>
> (z) 360.

"*Interest Period*" means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

"*Interest Rate*" means the rate specified in Paragraph 13.

"*Local Business Day*", unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"**Valuation Agent**"* has the meaning specified in Paragraph 13.

*"**Valuation Date**"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"**Valuation Percentage**"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"**Valuation Time**"* has the meaning specified in Paragraph 13.

*"**Value**"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
> > (A) Cash, the amount thereof; and
> >
> > (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**ISDA® 1994**

**Paragraph 13. Elections and Variables**

(a)    *Security Interest for "Obligations".* The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

With respect to Party B: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(b)    *Credit Support Obligations.*

(i) *Delivery Amount, Return Amount and Credit Support Amount.*

(A) *"Delivery Amount"* has the meaning specified in Paragraph 3(a), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(B) *"Return Amount"* has the meaning specified in Paragraph 3(b), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(C) *"Credit Support Amount"* has the meaning specified in Paragraph 3, unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) *Eligible Collateral.* The following items will qualify as *"Eligible Collateral"* for the party specified:

|     |     | Party A | Party B | Valuation Percentage |
|-----|-----|---------|---------|----------------------|
| (A) | Cash | [ ] | [ ] | [ ]% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [ ] | [ ] | [ ]% |
| (C) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [ ] | [ ] | [ ]% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [ ] | [ ] | [ ]% |
| (E) | other:  . . . . . . . . . . . . . . . . . . . . . . . . . . . | [ ] | [ ] | [ ]% |

(iii) *Other Eligible Support.* The following items will qualify as *"Other Eligible Support"* for the party specified:

|     |     | Party A | Party B |
|-----|-----|---------|---------|
| (A) | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | [ ] | [ ] |
| (B) | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | [ ] | [ ] |

**ISDA® 1994**

(iv) *Thresholds*.

(A)    *"Independent Amount"* means with respect to Party A: $ . . . . . . . . . . . . . . . . . . . . . . .
       *"Independent Amount"* means with respect to Party B: $ . . . . . . . . . . . . . . . . . . . . . . .

(B)    *"Threshold"* means with respect to Party A: $ . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
       *"Threshold"* means with respect to Party B: $ . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(C)    *"Minimum Transfer Amount"* means with respect to Party A: $ . . . . . . . . . . . . . . . . .
       *"Minimum Transfer Amount"* means with respect to Party B: $ . . . . . . . . . . . . . . . . .

(D)    **Rounding**. The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . ./up and down to the nearest integral multiple of $. . . ., respectively\*].

(c)    *Valuation and Timing.*

(i)    *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here:  . . . . . . . . . . .

(ii)    *"Valuation Date"* means:  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(iii)    *"Valuation Time"* means:

       [  ]    the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

       [  ]    the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(d)    *Conditions Precedent and Secured Party's Rights and Remedies*. The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

| | Party A | Party B |
|---|---|---|
| Illegality | [  ] | [  ] |
| Tax Event | [  ] | [  ] |
| Tax Event Upon Merger | [  ] | [  ] |
| Credit Event Upon Merger | [  ] | [  ] |
| Additional Termination Event(s):[1] | | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . | [  ] | [  ] |
| . . . . . . . . . . . . . . . . . . . . . . . . . . | [  ] | [  ] |

---

\*  Delete as applicable.

[1]  If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

ISDA® 1994

(e)    *Substitution.*

(i) **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable[*]][2]

(f)    *Dispute Resolution.*

(i) **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(iii) *Alternative.* The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(g)    *Holding and Using Posted Collateral.*

(i) *Eligibility to Hold Posted Collateral; Custodians.* Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: . . . . . . . . . . . . . . . . .

(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Initially, the **Custodian** for Party A is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: . . . . . . . . . . . . . . . . .

(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Initially, the **Custodian** for Party B is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will not apply to the [party/parties[*]] specified here:

[  ]  Party A

[  ]  Party B

and [that party/those parties[*]] will not be permitted to: . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

----

[*] Delete as applicable.

[2] Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.*, where a party to the Annex is the New York branch of an English bank).

ISDA® 1994

(h)    *Distributions and Interest Amount.*

(i) *Interest Rate.* The **"Interest Rate"** will be:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b), unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(i)    *Additional Representation(s).*

[Party A/Party B\*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(ii)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(j)    *Other Eligible Support and Other Posted Support.*

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support means: . . . . . . . . . . .

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: . . . . . . . . .

(k)    *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

Party A:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Party B:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(l)    *Addresses for Transfers.*

Party A:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Party B:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(m)    *Other Provisions.*

---

\*    Delete as applicable.

14                                                                                         **ISDA® 1994**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 27
-----------------------------------------x
THE HIGH RISK OPPORTUNITIES HUB FUND
LTD. (In Liquidation), by and through
G. James Cleaver and L. Daniel Scott,
Joint Official Liquidators,

                    Plaintiff,

           -against-                      Index No. 600229/00
                                          PC No. 16039

CREDIT LYONNAIS and SOCIETE GENERALE,

                    Defendants.
-----------------------------------------x

**Ira Gammerman, J.H.O.:**

     This is a breach of contract action by plaintiff The High Risk

Opportunities Hub Fund Ltd. (High Risk), through its liquidators,

arising from certain non-deliverable forward contracts entered into

with defendants Credit Lyonnais and Societe Generale. The parties

have stipulated to have this action determined on motion papers

supported by affidavits and documentary evidence, in lieu of

depositions and a trial with live testimony.[1]

     According to the complaint, High Risk was a highly leveraged

Cayman Islands hedge fund in the business of speculative investing,

focused mainly on investments in Russia. It asserted in its

offering memorandum that "[a]n investment in the company is highly

---

[1]After a lengthy delay, in which it was requested that the court
withhold decision, High Risk and defendant Societe Generale
settled their portion of this action pursuant to stipulation.

1

speculative, reflecting the risks of the unregulated, highly leveraged and frequently volatile markets" in which High Risk traded.

Credit Lyonnais is a French banking corporation. It entered into the transactions at issue through its New York offices.

Between June of 1997 and August of 1998, High Risk and Credit Lyonnais entered into several transactions called non-deliverable forward contracts (NDFs). The NDFs were currency contracts that were based on the exchange rate between the United States dollar and the Russian ruble, see, generally, Indosuez International Finance BV v National Reserve Bank, 98 NY2d 238, 241 (2002). Essentially, both parties took a position with respect to the value of the dollar versus the value of the ruble, to be determined at a specified future termination date. If the value of the ruble declined, relative to the dollar, from the commencement date of the transaction to the termination date, High Risk was entitled to a payment at termination from Credit Lyonnais in U.S. dollars reflecting the amount of that decline. If the value of the ruble increased during that time period, Credit Lyonnais was entitled to a payment from High Risk.

Each NDF transaction was governed by several documents, including an International Swaps and Derivatives Association,

2

Inc. Master Agreement (Master Agreement), which sets forth the basic terms for NDF transactions. Among other things, the Master Agreement provided for early termination (Early Termination) upon the happening of certain events, including the insolvency of either party. The Master Agreement provided in section 6(a) that

> [i]f at any time an Event of Default with
> respect to a party (the "Defaulting Party")
> has occurred and is then continuing, the
> other party (the "Non-defaulting Party")
> may...designate a day...as an Early
> Termination Date in respect of all
> outstanding Transactions.

The Master Agreement provided that on Early Termination, one party would pay the other a "Settlement Amount", which would be calculated as of the Early Termination Date, and include an adjustment for any outstanding obligations that had previously arisen under the Master Agreement. See, Master Agreement § 6(e)(i). The Settlement Amount was to be determined by the non-defaulting party according to certain Market Quotation procedures set forth in the Master Agreement.[2] Pursuant to the parties' agreements here, the non-defaulting party was required to obtain market quotations, whether positive or negative, as defined below, from certain "Reference Market-makers" for each terminated

---

[2] The Master Agreement contains several methods for obtaining Market Quotations. Here, the parties selected the Market Quotation/Second Method procedure.

3

transaction.[3] The Master Agreement provided in § 14 that "'Market

Quotation' means, with respect to one or more Terminated

Transactions and a party making the determination, an amount

determined on the basis of quotations from Reference Market-

makers." It further stated that

> Each quotation will be for an amount, if any,
> that would be paid to such party (expressed
> as a negative number) or by such party
> (expressed as a positive number) in
> consideration of an agreement between such
> party (taking into account any existing
> Credit Support document with respect to the
> obligations of such party) and the quoting
> Reference Market-maker to enter into a
> transaction (the "Replacement Transaction")
> that would have the effect of preserving for
> such party the economic equivalent of any
> payment or delivery (whether the underlying
> obligation was absolute or contingent and
> assuming the satisfaction of each applicable
> condition precedent) by the parties under
> Section 2(a)(I) in respect of such Terminated
> Transaction or group of Terminated
> Transactions that would, but for the
> occurrence of the relevant Early Termination
> Date, have been required after that date.[4]

The Master Agreement provided that "[i]f more than three

quotations are provided, the Market Quotation will be the

arithmetic mean of the quotations, without regard to the

---

[3] Reference market-makers were defined as four leading dealers in
the relevant market selected by the non-defaulting party in good
faith. See, Master Agreement § 14.

[4] Section 2(a)(I) stated that "Each party will make each payment
or delivery specified in each Confirmation to be made by it,
subject to the other provisions of this Agreement."

4

quotations having the highest and lowest values." <u>See</u>, Master Agreement § 14.

In addition to the Master Agreement, the parties executed an ISDA Credit Support Annex, which contained the general terms for margin calls and payment procedures. The parties also entered into individual confirmation agreements (Confirmations), which set forth the terms of each individual transaction, including: 1) the dollar notional amount of the transaction; 2) the Floating Rate Index B, which was the exchange rate as of the trade date, against which the eventual dollar/ruble exchange rate was to be measured on the termination date; 3) the trade date and the termination date; and 4) the source of the dollar/ruble exchange rate on the termination date.[5]

Each Confirmation also contained a "Deferral or Reduction of Payment" provision (Deferral/Reduction Clause), which stated that

> The payment obligations of [Credit Lyonnais] pursuant to this Transaction shall be deferred or reduced or, on account of fees, taxes, commissions or similar charges or costs imposed due to an Exchange Risk, reduced by an amount determined by [Credit Lyonnais] in a

---

[5] The parties here chose to reference the Moscow Interbank Currency Exchange, which was quoted by Reuters. The Confirmations provided several steps for ascertaining the Exchange Rate including starting with a quote from Reuters or if no such quote was available, obtaining quotes from Moscow banks. If no bank quote was available of a given day, then the parties turned to "the best rate obtainable by the Calculation Agent."

> commercially reasonable manner in an amount which is
> directly attributable to Exchange Risk until [Credit
> Lyonnais] determines, in its reasonable discretion,
> that such Exchange Risk no longer exists.

Exchange Risk was defined in the Confirmations as

> the promulgation or imposition of any law, order,
> decree or any other governmental action by any Russian
> governmental authority which prohibits, restricts,
> limits or otherwise imposes any charges or costs upon
> the ability of market participants located in Russia to
> (i) transfer [United States Dollars] to parties located
> outside of Russia, (ii) obtain [United States Dollars]
> in a lawful market located in Russia or (iii) convert
> Rubles into [United States Dollars].

It is undisputed that there were eight outstanding NDFs
between High Risk and Credit Lyonnais as of August 17, 1998 with
a total notional amount of approximately 60.8 million dollars. It
is also undisputed that on August 17, 1998, the Russian
Federation and its Central Bank issued a joint statement (Joint
Statement) that, among other things, announced a ninety-day
moratorium on payments under forward currency contracts.

High Risk contends that the restrictions set forth in the
Joint Statement caused the value of the ruble to fall
precipitously relative to the value of the dollar, resulting in
High Risk becoming increasingly "in the money" with respect to
its NDF Contracts with Credit Lyonnais. High Risk further states
that the decline in the value of the ruble resulted in it making

6

substantial margin calls on Credit Lyonnais.[6] According to High Risk, the Credit Support Annex required the party that was "out of the money" on a net basis covering all the open transactions, in this case Credit Lyonnais, to transfer margin to the other party whenever the value of the transactions exceeded certain amounts and where there was already a shortfall in posted collateral. High Risk asserts that Credit Lyonnais responded to the margin calls by asserting that Credit Lyonnais's obligation to make any margin payments were negated because Exchange Risk had occurred.

The parties unsuccessfully attempted to resolve their differences as to whether Exchange Risk, assuming it had occurred, applied to margin payments. However, it is undisputed that on August 25th, 1998 Credit Lyonnais made a single margin payment of approximately $11 million, while reserving its rights.

On September 1, 1998, non-party Credit Suisse First Boston (Europe) Limited ("CSFB"), filed for High Risk's involuntary liquidation before the Grand Court of the Cayman Islands. CSFB was a counter-party to certain debt transactions with High Risk,

---

[6] A margin call, in this context, is a demand by one of the parties to the NDF Contract on the other for the transfer of cash or cash equivalents, the amount of which is calculated pursuant to the Credit Support Annex.

known as "GKO" transactions. High Risk was "out of the money" on those transactions. High Risk asserts that CSFB's petition to have High Risk liquidated was based on CSFB's assertion that High Risk failed to meet certain margin calls made by CSFB in connection with the GKO transactions. On that same day, High Risk's shareholders resolved to place it in voluntary liquidation. The liquidation became final on September 24, 1998.

In the meantime, on September 3, 1998, Credit Lyonnais notified High Risk that it was declaring an Early Termination of the eight NDF transactions on the grounds that High Risk's insolvency constituted an Event of Default as set forth in the Master Agreement. Credit Lyonnais set the next day, September 4, 1998, as the Early Termination Date.

On September 4th, Credit Lyonnais contacted thirteen market-makers in an effort to obtain cumulative valuations of the NDF contracts, pursuant to section 6(e)(i) of the Master Agreement. It is undisputed that Credit Lyonnais instructed the market-makers, in writing, to consider the existence of Exchange Risk as a factor in valuating the NDFs. It is also undisputed that Credit Lyonnais followed the written requests with telephone calls to several of the market-makers.

Some of the Market-makers were unable or unwilling to

provide valuations of the NDFs. However, Credit Lyonnais

eventually received four quotations upon which it relied to

determine the value of the NDFs. Merrill Lynch and Goldman Sachs

both valued the contracts at zero. JP Morgan valued the contracts

at $403,180 and Societe Generale valued the contracts at

$4,097,381. Pursuant to the terms of the Master Agreement, Credit

Lyonnais dropped the highest and lowest of the quotes and then

averaged the value of the two remaining quotes, which came to

$201,590. It then deemed that to be the Settlement Amount owed to

High Risk.

On September 9, 1998, Credit Lyonnais requested that High

Risk return its collateral in excess of the Settlement Amount,

totaling $11,193,080.20. It is undisputed that the collateral was

not returned.

High Risk commenced this action, through its liquidators, in

January of 2000, asserting claims against Credit Lyonnais and

Societe Generale, which was another party to NDF transactions

with High Risk. In its first and second causes of action, High

Risk asserted that Credit Lyonnais and Societe Generale,

respectively, caused High Risk's insolvency by failing to post

margin payments after the Joint Statement was issued. On July 10,

2001, I dismissed the second cause of action, against Societe

Generale, on the grounds that High Risk failed to allege sufficient facts to support its claim that it·became insolvent because it was unable to meet its obligations to third-parties because of a failure by Societe Generale to post margin payments.[7]

The third and fourth causes of action in the complaint are for breach of contract, alleging that Credit Lyonnais and Societe Generale, respectively, improperly determined the Settlement Amounts owed to High Risk under the various NDFs. High Risk and Societe Generale eventually settled their dispute. Therefore, at this point, all that remains to consider is the third cause of action against Credit Lyonnais.

As described above, there were eight outstanding NDFs between High Risk and Credit Lyonnais as of September 4, 1998, the Early Termination date chosen by Credit Lyonnais. The dispute remaining here is whether Credit Lyonnais properly valued those NDFs through the Market Quotation procedure. The parties agree that while the NDF transactions themselves are complex, the legal issue here is a fairly straightforward contract interpretation question, based on the provisions of § 14 of the Master

---

[7] High Risk and Credit Lyonnais stipulated that High Risk would stay the prosecution of its analogous claim against Credit Lyonnais, i.e. the first cause of action.

Agreement, which sets forth the Market Quotation procedure and based on the Exchange Risk provisions of the Confirmations.

Section 14 of the Master Agreement, pertaining to Market Quotations, while not perfectly drafted, is unambiguous.[8] It required the terminating party, in this case Credit Lyonnais, to contact Reference Market-makers in order to determine the value of each NDF as of the Termination Date.

In order to make such a valuation, each Market-maker was, in effect, required to state how much Credit Lyonnais would have to pay or expect to be paid to have the market-maker step into the shoes of Credit Lyonnais with respect to each particular transaction. This amount depended of course on whether Credit Lyonnais was "in the money" or "out of the money" with respect to the given transaction. The Market-maker was not actually being asked to enter into such a transaction, but just to give its opinion on what the transaction was worth to Credit Lyonnais,

---

[8] This section of the Master Agreement is commonly used in conjunction with NDF transactions. As such, the parties have submitted a significant number of expert affidavits and other documentary evidence in connection with the customary interpretation of this section in the relevant industry. However, the parties agree that the court need not consider such evidence unless the court determines that the contract is ambiguous, which each party contends it is not. See, Gershon v CDC Ixis Capital Markets, Inc, 1 AD3d 137, 138 (1st Dept 2003). As noted above, the contract is not ambiguous and the additional evidence is therefore not considered.

positively or negatively, as of the Termination Date.

The issue here is whether the quotations obtained by Credit Lyonnais were obtained in "good faith" as required by Section 14 of the Master Agreement. Credit Lyonnais contends that Exchange Risk was in effect on the Termination Date, which meant that its payment obligations to High Risk were deferred or reduced, which therefore significantly reduced the value of the NDFs on the Early Termination Date. It argues that the Market-makers correctly considered that factor, resulting in a termination payment amount of $201,590.

High Risk argues that Credit Lyonnais improperly influenced the Market-makers with respect to how much weight to afford the Exchange Risk factor. High Risk asserts that in its telephone calls to the Market-makers, Credit Lyonnais pressed the Market-makers to apply unduly large discounts to the value of the NDFs. It asserts that this occurred even in situations where a given Market-maker had indicated to Credit Lyonnais that such discounts were inappropriate either because Exchange Risk was not a factor to be considered or because the discount urged by Credit Lyonnais was too large.[9]

---

[9] Although the parties in the papers submitted addressed whether Exchange Risk occurred, and if so, its effects on valuation, it is not necessary to resolve these issues.

12

As noted above, section 14 of the Master Agreement is unambiguous. Written agreements that are "complete, clear and unambiguous" must be enforced according to the plain meaning of their terms, Excel Graphics Technologies, Inc v CFG/AGSCB 75 Ninth Ave, LLC, 1 AD3d 65, 69 (1st Dept 2003), citing R/S Assoc v New York Job Dev Auth., 98 NY2d 29, 32 (2002). Moreover, contract provisions must be read so as to harmonize them, if possible, so that no provision is left without force or effect, see, James v Jamie Towers Housing Co, Inc, 294 AD2d 268, 269 (1st Dept 2002), affd 99 NY2d 639 (2003); Isaacs v Westchester Wood Works, Inc, 278 AD2d 184, 185 (1st Dept 2000). Here, the Market Quotation procedure in the Master Agreement, by its terms, served to determine the final Settlement Amount that would be owed by one party to another under the NDFs as of the Early Termination Date. Of course, this value had to ultimately derive from comparing the value of the dollar to that of the ruble, according to the applicable exchange rate, which was the purpose of the NDFs.

The Market Quotation procedure does not mention Exchange Risk. Instead, Exchange Risk is described in the Deferral/Reduction Clause in the individual Confirmations, which were executed after the Master Agreement. The Deferral/Reduction Clause, by its express terms, deferred or reduced the amount of a given payment, "until Credit Lyonnais, in its reasonable

13

discretion determine[d] that...Exchange Risk no longer exist[ed]." See, Confirmations, § 3(a). In other words, once the period of Exchange Risk ended, Credit Lyonnais was still obligated to fulfill its payment obligations.[10]

As noted above, Section 14 of the Master Agreement required Credit Lyonnais to obtain market quotations in "good faith". The Market-makers' function was to provide an independent opinion as to the value of the NDFS, and it was for the Market-makers to evaluate how much weight, if any, to accord to the Exchange Risk factor. Exchange Risk may have had some potential to affect the value of the NDFS, even assuming that the effect was temporary, because payments could be deferred or reduced.[11]

I find that Credit Lyonnais failed to obtain adequate market quotations in good faith pursuant to section 14 of the Master Agreement because it interfered with the Market-makers' independence in valuing the NDFs as of the termination date. Credit Lyonnais did so through its telephone communications with the Market-makers in which it repeatedly emphasized the importance of considering Exchange Risk, expressed its own

---

[10] Credit Lyonnais asserts that, in theory, Exchange Risk could have lasted indefinitely, although it does not assert that it did so here.

[11] High Risk has not demonstrated that Credit Lyonnais determined in bad faith that Exchange Risk had occurred.

14

opinion as to the effect that Exchange Risk should have on the value of the NDFs, and encouraged the Market-makers to discount the value of the contracts. Even assuming that Exchange Risk existed on the Termination Date, which is vigorously disputed here, it was for the Market-makers, not Credit Lyonnais, to independently determine how to assess that factor in valuing the NDFs. The examples set forth below are illustrative.[12]

### 1. Banque Paribas

On September 4, 1998, Dave Greenberg of Credit Lyonnais telephoned one of the Market-makers, Banque Paribas (Paribas), seeking to obtain a market quotation. Mr. Greenberg spoke to Salu Manzoor of Paribas, and told Mr. Manzoor that Credit Lyonnais needed a quote with regards to the price that Paribas would hypothetically pay to step into High Risk's shoes with respect to the NDFs.[13]

During the conversation, Mr. Greenberg pointed out that Credit Lyonnais had determined that Exchange Risk had occurred,

---

[12] The telephone conversations cited in this decision were recorded and neither side disputes the accuracy of the transcripts provided to the court.

[13] The request should have been with respect to stepping into the shoes of Credit Lyonnais, according to the terms of the Master Agreement. However, it is a distinction without a difference in this case.

15

and stated that this meant that its payment obligations could be deferred or reduced. Based on that, Mr. Greenberg then told Mr. Manzoor to try to put a "haircut", i.e., a discount, on the value of the NDFs, in light of the Exchange Risk factor. Mr. Greenberg noted that Exchange Risk was a "very important feature" which should be "reflected" in the quotation.

Mr. Manzoor responded by stating that the Exchange Risk factor could be difficult to quantify because Credit Lyonnais itself was responsible for determining whether Exchange Risk existed and for how long. Mr. Greenberg responded that if that was Mr. Manzoor's "belief", then it should be reflected in the market quotations. Mr. Greenberg reiterated a few moments later that if Mr. Manzoor believed that Credit Lyonnais was responsible for determining the deferral or reduction and that such a factor didn't "make it very...interesting for [Paribas]", then that lack of interest should be "reflected" in the price that Paribas placed on the NDFs. After further discussion, Mr. Manzoor stated that he needed to discuss the matter with legal counsel.

In a later conversation that day, Mr. Manzoor told Mr. Greenberg that Paribas could provide only a "good indication" of the value of the NDFs, rather than a firm quotation, to ensure that Paribas would not become obligated to actually enter into a

16

transaction with Credit Lyonnais. A few moments later, Mr. Greenberg asked Mr. Manzoor what percentage discount Paribas would apply in valuing the NDFs, based on Exchange Risk. After further discussion, Mr. Manzoor stated that it would likely apply a 10% "haircut".

In their next conversation, Mr. Greenberg stated that his managing director had told him to make sure that Paribas provided a "firm quotation", even though Paribas would not actually be required to enter into a transaction with Credit Lyonnais. Mr. Manzoor responded by stating that he would have to turn the matter over to legal counsel. Eventually, Paribas notified Credit Lyonnais that it was unable to provide firm quotes for the NDFs.

### 2. Chase Manhattan

On that same day, Mr. Greenberg sought a market quotation from Ian Edwards of Chase, with whom he had spoken previously about the "theoretical" value of the NDFs. Mr. Edwards told Mr. Greenberg that he had been instructed not to provide a quotation.

Despite this, Mr. Greenberg and another Credit Lyonnais representative, Omar Abukhadra, then spoke to another Chase representative, Bill Gilbert. Mr. Abukhadra requested a valuation of the NDFs which included a "factoring in" of the Exchange Risk

clause. However, Mr. Gilbert informed them that in his opinion, Exchange Risk did not affect the value of the NDFs.

Mr. Abukhadra disagreed and stated that Exchange Risk affected the NDFs "a lot" because Credit Lyonnais could defer or reduce its payments. However, Mr. Gilbert reiterated that the Exchange Risk provision did not affect the NDFs and that he would value the NDFs as "clean", ie, with no discount. After further discussion, Mr. Gilbert declined to provide a market quotation.

### 3. Salomon Brothers

Mr. Greenberg spoke to David Rosa of Salomon, telling him that Credit Lyonnais needed a "firm market quotation". In discussing the Exchange Risk provision, Mr. Greenberg stated: "I just implore you to sort of skim...read through the confirmation and you'll see some provisions in there which I think are material okay?"  Mr. Rosa responded that he would have legal counsel review it. Eventually, however, Salomon informed Credit Lyonnais that it could not give firm prices on the NDFs given the "current market environment".

### 4. Union Bank of Switzerland

Mr. Greenberg spoke to Behzad Goharian of UBS on September 4th. He pointed out the Exchange Risk provision to Mr. Goharian,

describing it as "critical factor" in evaluating the NDFs. Despite this, UBS eventually declined to provide a quotation, stating that "due to the convertibility clause" in the Confirmations, there was no market for the NDFs.

### 5. JP Morgan

On August 26, 1998, Mr. Greenberg spoke to Nick Cox of JP Morgan about the Exchange Risk provision and its effect on the value of the NDFs. This conversation took place before Credit Lyonnais formally requested a market quotation.

Mr. Greenberg stated that Credit Lyonnais had determined that Exchange Risk had occurred and opined that while this did not permit Credit Lyonnais to "cancel" the NDFs, it did permit it to delay payment indefinitely. He also stated that it would "probably" not be "prudent" to ignore Exchange Risk in trying to determine a value for the NDFs.

In a later conversation, Mr. Cox stated that he would probably apply a discount of approximately 80%, due to Exchange Risk. However, as set forth above, JP Morgan eventually valued the NDFs at $403,180, which it described as representing approximately a 99% discount.

19

### 6. Goldman Sachs

Mr. Greenberg spoke to Scott Gush of Goldman Sachs on September 4, 1998 and requested a market quotation. Mr. Greenberg stated that Credit Lyonnais had determined that Exchange Risk was in effect and requested that Goldman Sachs value the NDFs in that context, taking into account that payment might be for an "uncertain amount" at an "undetermined" time. Mr. Greenberg stated that while the Exchange Risk clause was somewhat ambiguous, he needed Goldman Sachs's "best efforts" to assign a value to the NDFs, including the possibility of putting a "distressed" value on them if necessary. Mr. Greenberg acknowledged that but for Exchange Risk, Credit Lyonnais would "probably owe a fair amount of money" on the NDFs. Goldman Sachs eventually provided a quote of zero, stating that it did so in light of the wording of the Exchange Risk clause.

### 7. Merrill Lynch

Mr. Abukhadra and Mr. Greenberg spoke to Alex Lomakin of Merrill Lynch. Mr. Abukhadra pointed out the Exchange Risk provision, stating that it allowed Credit Lyonnais to defer and reduce its payments if it incurred anything that it considered to be a cost on it. Merrill Lynch eventually provided a market quotation of zero.

### 8. Societe Generale

Mr. Greenberg spoke to Tom Athan of Societe Generale on September 4, 1998 and requested a market quotation. Mr. Athan pointed out that Credit Lyonnais had initially declined to provide a market quotation in connection with Societe Generale's NDFs with High Risk. Mr. Greenberg responded that Credit Lyonnais had decided to provide a quote to Societe Generale and requested that Societe Generale provide a quote with respect to the NDFs between Credit Lyonnais and High Risk. Societe Generale eventually provided a quote of approximately four million dollars, as set forth above.

It is clear from the examples cited above, as well as the full text of each telephone conversation, that Credit Lyonnais went beyond simply requesting market quotations from the Market-makers. Credit Lyonnais followed the initial requests with phone calls in which it repeatedly emphasized that it had declared Exchange Risk to be in effect and that it believed Exchange Risk could significantly affect the value of the NDFs. This resulted in a situation where some Market-makers declined to provide valuations and others did so under only after concerted efforts by Credit Lyonnais to persuade the Market-maker to substantially discount those valuations. Thus, Credit Lyonnais did not obtain

21

good faith market quotations as contemplated by the parties' agreements. Instead, they obtained quotations which discounted the cumulative value of the NDFs by more than forty million dollars. Under the circumstances set forth above, that result is not valid and was obtained in breach of the parties' contracts.

It is possible that had Early Termination not occurred, the value of the ruble versus the dollar might have changed significantly before the natural termination date occurred for each NDF. However, I cannot speculate that such an event would have occurred, and to do so would be to disregard the terms of the parties' agreements. Moreover, Credit Lyonnais had the option to allow the contracts to proceed until their natural termination date which would have set the value as of that later date, rather than declaring early termination. Credit Lyonnais chose not to do so.

The Master Agreement provided that in the event that adequate Market Quotations were not obtained, as here, the parties were required to follow a valuation procedure called Loss. This required one or both of the parties to determine the value of the NDFs themselves, rather than by reference to Market-makers.

On September 4, 1998, the eight outstanding NDFs had a

22

notional value of $60,828,562.43. High Risk asserts that it was
"in the money" on these NDFs for a total of $41,337,108, as of
September 4, 1998 and it states that this figure is supported by
Credit Lyonnais's own internal marks. Credit Lyonnais disputes
this assertion only on the grounds that it believed that Exchange
Risk was in effect on that date, which it believed caused the
value of the NDFs to be zero. Otherwise, Credit Lyonnais does not
dispute that its internal marks valued the NDFs as being in High
Risk's favor for $41,337,108 on the Early Termination date, i.e.
September 4, 1998.

Based on the foregoing, I find that High Risk has
demonstrated that it was "in the money" in the amount of
$41,337,108. However, it is undisputed that High Risk failed to
refund collateral payments posted by Credit Lyonnais totaling
$11,394,670.20. Therefore, the amount owed to High Risk by Credit
Lyonnais must be reduced by the amount of the collateral.

I also find that High Risk is entitled to interest from
September 9, 1998 through December 6, 2002. September 9th was the
date that Credit Lyonnais informed High Risk of the amount of the
termination payment as calculated by Credit Lyonnais. See, Master
Agreement § 6(d). On December 6, 2002, High Risk and Societe
Generale began requesting that the court withhold decision on

their motions pending settlement efforts, which resulted in a very lengthy delay in the disposition of the instant motions.

Accordingly, it is

ORDERED that the motion for summary judgment by defendant Credit Lyonnais is denied; and it is further

ORDERED that plaintiff's motion for summary judgment is granted; and it is further

ORDERED that plaintiff's first cause of action is severed; and it is further

ORDERED that upon presentation of the requisite papers, the clerk is directed to enter judgment for the plaintiff on the third cause of action in the amount of $29,942,437.80, with interest from September 9, 1998 to December 6, 2002 as set forth above.

DATED: 7|6|05

ENTER:

ι ι

J.H.O.
**IRA GAMMERMAN**

24



# England and Wales High Court (Commercial Court) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Commercial Court) Decisions >> Peregrine Fixed Income Ltd v. Robinson Department Store Public Co. Ltd [2000] EWHC Commercial 99 (18th May, 2000)
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2000/99.html*
Cite as: [2000] EWHC Commercial 99

[New search] [Help]

## Peregrine Fixed Income Ltd v. Robinson Department Store Public Co. Ltd [2000] EWHC Commercial 99 (18th May, 2000)

IN THE HIGH COURT OF JUSTICE Claim No.2000 - Folio 277

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

THE HONOURABLE MR JUSTICE MOORE-BICK

BETWEEN

PEREGRINE FIXED INCOME LIMITED (IN LIQUIDATION)

Claimant

and

ROBINSON DEPARTMENT STORE PUBLIC COMPANY LIMITED

Defendant

Defendant

JUDGMENT

_____

1. Mr. Mark Hapgood Q.C. and Mr. Michael Swainston instructed by Clifford Chance appeared for the claimant.

2. Mr. Iain Milligan Q.C. and Mr. Andrew Baker instructed by Slaughter and May appeared for the defendant

3. Pursuant to the Practice Statement issued by the Master of the Rolls on 9th July 1990 I hereby certify that the attached text records my judgment in this matter and direct that no further record or transcript of the same need be made.

The Hon. Mr. Justice Moore-Bick

1. This matter comes before the court by way of the trial of a claim under Part 8 of the Civil Procedure Rules in which the claimant, Peregrine Fixed Income Ltd ("Peregrine") seeks the determination of a number of issues between itself and the defendant, Robinson Department Store Public Company Ltd ("Robinson"), relating to the construction of the Master Agreement (Multicurrency - Cross Border) (1992) of the International Swaps and Derivatives Association Inc. ("the Agreement"). The facts giving rise to the dispute are set out in a long and carefully drafted agreement between the parties from which the following summary is derived.

2. Peregrine is a company incorporated in Hong Kong which up to 12th January 1998 carried on business as a provider of finance and financial products, including swaps and other derivatives. On 12th January 1998 the board of directors of its parent company resolved to seek the appointment of a provisional liquidator to the company and on 16th January 1998 provisional liquidators of Peregrine were appointed following the presentation of a winding-up petition against it in the High Court of the Hong Kong SAR on 15th January 1998.

3. Robinson is a company incorporated in Thailand and carries on business as an operator of department stores in that country. It is currently in the process of initiating a restructuring of its debts under the supervision of the court. It has been accepted by Robinson and its creditors that under the proposed restructuring arrangement the creditors' claims will be converted into equity. The eventual value of those claims will therefore depend on the performance of Robinson's shares.

4. On various occasions prior to December 1997 Peregrine and Robinson entered into derivatives transactions. In particular, on or about 20th November 1997 Peregrine and Robinson executed and exchanged the execution copy of a letter dated 20th November 1997 ("the Confirmation Letter") which was expressed to confirm a swap transaction under which, inter alia, Robinson agreed to pay Peregrine 25 annual instalments of US$6.85 million beginning in November 1998 and ending in November 2022. The Confirmation Letter incorporated the 1991 Definitions published by the International Swaps and Derivatives Association and provided that if they were not already parties

to a 1992 Master Agreement the parties would use their best endeavours to enter into one. On or about 16th December 1997 Peregrine and Robinson executed a copy of the Agreement and Schedule dated 17th February 1997. It is common ground that the terms of the Agreement and Schedule govern the contract between them and that English law is the proper law of the contract.

5.  The Agreement and Schedule are highly complex documents which give the parties the opportunity to choose how the contract is to operate under certain defined circumstances. The parties exercise that choice through the Schedule. In order to understand the issues to which this claim gives rise it is necessary to set out some of the terms of the Agreement at length, but in the interests of brevity I shall confine myself to those that are central to the dispute and summarise others where I think that may be of assistance. Most of the terms used in this judgment are defined in the Agreement and such defined terms are denoted by initial capitals. For ease of understanding I have adopted that convention throughout this judgment and accordingly expressions which have been given initial capitals should be understood as referring to those expressions as defined in the Agreement.

6.  Section 2 of the Agreement is headed "Obligations" and includes the following provisions:

"(a) General Conditions

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

. . . . . . . . . . . . . . . . . . . . . . .

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default . . . . . with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred . . . . . . . . . ."

7.  Section 5 is headed "Events of Default and Termination Events". It sets out a number of situations which constitute Events of Default; these include an application by a party for the appointment of a provisional liquidator for itself or for all or substantially all of its assets. It is common ground that steps were taken by Peregrine on 15th January 1998 to seek the appointment of a provisional liquidator which fell within this provision. It is also important to note, however, that Section 5 also provides for what are called "Termination Events" which may lead to the termination of outstanding transactions but do not constitute Events of Default. Termination Events fall into five categories described as "Illegality", "Tax Event", "Tax Event Upon Merger", "Credit Event Upon Merger" and "Additional Termination Event", the last of these being additional circumstances agreed by the parties to constitute Termination Events.

8.  Section 6 deals with "Early Termination". It is important to note at the outset that it provides for Early Termination of transactions under a variety of different circumstances. The first is on the occurrence of an Event of Default for which Section 6(a) provides as follows:

Right to terminate Following Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early

Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii) . . . . . (6) [an application for the appointment of a provisional liquidator]".

In the present case the parties had specified Automatic Early Termination in the Schedule to the Agreement.

9.  Section 6(b) deals with the right to terminate transactions following the occurrence of one of the Termination Events already mentioned. It recognises that one or other or both of the parties may be affected by the event in question. Such a party is described as an "Affected Party".

10.  Section 6(e) is headed "Payments on Early Termination". Again, it is important to note that it deals separately with termination following Events of Default in sub-paragraph (i) and termination following Termination Events in sub-paragraph (ii). Moreover, sub-paragraph (ii) contains different provisions depending on whether there are one or two Affected Parties. In the case of termination resulting from Events of Default the parties have the opportunity at the time of entering into the Agreement to choose between different formulae for calculating and paying the amount due from one to the other. It is unnecessary at this point to analyse the different formulae; it is sufficient for the moment to say that these parties chose what is described in Section 6(e)(i)(3) as the "Second Method and Market Quotation" formula which provides as follows:

"Second Method and Market Quotation. If the Second Method and Market Quotation apply an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the [US dollar] equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the [US dollar] equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."

The parties had chosen the United States dollar as the Termination Currency Equivalent, that is, the currency in which all outstanding obligations should be expressed for the purposes of this calculation. I have therefore inserted references to the US dollar in this sub-paragraph for the sake of simplicity. The expression "Unpaid Amount" is self-explanatory, but in fact Peregrine had fulfilled all its payment obligations under the contract and there were therefore no Unpaid Amounts outstanding in favour of Robinson as the Non-defaulting Party.

11.  In order to understand the effect of Section 6(e)(i)(3) it is necessary to turn next to the definitions of "Settlement Amount" and "Market Quotation". It is also convenient at this stage to consider the definition of "Loss". These are all defined in Section 14 of the Agreement.

12.  "Settlement Amount" is defined as follows:

"Settlement Amount" means, with respect to a party and any Early Termination Date, the sum of:-

(a) The [US dollar] Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined;

and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result."

13. The definition of "Market Quotation" is very long and complex. The concept behind it is that of obtaining an open market valuation of the obligation which the Non-defaulting party has lost as a result of the default by obtaining from a representative number of first-class market - makers (the "Reference Market-makers") quotations for replacing the Defaulting party in the transaction. The material parts of the definition for present purposes provide as follows:

"Market Quotation" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from [not less than three] Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery ( . . . . assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a) (i) in respect of such Terminated Transaction . . . . . . . . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."

14. The definition of "Loss" is also long and complex. For present purposes it is sufficient to quote the following parts:

"Loss" means, with respect to . . . . . . . . . . a party, the [US dollar] Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with the Terminated Transaction . . . . . . . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position (or any gain resulting from any of them). . . . . . . . . . . ."

15. In the present case the transaction embodied in the Confirmation Letter automatically terminated on 15th January 1998 when Peregrine took steps to seek the appointment of a provisional liquidator. That was the combined effect of the occurrence of an Event of Default falling within Section 5(a)(vii)(6) and the parties' specifying Automatic Early Termination as contemplated in Section 6(a). There were no other outstanding transactions between the parties at that date and it was therefore for Robinson as the Non-defaulting Party to determine the Settlement Amount in accordance with Section 6(e)(i)(3) of the Agreement. Quotations were sought from a number of Reference Market-makers who were asked to quote a price for entering into a replacement transaction, that is, to purchase Robinson's outstanding obligations. Three quotations were provided which, after disregarding the highest and lowest as required by the Agreement, produced a figure of US$9,694,901. In other words, those who were agreed to represent the market for these purposes valued Robinson's obligation to pay US$6.85 million each year for twenty five years (a total of US$171.25 million, or a little over US$87.3 million at present day values using conventional discounting methods) at just over US$9.5 million. If one adopts the Market

Quotation measure as the basis for calculating the Settlement Amount, the amount payable by Robinson to Peregrine under Section 6(e)(i)(3) is US$9,694,901. That, therefore, is the amount for which Peregrine would be entitled to prove in the liquidation (or in this case the reconstruction) of Robinson.

16. Against that background Mr. Hapgood Q.C. on behalf of Peregrine submitted that in this case the use of the Market Quotation measure to calculate the amount payable under Section 6(e) does not produce a commercially reasonable result because it grossly undervalues Robinson's obligation, or more accurately, what Robinson has gained as a result of the termination of the transaction. That much, he said, is demonstrated by the extent of the discrepancy between the present discounted value of Robinson's obligation and the figure obtained by Market Quotation. The possibility that a Market Quotation might not produce a commercially reasonable result is one which is expressly contemplated in the definition of the Settlement Amount. In such cases, he submitted, the definition requires that the Settlement Amount be calculated by reference to the Defaulting Party's actual Loss rather than a Market Quotation. Accordingly, instead of using Market Quotation Robinson should have used the alternative measure, Loss, for the purposes of calculating the Settlement Amount. That would have resulted in the amount payable under Section 6(e) being US$87.3 million.

17. This is all very well as far as it goes, but it is important not to lose sight of the fact that the calculation of the amount payable under Section 6 is the responsibility of the Non-defaulting Party and in cases where the parties have chosen the Market Quotation measure the Agreement only requires the calculation of the Settlement Amount to be made by reference to the Loss measure if in that party's reasonable belief the use of Market Quotation would not produce a commercially reasonable result. Robinson has said that it does believe that Market Quotation produces a commercially reasonable result and Mr. Milligan Q.C. on its behalf has explained why, in his submission, the result which it produces is both reasonable and in accordance with the wider principles of the Agreement.

18. Against this background Peregrine has asked the court to determine the following five questions:

(1) Is Peregrine entitled to challenge Robinson's belief that the Market Quotation payment measure has produced a commercially reasonable result?

(2) If so, does the Market Quotation payment measure produce a commercially reasonable result?

(3) If the answer to question (2) is 'No', is Peregrine entitled to require Robinson, and/or is Robinson bound, to use the Loss payment measure in determining the Settlement Amount?

(4) If the answer to question (3) is 'Yes', or if the court is willing to determine this question in any event, is Loss to be determined

(a) as Peregrine contends; or

(b) as Robinson contends?

(5) Without prejudice to the generality of question (4), is the creditworthiness of Robinson relevant to the assessment of Loss, and if so, is there any condition, limitation or restriction on the extent to which, or in respect of the manner in which, such creditworthiness should be considered as relevant or taken into account?

19. On the face of it one can well see why Peregrine considers that the use of Market Quotation as the basis for calculating the amount payable under Section 6 produces an unreasonable result in this case. Two closely related questions immediately spring to mind: how can an obligation which has a nominal present value of US$87.3 million be worth only US$9.7 million; and why does a valuation derived from the market (which in principle ought to provide a reliable assessment of the value of the transaction) apparently fall so far short of the figure which would ordinarily be attributed to the contract if one were valuing the loss of the bargain?

20. I think the answer to both of these questions lies partly in the fact that Robinson is itself in serious financial difficulties, as the restructuring arrangements demonstrate. By seeking quotations from a group of Reference Market-makers in accordance with the Agreement Robinson was effectively asking the market how much it would pay to take over the benefit of its obligation. Unless precluded from doing so, it is inevitable that when answering that question the market would consider not just the nominal amount of the obligation but many other factors as well, including the period over which the payments were due to be made and the risk of default on the part of Robinson. It has to be remembered that in this case none of Peregrine's obligations remained outstanding and there was no form of security or credit support in place. In reality Peregrine was simply holding a long-term unsecured debt due from Robinson. If the debtor is financially weak, the market cannot be expected to regard his unsecured debt in the same way as it might regard the debt of a first-class financial institution.

21. It was common ground that Reference Market-makers who are approached for quotations under the terms of this Agreement are not required or expected to ignore the financial standing of the Non-defaulting Party when considering what they would pay, or demand, as the price of entering into a Replacement Transaction. The definition of Market Quotation expressly requires them to quote on the basis of entering into a contract with the Non-defaulting party that would have the effect of preserving for that party the economic equivalent of any payment due under the original contract and when doing so to take into account any existing Credit Support Document relating to that party's obligations. As both parties recognised, this reflects an assumption that the financial status of the Non-defaulting Party will be taken into account. The Reference Market-makers are required to assume the satisfaction of each applicable condition precedent, but that only requires them to assume that all conditions precedent to performance by the Non-defaulting party have been, or will be, performed. It has no bearing on the ability of the Non-defaulting Party to perform when the time comes. The Market Quotation measure is, therefore, one which in certain circumstances may result in the payment which has to be made by the Non-defaulting Party to the Defaulting Party under Section 6(e) failing to a substantial degree to reflect fully the nominal value of the obligation owed by the Non-defaulting Party.

22. It was fundamental to Mr. Hapgood's argument that the Market Quotation and Loss measures should lead to a broadly similar result, and indeed he relied in part on the difference in the results he said they produced in this case as evidence of the fact that the result produced by the Market Quotation measure is commercially unreasonable. Whether any given result is in fact commercially unreasonable must very largely depend on the extent to which it departs from the result which the parties must be taken to have had in mind, and that, of course, is a matter which has to be determined by reference to the terms of the Agreement. One of the interesting characteristics of the Agreement is that on Early Termination as a result of an Event of Default the Non-defaulting Party may be required to make a payment to the Defaulting Party. Mr. Hapgood submitted that where the parties have specified Automatic Early Termination the occurrence of an Event of Default effectively closes out all their open transactions at once and a payment will then become due from the Non-defaulter to the Defaulter if, taken overall, the Defaulter is "in the money", as was the case here. Mr. Milligan, on the other hand, submitted that an important

distinction is drawn in the Agreement between termination as a result of an Event of Default and termination following a Termination Event. In the former case the Agreement, he submitted, is only concerned with preventing the Non-defaulting Party from obtaining a windfall benefit as a result of the other party's default. It was not intended to enable the Defaulting Party to obtain the full benefit of any obligations owed to him. In this respect it seemed that there might be a clear difference between the parties as to the philosophy of the Agreement.

23.  In Section 6(e) the Agreement provides for two fundamentally different methods of handling payments on Early Termination. Under what is termed the "First Method" the Defaulting Party pays the Non-defaulting Party an amount equal to the value of the outstanding obligations under the transactions which have been terminated less any unpaid amounts owed to him by the Non-defaulting Party. The Defaulting Party recovers nothing in respect of the loss of his bargain, notwithstanding that he may have been "in the money" at the time of default. This reflects the position under English law following the repudiation of a contract: accrued liabilities are unaffected and the defaulter must compensate the non-defaulter for the loss of any unperformed obligations but he is not entitled to receive anything himself in respect of the lost bargain. Under the "Second Method" a payment may be made either way depending on whether the net balance of gain and loss favours the Defaulting or Non-defaulting Party. That appears most clearly from Section 6(e)(i)(4) and the definition of Loss from which it is clear that the Non-defaulting Party's "loss" in respect of the Terminated Transactions may be a negative amount (i.e. a gain), in which case a payment of that amount must be made to the Defaulting Party.

24.  These provisions seem to me to support Mr. Hapgood's submission that the object of the Second Method of payment (whether combined with Market Quotation or Loss as the basis of measurement) is to move away from a simple breach-based approach towards one under which all the transactions covered by the Agreement are effectively closed out. I think that it would be going too far to say that they are intended in all cases to operate neutrally as between the parties, but the fact that the Non-defaulting Party must account to the Defaulting Party for any gain clearly deprives the Event of Default of most of its characteristics as a breach of contract. However, the parties are free to agree to that and there are no doubt good commercial reasons for doing so. It is interesting to note that in the absence of any other choice Section 6(e) provides that the Second Method is to apply. It is necessary, however, in order to give full consideration to Mr. Milligan's argument, also to examine Section 6(e)(ii) which deals with Early Termination resulting from Termination Events, i.e. events which do not constitute Events of Default.

25.  Section 6(e)(ii) distinguishes between the situation in which there is one Affected Party and the situation where there are two. To understand the operation of Section 6(e)(ii), therefore, it is necessary first to turn to Section 5(b) which describes what constitute Termination Events and defines the term "Affected Party". Termination Events fall into four categories: (i) Illegality, (ii) Tax Event, (iii) Tax Event Upon Merger and (iv) Credit Event Upon Merger. (One can ignore for present purposes the fifth category of Additional Termination Events which covers additional events specified by the parties. There were none in the present case.) The definition of Affected Party differs in each case to reflect the nature of the event in question. For the purposes of Illegality it is defined as a party which is prevented by supervening illegality from further performance; for the purposes of Tax Event it is defined as a party which becomes liable to bear an additional tax burden as a result of some supervening change in the applicable tax régime; for the purposes of Tax Event Upon Merger it is defined as a party which becomes subject to an additional tax burden as a result of a merger; and for the purposes of Credit Event Upon Merger it is defined as a party whose creditworthiness is materially weakened as a result of a merger. The one thing these four categories have in common is that they all involve a material alteration in the position of one party as a result of an event which does not amount to an Event of Default. They

give rise to a right to terminate the transaction under certain circumstances which are set out in Section 6(b).

26. Section 6(e)(ii) deals with the consequences of termination arising from a Termination Event. If there is only one Affected Party the amount payable as a result of early termination is determined in accordance with Section 6(e)(i)(3) if the Market Quotation payment measure has been chosen and in accordance with Section 6(e)(i)(4) if the Loss payment measure has been chosen. For these purposes references in those sub-paragraphs to the Defaulting Party and the Non-defaulting Party are to be read as references to the Affected Party and the party which is not the Affected Party respectively. In either case, however, the Second Method of payment applies. If there are two Affected Parties, the position is more complicated. Each party determines it own loss in relation to the Terminated Transaction (using the Market Quotation or Loss payment measure as appropriate) and a payment of half the difference is then made by one to the other to balance the gains and losses equally between the two parties.

27. Mr. Milligan submitted that an Event of Default is a breach of contract and that the way in which the Agreement deals with Termination Events shows that a different régime was intended to apply where neither party was at fault from that which applies when there has been an Event of Default. In my view, however, when one examines Section 6(e)(ii) as a whole one can see that that is only partly true. One of the striking features of these provisions is that where there is only one Affected Party the position exactly mirrors that under Sections 6(e)(i)(3) and (4). This strikes me as significant in two respects. In the first place, having regard to the fact that Termination Events occur without fault of either party, it is perhaps not surprising that the Affected Party should retain the benefit of the transaction if it is "in the money" at the date of termination and should not be penalised by the occurrence of an event for which he is not in legal terms responsible. That is presumably why the calculation of the amount to be paid must be carried out in accordance with sub-paragraphs (3) and (4) of Section 6(e)(i) to the exclusion of sub-paragraphs (1) and (2). In the second place, however, it underlines the similarity between the treatment of the parties in the case of a Termination Event where only one of them is affected and the case of default on the part of one party where the parties have chosen the Second Method of payment. In other words, where, for example, the transaction is terminated as a result of supervening illegality affecting only one party the transaction is closed out in just the same way as it would be if that party were in default. This in turn highlights the distinction between the First and Second Methods of payment. Where there are two Affected Parties they are both in precisely the same position and neither can be equated to the Defaulting or Non-defaulting Party. I think that provides a sufficient explanation for the particular way of calculating the payment in that particular case. In the event, therefore, I do not think that Mr. Milligan gains much assistance from the provisions relating to Termination Events.

28. Finally some further indication of the general purpose of Section 6(e) can be found in sub-paragraph (iv) which provides as follows:

"Pre-Estimate. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses."

This, of course, provides further support for Mr. Hapgood's submission that the payment called for under Section 6(e) is intended broadly to reflect the loss of bargain.

29. Much of Mr. Hapgood's argument in the present case proceeded on the premise that the object of Section 6(e)(i)(3) is to preserve the benefit of the bargain for the party "in the money" at the time of termination. However, although that is no doubt how it will work in most cases, it is not the way in which this part of the Agreement is constructed. Section 6(e)(i) does not require the Non-defaulting Party to compensate the Defaulting Party for the loss of the bargain he suffers by reasons of his own default; it requires the Non-defaulting party to calculate his loss and to account to the Defaulting Party for any gain he has made by being relieved of further performance. That appears most clearly from Section 6(e)(i)(4) in which the Loss measure is used, but applies equally to Section 6(e)(i)(3). A payment will therefore only become due to the Defaulting Party if and insofar as it represents a gain to the Non-defaulting Party resulting from its being relieved of a disadvantageous contract.

30. I think Mr. Hapgood was right in saying that when one is seeking to determine what outcome is broadly contemplated by the Agreement when Market Quotation is used in the calculation of the Settlement Amount and hence the amount payable under Section 6(e)(i)(3) some assistance can be derived from Section 6(e)(i)(4) which is concerned with the alternative calculation based on the Loss payment measure. I say that because Loss is defined in terms which make it clear that loss of bargain is one of the principal heads of damage intended to be covered and both Section 6(e)(i)(3) and Section 6(e)(iv) indicate that the Market Quotation measure and the Loss measure are intended to lead to broadly the same result. My attention has also been drawn to Australia and New Zealand Banking Group Ltd v Société Général (Court of Appeal, 29th February 2000, unreported) in which the Court of Appeal considered the definition of Loss in this form of Agreement with reference to certain hedging contracts. The details of the case do not matter for present purposes, but it is interesting to note that Mance L.J., with whose judgment the only other member of the court, Kennedy L.J., agreed, also considered that the Market Quotation measure and the Loss measure were intended to lead to broadly the same result. If the parties had chosen to adopt the Loss measure for these purposes the primary element in Robinson's calculation would have been the gain represented by being relieved of the obligation to perform the contract. In this case the termination of the transaction has relieved Robinson from the performance of an obligation whose present nominal value is US$87.3 million. When assessing damages for the loss of a bargain one does not normally discount its nominal value for the chance that the obligor will fail to perform and I can see nothing in the definition of Loss to suggest that a different approach is called for under this Agreement. By normal standards, therefore, the present value of its obligation, US$87.3 million, reflects the amount Robinson has gained by being relieved of the requirement to perform its obligations and I find it difficult to accept that it has gained only to the extent that it might actually have been capable of performing those obligations. If Robinson were financially strong, it is likely that Market Quotation would have produced a Settlement Amount somewhere near that figure, although there would presumably always have been some discount for contingencies.

31. Mr. Milligan submitted, however, that even applying the Loss measure Robinson's gain was far less that the full nominal value of the obligation. He submitted that allowance should be made for the cost of funding an immediate payment of US$87.3 million which would itself cost Robinson a total of US$71.436 million because of its poor credit rating. That, he said, reduced Robinson's net gain to a little under US$15.9 million.

32. I am unable to accept that argument. I think it is clear both from the language of the definition itself and from the wider context of the Agreement that the definition of Loss is directed to identifying the loss which a party has suffered as a result of the termination of the transaction or transactions in question and is not concerned with the steps which a party may take to fund any payment required pursuant to Section 6(e). Loss is simply one step on the road which leads to the

assessment of the amount payable by one party to the other in respect of Early Termination. It must be remembered that in many cases an Event of Default will result in the termination of several transactions between the same parties and the calculation by the Non-defaulting Party of his overall loss or gain may call for an analysis of the position under each one. The definition of Loss is in my view intended to go some way towards identifying the heads of loss which can properly be taken into account when analysing the position under any one transaction. It has nothing to do with the means by which the amount, if any, ultimately payable by the Non-defaulting Party to the Defaulting Party is funded.

33.    In these circumstances I think Mr. Hapgood is right in saying that in the present case the Market Quotation measure and the Loss measure yield significantly different results when calculating the amount to be paid by Robinson to Peregrine. Is that something which is consistent with the wider objects of the Agreement? I do not think it is. This case is far from being typical of those to which these provisions are likely to apply. Only one transaction between these two parties has been affected by the Early Termination provisions of Section 6 and that transaction is itself far from being a typical swap transaction. Moreover, the discrepancy between the results produced by adopting these different measures results from an unusual combination of factors, namely, the extreme financial weakness of the Non-defaulting Party and an Event of Default brought about by the party which was not simply the party "in the money" but which had already performed the whole of its side of the bargain.

34.    With this in mind I turn again to the language of Section 6(e)(i)(3) and thence to the definition of "Settlement Amount". The critical words are

"Settlement Amount" means . . . . . the sum of:-

(a) the [US dollar] Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction . . . . . . . . for which a Market Quotation is determined;

and

(b) such party's Loss . . . . . . . . . . for each Terminated Transaction . . . . . for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result."

35.    The first thing to notice is that the Agreement here recognises that it may be appropriate to adopt the Loss measure even in a case where a Market Quotation could be obtained. The second is that the definition itself recognises that there may be circumstances in which the Market Quotation measure will not operate satisfactorily. This provides further support for the proposition that Loss as defined in the Agreement provides a benchmark by reference to which the Market Quotation measure should be judged. It is clear, however, that whether Market Quotation would or would not produce a commercially reasonable result is a matter of judgment and is a matter to be determined by the Non-defaulting Party. Mr. Milligan submitted that the option to move to the Loss measure had no application once a Market Quotation had been obtained. He submitted that paragraph (a) of the definition of Settlement Amount makes it clear that if a Market Quotation has been obtained, the situation contemplated by paragraph (b) cannot arise and the calculation proceeds automatically in accordance with the prescribed formula. The use of the words "would not" in the phrase "would not produce a commercially reasonable result", which pointed to the obtaining of a Market Quote at some time in the future, should therefore be read as meaning "would not, if obtained, produce a commercially reasonable result". It follows, he submitted, that,

once obtained, a Market Quotation necessarily produced a commercially reasonable result.

36.  I am unable to accept this submission which in my view fails to give sufficient weight to the underlying objective of Section 6(e). There are various circumstances in which a Market Quotation may not produce a commercially reasonable result, some of which were canvassed in argument, and paragraph (b) of the definition of Settlement Amount recognises that that is so. If, when he comes to determine the Settlement Amount, the Non-defaulting party already believes that to be the case, he is relieved of the need to obtain a Market Quotation, but at that time he may be unaware of the existence of circumstances which would cause it to have that effect. Alternatively, he may be unaware of the extent to which factors of which he is generally aware will influence the market. Or again, he may not have fully in mind all the factors which he ought to take into account when forming an opinion about whether the result would be commercially unreasonable. For my own part I think the phrase "would not produce a commercially reasonable result" can equally well be construed as meaning "would not, if used, produce a commercially reasonable result". If that is so, the obtaining of a Market Quotation as contemplated by paragraph (a) does not inevitably preclude the use of the Loss measure in the circumstances contemplated by paragraph (b). Such a construction is in my view more conducive to the object of the Agreement which is to assess with reasonable accuracy the loss or gain to the Non-defaulting party as a result of the termination of the transaction. I see no reason why the parties should be taken to have agreed that they should in effect be bound by the decision of the Non-defaulting Party to seek a Market Quotation even if, for some reason which that party failed to appreciate at the time, it would produced an obviously unreasonable result and I can find nothing in the language of the Agreement which compels me to that conclusion.

37.  I come next to the question whether the use of a Market Quotation would in fact produce a commercially unreasonable result in this case and, if so, what if any steps can be taken by Peregrine to challenge the calculation by Robinson of the amount payable under Section 6(e)(i) of the Agreement. As to the first of these, although I am aware that commercial men are generally by far the best judges of what is and is not commercially reasonable, I am satisfied that the use of Market Quotation would not produce a commercially reasonable result in this case. This is a matter which has to be judged not simply by reference to the interests of one or other party but by reference to the aims and objects of the Agreement insofar as they are to be gathered from its terms as a whole. Adopting that approach it seems to me that where Market Quotation produces a result as far removed from that which would be produced by the use of the Loss measure as it does in this case it is possible to say with some confidence that the result is commercially unreasonable by the standards of the Agreement.

38.  That of itself is not enough, however. The Non-defaulting Party is responsible for determining the Settlement Amount and the Agreement provides for the use of the Loss measure only if Market Quotation would not, in the reasonable belief of that party, produce a commercially reasonable result. The court cannot, therefore, simply substitute its own judgment of what is commercially reasonable for that of the Non-defaulting Party. However, I do think that the Agreement by necessary implication requires the Non-defaulting Party to consider whether the Market Quotation measure would produce a commercially reasonable result and to adopt the Loss measure instead if it does not believe that it would. Moreover, there is some protection for the Defaulting Party in the fact that the view taken by the Non-defaulting Party must be "reasonable", that is, it must be based on reasonable grounds. That in turn requires that it must be one which can reasonably be held taking into account all the factors which ought properly be taken into account. In many cases there may well be room for different opinions, but in others it may be possible to say that a view one way or the other cannot reasonably be justified. If in such a case the Non-defaulting Party acted on the basis of a view of the matter which could not reasonably be justified, the Defaulting Party

would in my view be entitled to relief on the basis that the adoption of the wrong measure in determining the Settlement Amount would amount to a breach of the Agreement.

39. Leaving aside cases where there is or may be a lack of honest belief, when the court is asked to decide in a case of this kind whether a person has acted in breach of contract it should in my view adopt a similar approach to that taken in the well-known case of Associated Provincial Picture Houses Ltd v Wednesbury Corporation [1948] 1 K.B. 223. It should not regard any act done by him honestly and in good faith as unjustified or involving a breach of contract unless it is clear that the belief in which he acted was flawed in one of the ways identified in that case. Mr. Hapgood submitted that the established approach to judicial review of discretionary decisions represented by the Wednesbury case was the proper approach in a case of this kind and Mr. Milligan did not disagree. In order for Peregrine to challenge the calculation of the amount payable under Section 6(e)(i)(3), therefore, it is necessary for it to show that the decision to use a Market Quotation for the purpose was flawed in the sense I have just indicated. It has been agreed in this case that Robinson believes that the use of the Market Quotation measure has produced a commercially reasonable result and it has not been suggested that that belief is not honestly held. However, in reaching that conclusion I do not think that Robinson can have taken proper account of the various terms of the Agreement to which I have referred, to the gain which accrued to it as a result of its having been relieved of the obligation to perform its contract or to the purpose behind the calculation of the Settlement Amount. It must also have failed, in my judgment, to take proper account of the discrepancy both between the nominal value of the obligation and the amount payable under Section 6(e) which is produced by using the Market Quotation measure, and also the substantial difference between the amount payable to Peregrine under Section 6(e) produced by using the Market Quotation measure and that produced by using the Loss measure. These are all factors which ought to be taken into account when considering whether the result is commercially reasonable by the standards of the Agreement and I do not think that anyone who had taken them into account could have formed the view that the use of Market Quotation in this case would produce a commercially reasonable result. In these circumstances I do not think that Robinson's belief was one which a reasonable person in its position, properly directing himself in accordance with the Agreement, could hold. In adopting the Market Quotation measure for the purposes of calculating the Settlement Amount rather than the Loss measure, therefore, Robinson acted in breach of the Agreement.

40. I therefore answer the questions set out in the claim form as follows:

(1) 'Yes';

(2) 'No';

(3) 'Yes';

(4) 'Loss is to be determined as the claimant contends and in accordance with the principles set out in this judgment';

(5) 'No'.

© 2000 Crown Copyright

URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2000/99.html*