**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

CDO PLUS MASTER FUND LTD.,          :

                                    :       **07 Civ. 11078 (LTS)(AJP)**

                 Plaintiff,     :

                                    :       **ECF CASE**

          - against -       :

                                    :

WACHOVIA BANK,                :

NATIONAL ASSOCIATION,      :

                                    :

               Defendant.   :

------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF**
**<u>DEFENDANT WACHOVIA BANK FOR JUDGMENT ON THE PLEADINGS</u>**

MINTZ & GOLD LLP
Steven G. Mintz
Terence W. McCormick

470 Park Avenue South
10th Floor North
New York, New York 10016-6819
Tel:   (212) 696-4848
Fax:  (212) 696-1231

*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 3

ARGUMENT ............................................................................................................................. 11

I.  THE COMPLAINT STATES A CAUSE OF ACTION ARISING OUT OF
    WACHOVIA'S IMPROPER DEMANDS FOR CREDIT SUPPORT ................................ 11

    A.  The Confirmation Letter Does Not Authorize Demands for Credit Support
        After the Posting of the Independent Amount ............................................................ 11

    B.  Even if Wachovia's Claims for Credit Support Were Permissible Under
        the ISDA Master Agreement, the Complaint States a Cause of Action for
        Breach of Contract ...................................................................................................... 14

        1.  The Complaint Adequately Alleges that Wachovia Breached the Swap
            Agreement by Improperly Valuing the Reference Obligation ........................... 14

        2.  Wachovia's Self-Serving Valuation of the Reference Obligation Was
            Commercially Unreasonable and Undertaken in Bad Faith .............................. 15

    C.  Wachovia's Self-Serving Calculation of its "Exposure" Was Not
        Validated Simply Because Market Makers Supplied Quotations That
        Uniformly Undervalued the Reference Obligation ..................................................... 17

II.  CDO PLUS HAS PLEADED TORT CLAIMS SEPARATE AND DISTINCT
     FROM ITS CAUSES OF ACTION FOR BREACH OF CONTRACT ................................ 19

III. CDO PLUS HAS ADEQUATELY PLEADED ALL OF THE ELEMENTS OF A
     FRAUD CAUSE OF ACTION ........................................................................................... 21

    A.  Neither the Parol Evidence Rule Nor the So-Called "Disclaimer of
        Reliance" Clause Bars CDO Plus's Fraud Claim ...................................................... 21

    B.  CDO Plus Has Adequately Pleaded Reasonable Reliance ........................................ 23

    C.  CDO Plus Has Adequately Pleaded Intent to Defraud .............................................. 23

IV.  WACHOVIA IS NOT ENTITLED TO JUDGMENT IN ITS FAVOR
     ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT ......................................... 24

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*Aetna Cas. And Sur. Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005) ................................................................................ 22

*Aon Financial Products, Inc. v. Société Générale*,
    476 F.3d 90 (2d Cir. 2007) ........................................................................... 12, 13

*Banque Arabe et Internationale v. Maryland Nat. Bank*,
    57 F.3d. 146 (2d Cir. 1995) ................................................................................ 22

*Bell Atlantic Corp. v. Twombly*,
    – U.S. – , 127 S.Ct. 1955 (2007) ................................................................... 11, 14

*Breard v. Sachnoff & Weaver, Ltd.*,
    941 F.2d 142 (2d Cir. 1991) ............................................................................... 23

*Bridgestone/Firestone Inc. v. Recovery Credit*,
    98 F.3d 13 (2d Cir. 1996) ................................................................................... 20

*Carvel Corp. v. Diversified Management Group, Inc.*,
    930 F.2d 228 (2d Cir. 1991) ............................................................................... 17

*Channel Master Corp. v. Aluminum Limited Sales, Inc.*,
    4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958) ................................ 20

*Chemical Bank v. Stahl*,
    272 A.D.2d 1, 712 N.Y.S.2d 452 (N.Y. App. Div. 1st Dep't 2000) ................... 17

*Chill v. General Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ............................................................................... 24

*Citibank v. Plapinger*,
    66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) ................................ 22

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994) ......................................................................... 19, 20

*Cougar Audio, Inc. v. Reich*,
    99 Civ. 4498 (LBS), 2004 WL 420546 (S.D.N.Y. April 18, 2000) ................... 20

*Dalton v. Educational Testing Services*,
    87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995) ............................... 25

*Danann Realty Corp. v. Harris*,
    5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) ................... 22

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*,
    68 N.Y.2d 954, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (1986) ................ 20

*Desiano v. Warner-Lambert & Co.*,
    467 F.3d 85 (2d Cir. 2006) ............................................ 11

*Graubard, Mollen, Dannett & Horowitz v. Moskovitz*,
    86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995) ............. 20

*High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*,
    Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005) ........... 15, 16

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997) ........................................... 17

*JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*,
    189 F. Supp. 2d 24 (S.D.N.Y. 2002) ................................... 22

*Lanni v. Smith*,
    89 A.D.2d 782, 453 N.Y.S.2d 497 (N.Y. App. Div. 4th Dep't 1982) .................. 12

*Manufacturers Hanover Trust Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993) ............................................. 22

*Osdan Ltd. v. Accenture LLP*,
    454 F. Supp. 2d 46 (E.D.N.Y. 2006) ................................... 20

*Peregrine Fixed Income Limited v. Robinson Dep't Store Public Company Limited*,
    [2000] EWHC (QB) Commercial 99 (Eng.) ............................. 18

*Sabo v. Delman*,
    3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) ............... 20

*Siben v. American Airlines, Inc.*,
    913 F. Supp. 271 (S.D.N.Y. 1996) ..................................... 24

*SportsChannel Assoc's v. Sterling Mets, L.P.*,
    25 A.D.3d 314, 807 N.Y.S.2d 61 (N.Y. App. Div. 1st Dep't 2006) ................... 12

*Sultan v. Read*,
    No. 03 Civ. 7462 (PKL), 2005 WL 486732 (S.D.N.Y. March 1, 2005) ............. 19

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ................................................................ 11

*TVT Records v. Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005),
    *cert. denied*, 585 U.S. 904 (2006) ...................................................... 20

*Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*,
    26 F.Supp.2d 698 (S.D.N.Y. 1998) ...................................................... 12

*Travellers Intern., A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994) ............................................................ 25

*Wall v. CSX Transportation, Inc.*,
    471 F.3d 410 (2d Cir. 2006) ............................................................ 22

## Statutes and Other Authorities

Fed. R. Civ. P. 12(b)(6) .................................................................... 11

Fed. R. Civ. P. 12(c) ...................................................................... 11

22 N.Y. Jur.2d Contracts § 254 ............................................................ 12

Restatement (Second) of Contracts §203(d) ................................................ 12

Restatement (Second) of Contracts § 237 .................................................. 17

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1367 .................... 2

John P. Doherty and Richard F. Hans, *The Changing Landscape of Subprime Litigation*,
14 No. 6 Andrews Derivatives Litig. Rep. 2 (Feb. 4, 2008) ........................................ 14

2 N.Y. Pattern Jury Instructions 3rd (West 2008) PJI 4:2, 4:11 ................................... 19

## PRELIMINARY STATEMENT

This case is about Wachovia's abuse of its immense leverage in a credit default swap transaction, in which Wachovia extorted from the plaintiff millions of dollars in collateral to which Wachovia was never entitled. Wachovia fraudulently represented that it would enter into the swap upon the deposit of no more than $750,000 in margin, knowing that it would simply lock the plaintiff into a trade in which it would later demand more collateral. In due course, Wachovia demanded collateral exceeding even the total notional amount of the swap, at one point issuing a margin call based upon the value of the contract as of the close of business on *Thanksgiving Day*. The plaintiff's skepticism grew to the point that it challenged Wachovia's unwarranted demands for collateral and ultimately refused to submit to further blackmail. Wachovia then seized the collateral under the pretext that an Event of Default had occurred in the swap transaction with the plaintiff. Wachovia committed this act of commercial piracy because, like other major banks, its portfolio of investments was weighted down with billions of dollars of subprime mortgage debt. By squeezing every penny it could from its counterparties (*e.g.*, plaintiff, a small hedge fund), Wachovia sought to minimized write-downs it later announced to Wall Street as the result of its exposure in the credit markets.

This action presents issues of first impression concerning the industry-wide rights and obligations of counterparties in credit derivative transactions governed by, *inter alia*, the form Master Agreement and Credit Support Annex of the International Swaps and Derivatives Association, Inc. ("ISDA"). In this connection, earlier this month Magistrate Judge Peck rejected Wachovia's challenges to a number of discovery requests regarding its conduct with

respect to similarly situated swap counterparties.[1]  It follows that the complaint in this action presents important questions of fact that do not lend themselves to summary disposition.

Wachovia simply contrived to call in collateral on the swap even though the confirmation letter governing the swap did not authorize any such demand, *i.e.,* other than a one-time deposit of collateral that plaintiff delivered on the closing of the trade.  Furthermore, even if the form ISDA documents that accompanied the confirmation letter entitled Wachovia to collect collateral during the life of the transaction – which plaintiff disputes – Wachovia nevertheless grossly undervalued the reference security of the transaction in order to inflate the amount of collateral that it could demand from plaintiff.  In so doing, Wachovia materially breached the contract, entitling plaintiff to suspend its performance and seek rescission of the swap.

The timing of Wachovia's motion is particularly inappropriate inasmuch as several months have passed since the pleadings closed and the parties have already engaged in a substantial amount of document production.  Furthermore, Wachovia has already taken one day of testimony from plaintiff's 30(b)(6) witness and the balance of non-expert depositions are expected to take place in September.  Wachovia offers no explanation as to why it waited so long to bring this motion.  "Ordinarily, a motion for judgment on the pleadings should be made *promptly* after the close of the pleadings."  5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1367 (emphasis added).  Thus, although the motion may be technically permissible under the Federal Rules, plaintiff respectfully submits that it would be unjust to cut short the plaintiff's right to develop the record further at this stage of the litigation.

---

[1]    Significantly, Judge Peck has ruled that plaintiff will be entitled to obtain evidence tending to show that Wachovia was engaged in bad faith and/or commercially unreasonable behavior in demanding payments under the swap, including evidence of its dealings with similarly situated swap counterparties.  Judge Peck authorized discovery into, for example, "[a]nything that is corporate-wide, that is to say a memo from the board of directors to whatever department is in charge of these, that says let's get more security whatever the contracts say or anything along those lines."  (Aug. 4, 2008 Tr. at p. 9).

**THE FACTS**

1.    The Forge ABS Credit Default Swap

Plaintiff, CDO Plus Master Fund Ltd. ("CDO Plus") is a hedge fund with approximately

$50,000,000 of funds under management.  (Amended Complaint (hereafter, "Compl."), ¶8)

Effective as of May 24, 2007, CDO Plus entered into a credit default swap transaction ("CDS")

with Wachovia, whereby CDO Plus sold Wachovia protection against the risk of a credit default

by a collateralized debt obligation ("CDO") up to a maximum of $10,000,000.  (Compl. ¶9).

CDOs are a form of debt securitization.  CDOs are typically structured as several classes

of asset-backed notes, and are secured by the expected future stream of interest and principal

generated by an underlying pool of loans.  The relevant CDO in this action is the Forge ABS

High Grade CDO Ltd., 2007-1A (the "Forge CDO").

A CDS is a credit derivative contract in which "Party A" (the "protection buyer")

transfers to "Party B" (the "protection seller") the default risk of a particular third-party debt

obligation.  The protection buyer (Wachovia) pays a fee (called a "Fixed Payment"), which is a

percentage of a certain dollar amount (the "notional amount") of the principal of an underlying

debt obligation, in this case the Class B Notes of the Forge CDO.  (Compl. ¶11).  In swap

terminology, the Forge CDO is the "reference entity" and the Class B Notes, which constitute the

particular default risk transferred under the swap, are referred to as the "reference obligation."

In return for receiving Fixed Payments, the protection seller (CDO Plus) undertakes the

default risk of the reference obligation, *i.e.*, it agrees to pay all or a portion of the unpaid

obligation – up to the notional amount – to the protection buyer if certain credit events take place

during the term of the swap.  In such an event, the sums due to the protection buyer are called

"Floating Payments."  Sometimes the protection buyer in a CDS requires the seller to deposit

3

collateral at the time of contracting to secure the protection buyer against the risk that the protection seller will not be in a position to make the Floating Payments. This collateral is called the "Independent Amount," or "initial margin."

The specifically negotiated terms of the swap, including the Fixed Payments, the Independent Amount and the conditions under which Floating Payments may become due and payable are set forth in the principal contract document of the CDS, which is the confirmation letter exchanged between the counterparties at the time the trade is executed. In this case, the Wachovia confirmation letter, dated May 30, 2007 (the "Confirmation Letter") set the rate of Fixed Payments owed to CDO Plus in the amount of 2.75% per annum of the notional amount of $10,000,000 of the Class B Notes of the Forge CDO. A copy of the Confirmation Letter is annexed as Exhibit 1 to the Declaration of Terence W. McCormick ("McCormick Decl.").

Apart from the Confirmation Letter, the other contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swaps and Derivatives Association, dated May 4, 2007 (the "ISDA Master Agreement"), a Schedule to the ISDA Master Agreement, dated as of May 4, 2007, and a Credit Support Annex, which in turn cross-referenced the provisions of the pre-printed 1994 ISDA form Credit Support Annex. (Compl. ¶12). Copies of the ISDA Master Agreement, the Schedule, Credit Support Annex and the 1994 pre-printed ISDA Credit Support Annex are annexed to the McCormick Declaration as Exhibits 2, 3, 4 and 5, respectively.

Of critical importance, by the terms of the foregoing documents, in the event of any inconsistency between the Confirmation Letter and the ISDA Master Agreement (which includes the Credit Support Annex), *the terms of the Confirmation Letter control*. The ISDA 1992 Master Agreement provides, in pertinent part:

(b) *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

*See* McCormick Decl., <u>Exhibit 2</u> at p. 1.

2.    <u>Initial Margin and Floating Payments</u>

As stated above, sometimes (but not always), the protection buyer requires the protection seller to deposit collateral (the Independent Amount) at the time of the trade as a condition to entering into the swap. In this case, the Independent Amount was identified in the Confirmation Letter as 7.50% of the $10,000,000 initial notional amount, or $750,000. (*See* McCormick Decl., <u>Exhibit 1</u> at p. 13). The *sole* purpose of the Independent Amount is to secure the protection buyer against *counterparty risk*, *i.e.*, the possibility that the protection seller might not be good for the money if the reference obligation (the Class B Notes) actually experiences one or more specified credit events in the future. (Compl. ¶14).[2]

Unlike the CDS negotiated between CDO Plus and Wachovia, some swaps allow the protection buyer to demand additional collateral, *i.e.*, after the Independent Amount. Such an arrangement would be appropriate if the confirmation letter governing the swap transaction contained an express undertaking on the part of the protection seller to bear more than simply the default risk of the reference obligation. In such cases, the additional collateral is referred to as "<u>Eligible Credit Support</u>," or "<u>variation margin</u>," and is based upon a downward movement in the daily mark-to-market value of the underlying reference obligation. (Compl. ¶17).

"Mark-to-market" is a term of art in the financial and accounting industries. When an institution marks an asset to market, it assesses and records on its books a change in the asset's

---

[2]    Initial margin may loosely be compared to the down-payment on a house. Once the down-payment is made, the borrower does not deposit additional security with the mortgage lender even if the value of the house rises or falls during the term of the loan.

value since the last time a valuation took place, whether the gain (or loss) is realized or not. Where the asset is actively traded on a given market, current values can be assessed on a daily basis and the asset may be marked-to-market at the close of trading every day.   In that case, the mark-to-market is based upon independent pricing data (*i.e.*, the last price at the close of trading on a given day when the markets are open).  However, if the asset is illiquid, the process will not necessarily take place on a daily basis, and it will require resort to other methods of valuation, which may not be as objective – or reliable.

Under the Confirmation Letter in ***this*** case, the only payments that Wachovia may demand from CDO Plus after the Independent Amount are Floating Payments, and then ***only*** on the basis of a good faith determination by the Calculation Agent (which in this case is Wachovia) that a "<u>Floating Amount Event</u>" had taken place: (i.) the obligor on the reference obligation (the Forge CDO) had failed to make a required principal payment to the holders of the Class B Notes, (ii) an interest shortfall had taken place, or (iii) a write-down had taken place under the reference obligation's governing instrument (the Indenture).  However, Wachovia may ***not*** demand a Floating Payment on the basis of the perceived creditworthiness of the counterparty.  (*Id*. ¶15-16).  ***That*** issue is resolved at the time when the parties negotiate the Independent Amount.

      3.      Wachovia Misrepresents its Margin Requirement and Then <u>Squeezes Plaintiff for More Money</u>.

In or about April 2007, before the parties entered into the swap agreement, Wachovia had originally proposed an Independent Amount of $1,500,000, but CDO Plus informed Wachovia that the trade would not make economic sense *unless* the initial margin were reduced to $750,000.  (Compl. ¶18).  Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms – knowing at the time that it would simply contrive later to demand more

6

collateral on the pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once CDO Plus was already locked into to the trade. (*Id*. ¶19).

Plaintiff wired $750,000 to Wachovia's account on May 30, 2007. (Compl. ¶20). However, less than three weeks later, Wachovia demanded more collateral, requiring a deposit of $320,000. Several days later, Wachovia requested an additional $430,000. Tellingly, the sum of the initial margin and these two latter deposits comes to $1,500,000 – precisely the amount that Wachovia had wanted in the first instance and that Plaintiff thought it had bargained down to $750,000. (*Id*. ¶21). This act alone proves a fraud and is sufficient for an order of rescission.

Nor was Wachovia finished at $1,500,000. Over a five-month period, Wachovia demanded, and Plaintiff paid, $8,920,000, purportedly to secure Wachovia against a total credit risk of $10,000,000 from an investment-grade debt instrument. (Compl. ¶22-3). However, during the entire period, the reference entity (Forge ABS High Grade CDO Ltd, 2007-1A) had not experienced any shortfall in principal or interest payments whatsoever. (*Id*. ¶24). During the same period, no write-down had taken place according to the reference obligation's controlling documents resulting in any reduction of the outstanding principal amount of the reference obligation, nor had any other write-down taken place such that Plaintiff could properly have been required to make a Floating Payment to Wachovia. At all times relevant to this action, the reference obligation was an investment grade debt instrument. (*Id*. ¶25, 30). Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia ***solely*** upon the basis of a report of the servicer of the underlying reference obligation. (*Id*. ¶26).

While Plaintiff believed it was not obligated to pay the sums demanded by Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal to post

variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Wachovia did.    (Compl. ¶28).  Nevertheless, after the August 15, 2007 margin call, CDO Plus wrote to Wachovia expressing grave concern that it had been required, within a few short weeks after the launch of the CDO, to post collateral in the amount of $3,260,000 *after* the initial margin, for a total of over *40%* of the notional amount.  (*Id*. ¶27).

### 4.    Wachovia Admits that it Breached the Swap Agreement

In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.    (Compl. ¶33).  Wachovia admitted that it had *not* used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible. (*Id*. ¶34).  Tellingly, a trader at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of CDO Plus's portfolio.  (*Id*. ¶35).  Thus, the margin calls had been expressly used by Wachovia not to satisfy CDO Plus's obligation to make a Floating Payment, or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.  (*Id*. ¶36).

### 5.    Wachovia Escalates its Margin Demands

On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.  (Compl. ¶38).  Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated

November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex. (Compl. ¶39).

In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation. (Compl. ¶40). At first, Wachovia did not respond to the November 21 letter. (Compl. ¶41). Instead, on the next business day, which was the day after Thanksgiving, Wachovia sent a new margin call, this time in the amount of $810,000. (Compl. ¶42). Intriguingly, the margin call for November 23, 2007, which demanded $260,000 more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the following Collateral Movement as of Close of Business of 22 November 2007," which was Thanksgiving Day, a day when the markets were closed. (Compl. ¶43).

As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved. (Compl. ¶44). On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000. (*Id*. ¶45).

Pursuant to the dispute resolution mechanism of the Credit Support Annex, Wachovia sent four market quotations of the swap from contacts Wachovia had at Merrill Lynch, Goldman Sachs, Greenwich Capital and Deutsche Bank (the "Reference Market Makers"), expressed in "points upfront," which purported to justify Wachovia's exorbitant margin calls, suggesting that the reference obligation's creditworthiness had deteriorated to the point that it was worth approximately five cents on the dollar. (Compl. ¶49). But upon reviewing the servicer's report, CDO Plus saw that Wachovia had not been collecting Floating Payments; no "Floating Amount Event" had taken place. (*Id*. ¶51).

9

Thus, even if Wachovia were entitled to demand credit support (as distinguished from Floating Payments), Wachovia's demands exceeded the boundaries of commercial reasonableness.   In fact, at one point, Wachovia demanded $1,490,000 – almost $500,000 **more** than the notional amount of the swap.  (*Id*. ¶48).  By any measure, Wachovia's request for that amount of credit support for an investment-grade CDO was commercially unreasonable on its face – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's total funds under management, allowing Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market.  (*Id*.  ¶55).

6.    Plaintiff Files the Lawsuit in Supreme Court and
      Wachovia Declares an Event of Default

On November 28, 2007, Plaintiff commenced a civil action in the Supreme Court of the State of New York.  On December 7, 2007, Wachovia removed the action to federal court.  The same day, Wachovia sent Plaintiff a Notice of Failure to Transfer, reciting that "[a]s of November 28, 2007 and continuing through the date hereof, Counterparty [*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers of Eligible Collateral in an amount equal to $1,740,000 to Wachovia as required under the Credit Support Annex.  Counterparty's failure to Transfer will become an Event of Default under Paragraph 7(i) of the Credit Support Annex and Section 5(a)(iii)(1) of the Agreement if the required amount of Eligible Collateral is not delivered to Wachovia on or before the first Local Business Day after this notice is delivered to you."  (Compl. ¶57).

Plaintiff declined to pay any further collateral.  Wachovia responded by sending a Notice of Event of Default, (*Id*. ¶59), declaring an early termination of the swap and seizing all previously deposited collateral.  (Id. ¶¶60-62).

## ARGUMENT

In deciding a motion for judgment on the pleadings under Rule 12(c), the federal courts apply the same standard that governs the determination of motions brought under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party. *See, e.g., Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 89 (2d Cir. 2006). Accordingly, in deciding the instant motion, the Court must determine whether the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, – U.S. – , 127 S.Ct. 1955, 1974 (2007). The plaintiff is not required to set forth particularized facts establishing each element of a *prima facie* case as to each cause of action, but need only provide the defendant with fair notice of the basis for the plaintiff's claims. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

### I.

### THE COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF CONTRACT ARISING OUT OF WACHOVIA'S IMPROPER DEMANDS FOR CREDIT SUPPORT

A.    The Confirmation Letter Does Not Authorize Demands for Credit Support After the Posting of the Independent Amount

The parties differ over a central economic term of the transaction. CDO Plus asserts, and the Confirmation Letter so provides, that at the time CDO Plus entered into the CDS with Wachovia it was selling protection ***against a credit default only***. After CDO Plus deposited the Independent Amount of $750,000, its only obligation thereafter was to make a Floating Payment, *i.e.*, if a specified credit event were to take place. Wachovia concedes that no such credit event ever took place, and thus there was no entitlement to a Floating Payment. (Wachovia Mem. at 13, n. 9). In its motion, however, Wachovia insists that paragraph 3 of the form 1994 Credit Support Annex requires CDO Plus to hold Wachovia harmless against daily variations in the

11

mark-to-market value of the reference obligation (marks that *Wachovia* determined) by delivering a corresponding amount of credit support according to a formula driven by the Credit Support Annex. (Wachovia Mem. at 12-14).[3]  Wachovia is wrong.

It is a fundamental rule of contract construction that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) of Contracts §203(d).  *See also Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*, 26 F.Supp.2d 698, 709 (S.D.N.Y. 1998); *SportsChannel Assoc's v. Sterling Mets, L.P.*, 25 A.D.3d 314, 314, 807 N.Y.S.2d 61, 62 (N.Y. App. Div. 1st Dep't 2006).  The rationale underlying this rule is that specifically negotiated terms (such as those set forth in the Confirmation Letter) "are the immediate language and terms selected by the parties themselves for the expression of their meaning, while the printed form is intended for general use without reference to particular objects and aims."  *Lanni v. Smith*, 89 A.D.2d 782, 783, 453 N.Y.S.2d 497, 498 (4th Dep't 1982)(citations omitted).  *See also* 22 N.Y. Jur.2d Contracts § 254.

In this case, the Confirmation Letter differs from the pre-printed, standard form ISDA Master Agreement and Credit Support Annex in that, unlike the form ISDA documentation, the Confirmation Letter was specifically negotiated and tailored to the Forge CDO swap transaction, identifying the economic terms of the swap and the other transaction-specific modifications to the Master Agreement.  *Aon Financial Products, Inc. v. Société Générale*, 476 F.3d 90, 93 & n.4 (2d Cir. 2007)(citing Amicus Brief of International Swaps and Derivatives Association).  The benefit of the ISDA Master Agreement is that it enables counterparties to enter into multiple

---

[3]  Actually, paragraph 3 was not contained within the version of the Credit Support Annex that the parties executed. (McCormick Decl. at Exhibit 4).  Rather, that document cross-referenced paragraphs 1 through 12 of the blank, pre-printed 1994 Credit Support Annex (Bilateral – New York), which is annexed to the McCormick Declaration as Exhibit 5, and which was not among the documents provided to CDO Plus at the time of the trade.  In other words, Wachovia is relying upon *two* levels of boilerplate to defeat the transaction-specific terms contained in the Confirmation Letter.

derivative contracts, all grounded in the same document that defines the legal and credit relationship between them, subject to their right to vary particular economic obligations in the negotiated Schedule to the ISDA Master Agreement and/or the Confirmation Letter.[4]

Thus, CDO Plus could have entered into *any number* of different swaps with Wachovia, some containing a duty to deposit margin in response to daily changes in the mark-to-market of the reference obligation, and others, like the Forge CDO swap at issue here, expressing ***no*** such obligation. In the former case, the collateral delivery obligations in the Credit Support Annex would have applied because that would have been consistent with the economic substance of the deal; in the latter case (like this case) they would not. But the same ISDA Master Agreement, including the Credit Support Annex, would still apply to all of the swaps – that is, to the extent that the Confirmation Letter (or the Schedule) of the particular swap were not otherwise inconsistent with the boilerplate terms in the Master Agreement and Credit Support Annex.

Critically, the Confirmation Letter in this case *does* explicitly provide for the payment of the Independent Amount (initial margin), in the amount of $750,000, to protect Wachovia against its counterparty risk and enumerates each of the credit events that could trigger an obligation to make Floating Payments: "[a] Writedown, a Failure to Pay Principal or an Interest Shortfall." (McCormick Decl. at <u>Exhibit 1</u>, p. 4). Conspicuous by its absence is any ongoing credit support obligation arising out of a change in the mark-to-market of the reference obligation that did not result from an actual writedown or a failure on the part of the issuer to pay principal or interest to the Class B Noteholders. That is because CDO Plus had agreed to undertake exposure to the ***default*** risk of the reference obligation, ***not*** exposure to its periodic fluctuations in the market – a classic question of fact regarding the intent of the parties. In any

---

[4]     *See Aon Financial Products v. Société Générale, supra,* 476 F.3d at 93, & n. 4 (citing Introduction to the Documentation of OTC Derivatives, "Ten Themes" (May 2002) by Allen & Overy, published on the ISDA website at <u>http://www.isda.org/educat/pdf/ten-themes.pdf</u>).

case, since the Confirmation Letter supersedes any contrary obligation in the form ISDA Credit

Support Annex to deliver collateral after the Independent Amount, CDO Plus respectfully

submits that the inquiry ends right there, and the motion must be denied.

> B.      Even if Wachovia's Claims for Credit Support Were Permissible Under
> the ISDA Master Agreement, the Complaint States a Cause of Action for a
> <u>Material Breach of Contract</u>

>> 1.      The Complaint Adequately Alleges that Wachovia Breached the
>> <u>Swap Agreement by Improperly Valuing the Reference Obligation</u>.

Even assuming *arguendo* that CDO Plus was obligated to deposit variation margin under

the Credit Support Annex, the complaint sets forth a compelling claim that Wachovia grossly

undervalued the reference obligation.  Unlike publicly traded stocks and bonds, which financial

institutions and portfolio managers can mark-to-market on a daily basis, CDOs are issued in

private transactions, to accredited investors only, and are classically illiquid instruments for

which reliable market data are not always readily available.  "CDO securities are thinly traded

and, as such, there is little market data to which one may "mark" the security; that is, buyers

cannot mark the value of such holdings to recent sales prices in a broad and efficient market

('mark to market')".  John P. Doherty and Richard F. Hans, *The Changing Landscape of*

*Subprime Litigation*, 14 No. 6 Andrews Derivatives Litig. Rep. 2 (Feb. 4, 2008).

Accordingly, the allegation in the complaint that Wachovia's demands for credit support

were based upon unreliable or commercially unreasonable valuations of the reference obligation

is more than sufficient to state a plausible cause of action, and is not the proper subject of a

motion for judgment on the pleadings. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1974.

Plaintiff intends to prove through discovery and expert testimony at the trial of this matter that

Wachovia's mark-to-market throughout 2007 was persistently implausible and therefore

amounted to a material breach of the CDS contract.

2.    Wachovia's Self-Serving Valuation of the Reference Obligation Was Commercially Unreasonable and Undertaken in Bad Faith.

Wachovia's demands for collateral were so unreasonable and infected by such evident bad faith as to constitute a material breach of the swap agreement.  As alleged in the complaint, Wachovia was demanding margin, supposedly on the basis of deterioration in the creditworthiness of the reference obligation, at a time when the reference obligation was still an investment grade instrument.  (Compl. ¶23).  Almost immediately after the parties entered into the swap, and over a period of five months thereafter, Wachovia demanded $8,920,000 in collateral as compared to a total default risk of $10,000,000.  *Id*.  In essence, Wachovia was telling CDO Plus that the reference obligation was already completely worthless, even though the servicer's report for the Forge CDO supported no such conclusion.

This part of the case will be a question of first impression for the Court.  In an analogous case, however, Justice Gammerman, formerly of the Commercial Division of the New York Supreme Court, held that when a swap counterparty obtains market quotations in support of its valuation of a derivative contract, it must do so in good faith.  *See High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*, Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005)(Gammerman, *J.S.C.*)(opinion withdrawn).   A copy of Justice Gammerman's decision in *High Risk* is annexed as Exhibit 6 to the McCormick Declaration.

Like the parties in this action, the parties in *High Risk* executed a standard form 1992 ISDA Master Agreement and a Credit Support Annex.  In *High Risk*, the derivative instruments at issue were nondeliverable forward contracts ("NDFs"), which were based upon the exchange rate between the United States dollar and the Russian ruble.  However, before the NDFs expired, High Risk was forced into involuntary liquidation by Credit Suisse after Credit Suisse determined that High Risk had failed to meet margin calls.  As a result, Credit Lyonnais notified

15

High Risk that it was invoking its right to declare an Event of Default arising out of High Risk's insolvency, and proceeded to close out all the NDF trades, by calculating the "Settlement Amount."[5]  Justice Gammerman held in *High Risk* that Credit Lyonnais had breached the NDF contracts by improperly calculating the amounts that Credit Lyonnais would have to pay High Risk upon early termination of the NDFs under the ISDA Master Agreement.

Under the termination provisions of the ISDA Master Agreement in the *High Risk* case, the mechanism for calculating the settlement amount upon early termination of the NDF trade was substantially the same one that was followed under the dispute resolution provisions of the Credit Support Annex that CDO Plus was compelled to invoke in this case.  Specifically, both mechanisms contemplate that the calculation agent/valuation agent will base the determination upon quotations obtained from independent market makers.

Justice Gammerman found that Credit Lyonnais had interfered with the independence of the market makers in *High Risk*, thus manipulating the market quotation process, and had presented four market quotations that did not represent a good faith valuation of the NDFs.  On that basis, Justice Gammerman set aside Credit Lyonnais' calculations, found that High Risk was "in the money" and that Credit Lyonnais was in breach of the swap agreement with High Risk.

*High Risk*, therefore, stands for the proposition that a unilateral determination by Wachovia, even if ostensibly validated by four Reference Market Makers, is not dispositive on the question of whether Wachovia's valuation of the reference obligation was commercially reasonable.  Accepting the allegations of the complaint as true, the Court should apply the same skepticism to Wachovia's calculation of its "exposure" that Justice Gammerman applied to the self-serving calculation of the Settlement Amount in *High Risk*.  Here, the Amended Complaint

---

[5]     The "Settlement Amount" measures how much it would cost for a party (in *High Risk*, Credit Lyonnais, and in this case, Wachovia) to replace the terminated transaction, *i.e.*, by entering into a commercially equivalent transaction with a third party having terms identical to the terminated transaction.

16

alleges that when Wachovia was supposedly calculating its exposure under the CDS and demanding credit support, Wachovia **could not possibly** have made a good faith valuation of the position because its valuation was irreconcilable with the actual financial condition of the reference obligation, as reflected by the servicer's report, which should have formed the basis for any such valuation.  (Compl. ¶26; 34-36; 50).  The demands for Eligible Credit Support, even if otherwise permissible, were purely pretextual and were a material breach of the swap agreement. Accordingly, CDO Plus is entitled to proceed to discovery to establish the particulars of how Wachovia came to demand nearly 100% collateralization for a reference obligation that never defaulted, thereby allowing Wachovia to simply steal nearly $9,000,000 and demand an additional $1,000,000 soon after CDO Plus objected.

The proper remedy for Wachovia's extortionate demands for credit support is rescission, inasmuch as Wachovia's conduct constituted a material and total breach of the agreement.  From the moment Wachovia abrogated its obligation of good faith and fair dealing and consciously overreached in its demands for collateral, it materially breached the agreement, excusing any further performance by CDO Plus and entitling it to seek rescission of the agreement.  *See* Restatement (Second) of Contracts § 237 (1981).  *See also In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997); *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 231 (2d Cir. 1991); *Chemical Bank v. Stahl*, 272 A.D.2d 1, 14-17, 712 N.Y.S.2d 452, 462-65 (N.Y. App. Div. 1st Dep't 2000).  Any other result would reward flagrantly inequitable behavior and send the wrong signal to the credit markets.

      C.      Wachovia's Self-Serving Calculation of its "Exposure" Was Not Validated Simply Because Market Makers Supplied Quotations That Uniformly Undervalued the Reference Obligation.

Wachovia relies heavily upon the fact that four other institutions supplied market quotations purportedly confirming Wachovia's undervaluation of the reference obligation.

17

(Wachovia Mem. at 14).  By Wachovia's lights, the "independent valuations" constitute a sort of plenary indulgence, absolving Wachovia of the consequence of its bad faith and commercially unreasonable demands for credit support.  Wachovia is wrong.

In *Peregrine Fixed Income Limited (In Liquidation) v. Robinson Dep't Store Public Company Limited*, [2000] EWHC (QB) Commercial 99 (Eng.), the Queen's Bench Division of the High Court of Justice in London held that, under the 1992 ISDA Master Agreement (the same version used in the instant case), when a non-defaulting party determines the settlement amount of a terminated swap transaction, its calculation of the settlement amount is subject to an overriding requirement of commercial reasonableness.[6]  A copy of the decision in *Peregrine* is attached as Exhibit 7 to the McCormick Declaration.

In brief, the facts of the *Peregrine* case are as follows.  Pursuant to a confirmation letter dated November 20, 1997, Robinson had agreed to pay Peregrine 25 annual installments of $6.85 million, beginning in November 1998 and ending in November 2022.  However, in January 1998, Peregrine sought the appointment of a provisional liquidator, which constituted an event of default under the swap agreement and resulted in an automatic early termination of the swap.

The method identified in the ISDA documents for settling all terminated trades and determining the amounts payable to either Party A or Party B specified that Robinson would obtain independent market quotations from no fewer than three "Reference Market Makers," just as had happened in *High Risk, supra*.  When it approached the Reference Market Makers, Robinson secured quotations from which it calculated that the replacement value of the transaction to Peregrine was $9.7 million.  However, twenty-five years of annual payments of $6.85 million would have yielded $171.25 million, which, discounted to then present-day value,

---

[6]    Consulting English law is appropriate in this case because ISDA has designed different sets of form credit derivative documentation, with the standard choice of law being either New York law or English law.

would have been worth $87.3 million to Peregrine. In view of the glaring inconsistency between the true market loss to Peregrine and the sums quoted by Robinson, and the resulting windfall that Robinson would receive as a result, the High Court of Justice held that Peregrine was entitled to challenge Robinson's calculation as commercially unreasonable on its face and one that Robinson could not have seriously considered to be valid.

Similarly, Wachovia's purported determination of its "Exposure" and the four market quotations that it obtained from the Reference Market Makers are out of all proportion to any deterioration in the creditworthiness of the reference obligation. Discovery is therefore required to determine whether and to what extent the Reference Market Makers conducted any sort of valuation of the reference obligation, and if so, the steps that they took.

## II.

### CDO PLUS HAS PLEADED TORT CLAIMS SEPARATE AND DISTINCT FROM ITS CAUSES OF ACTION FOR BREACH OF CONTRACT

Wachovia has argued that none of the pleaded "tort" claims[7] is sustainable because the claims do not arise out of duties separate from those imposed by the parties' contract. However, under New York law, a tort claim for fraudulent inducement requires a showing that the defendant made a false representation of a present, material fact for the purpose of inducing the plaintiff's reliance and that the plaintiff justifiably relied on the misrepresentation. *See, e.g.*, *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); *Sultan v. Read*, No. 03 Civ. 7462(PKL) 2005 WL 486732, *3 (S.D.N.Y. Mar. 1, 2005). Where the case potentially involves both a fraud claim and a claim based on breach of contract, the complaining party must meet an additional

---

[7]  Curiously, Wachovia has referred to plaintiff's causes of action for mistake and unjust enrichment as "torts." However, both of these claims are analyzed under New York law under contract rather than tort principles. *See* 2 N.Y. Pattern Jury Instructions 3rd (West 2008) PJI 4:2, p. 694; *id.*, PJI 4:11. Wachovia's reference to a claim for "declaratory judgment" is also puzzling because no such claim has been pleaded.

19

requirement by demonstrating (a) a legal duty separate from the duty to perform under the contract, (b) a fraudulent misrepresentation collateral or extraneous to the contract or (c) the existence of special damages that are caused by the misrepresentation and are unrecoverable as contract damages. *Bridgestone/Firestone Inc. v. Recovery Credit*, 98 F.3d 13, 20 (2d Cir. 1996).

While a cause of action for fraud in the inducement cannot be based solely on the failure to perform under the contract, *see, e.g.*, *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 91 (2d Cir. 2005), *cert. denied*, 585 U.S. 904 (2006), fraud separate from the contract exists when (a) the promise or representation in question was made before the contract was entered into, (b) the defendant harbored an intent not to perform at the time the promise was made and (c) the promise or representation was made for the purpose of inducing the plaintiff's assent, *see, e.g.*, *Osdan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 52 (E.D.N.Y. 2006)(citing *Bridgestone/Firestone Inc. v. Recovery Credit*, 98 F.3d at 20 and *Cohen v. Koenig*, 25 F.3d at 1172); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954 (1986). [8]

Here, CDO Plus has alleged that Wachovia obtained its assent to the transaction by a "classic 'bait and switch' . . . through the offer of more favorable margin terms than [defendant]

---

[8]     The New York Court of Appeals has held on at least four occasions that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud." *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); *accord, Graubard, Mollen, Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986); *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958).   In contrast, the Second Circuit, relying on contrary intermediate state appellate court decisions, has stated that "intentionally-false statements . . . indicating [an] intent to perform under the contract [are] not sufficient to support a claim of fraud under New York law." *Bridgestone/Firestone Inc. v. Recovery Credit*, 98 F.3d at 19-20. *See also Cougar Audio, Inc. v. Reich*, 99 Civ. 4498 (LBS), 2004 WL 420546 (S.D.N.Y. April 18, 2000) (taking note of the apparent discrepancy between the decisional law of the Second Circuit and the New York Court of Appeals and opining that the Second Circuit has decided to view the Appellate Division cases as stating the correct general principle of law).  It is respectfully submitted that the Second Circuit's holding in *Bridgestone/Firestone* is not consistent with prevailing New York precedent and that, viewed correctly, New York courts would recognize a fraud cause of action a claim by CDO Plus that Wachovia entered into the agreement with a present intention not to perform under its terms.

actually intended to honor." (Compl. ¶ 1).  Specifically, CDO Plus has alleged that it objected to Wachovia's initial demand for $1,500,000 in margin and that it advised Wachovia "that the trade would not make economic sense" unless that amount was reduced to $750,000.  *Id.*, ¶ 18.  Wachovia "acquiesced and entered into the swap with [p]laintiff on those terms" even though it knew *at that point* that it would ultimately extract from CDO Plus the full $1,500,000 under the pretext of margin calls.  *Id.*, ¶ 19.  The Amended Complaint further alleges that the first two margin calls brought Wachovia up to the precise $1,500,000 it had originally asked, giving rise to a strong inference of fraud.  *Id.*, ¶21.

In other words, Wachovia made a *collateral promise – i.e.*, that CDO Plus would not be required to deposit more than $750,000 – before the swap was executed, while harboring a *present* intent to extract more money under the guise of a claimed decline in the mark-to-market value of the reference obligations.  Further, the collateral representation was made for the purpose of inducing CDO Plus to enter into the credit swap transaction.  Such allegations are more than sufficient under New York law to create an independent cause of action for fraud.

### III.

### CDO PLUS HAS ADEQUATELY PLEADED ALL OF THE ELEMENTS OF A FRAUD CAUSE OF ACTION

A.     Neither the Parol Evidence Rule Nor the So-Called "Disclaimer of Reliance" Clause Bars CDO Plus's Fraud Claim

Wachovia seeks to evade responsibility for its misrepresentation by relying upon a general disclaimer in the swap documents.  (*See* ISDA Master Agreement at ¶3(g), as amended by Schedule at Part 5(c), McCormick Decl., Exhibit 2 and Exhibit 3, respectively).  However, under New York law parol evidence is generally admissible to prove a claim of fraud in the inducement and this general rule applies even where the parties' agreement contains a merger

21

clause.  *See, e.g.*, *Wall v. CSX Transportation, Inc.*, 471 F.3d 410, 416 (2d Cir. 2006).  Indeed, even *Aetna Cas. And Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 576 (2d Cir. 2005), the case on which Wachovia relies, recognizes this fundamental rule.

The only exception to the general principle is the one discussed in *Citibank v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 311-312, 485 N.E.2d 974, 976-977 (1985), and *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320, 184 N.Y.S.2d 599, 602, 157 N.E.2d 597 (1959).  In those cases, the New York Court of Appeals stated that a contracting party who has disclaimed the existence of – or its reliance upon – particular, specified representations will not be heard to assert that it entered into the contract in reliance on *those specific representations*.  This exception is a narrow one requiring "a clear indication that the disclaiming party has knowingly disclaimed reliance on the *specific* representations that form the basis of the fraud claim." *JPMorgan Chase v. Liberty Mut.*, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002)(emphasis supplied).

In this instance, the purported "disclaimer" on which Wachovia relies is a general and unfocused statement that refers only to "any evaluation or advice (including any recommendation, opinion or representation) from [Wachovia]."   Wachovia's pre-contract misrepresentation about the amount that plaintiff would be required to keep on deposit does not even fit within this purported "disclaimer," since it is not fairly characterized as an "evaluation," "advice," a "recommendation" or an "opinion."  In any event, the cited "disclaimer" is a mere "omnibus" statement of the kind that has long been held ineffective against a claim of fraud. *See, e.g.*, *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993).

Moreover, this exception to the general rule permitting the use of parol evidence to prove fraud is inapplicable where, as here, the facts are peculiarly within the knowledge of the party invoking the disclaimer.  *Banque Arabe et Internationale v. Maryland Nat. Bank*, 57 F.3d. 146,

22

155 (2d Cir. 1995). Although Wachovia argues otherwise, (*see* Wachovia Mem., p. 18, n.14), it is beyond dispute that Wachovia's private intentions with regard to the maximum margin amount that would be demanded of CDO Plus was a matter which, by definition, was "peculiarly" within Wachovia's knowledge.

### B.    CDO Plus Has Adequately Pleaded Reasonable Reliance

It is undisputed that CDO Plus has adequately pleaded *actual* reliance on Wachovia's assurances. Moreover, despite Wachovia's contrary argument, a straightforward reading of the complaint confirms that "reasonable" reliance has also been satisfactorily pleaded.

First, CDO Plus made clear to Wachovia from the outset that it was not interested in the transaction if the required margin were to be greater than $750,000. (Compl. ¶ 18). Once Wachovia acquiesced in this understanding and memorialized it in the Confirmation Letter, CDO Plus had no reason to doubt that, absent a credit default on the part of the reference obligation, it would not have to add to its initial deposit. But for that representation, CDO Plus would not have entered into the trade. Furthermore, CDO Plus's reliance on the foregoing assumption was commercially reasonable, since it entered the transaction "with the understanding that it was selling risk protection against a credit default only." Complaint ¶ 2. Given the nature of such a "credit swap" transaction, it was reasonable for CDO Plus to assume, as Wachovia impliedly assured it, that mere fluctuations in creditworthiness – rather than actual defaults – would not trigger the need for further margin deposits.

### C.    CDO Plus Has Adequately Pleaded Intent to Defraud

Because intent is a matter that rests exclusively within the knowledge of the actor, allegations of scienter "are not subjected to the more exacting consideration applied to the other components of fraud." *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 143 (2d Cir. 1991).

While plaintiffs must "at a minimum, allege facts that give rise to a strong inference of fraudulent intent," *see, e.g.*, *Siben v. American Airlines, Inc.*, 913 F. Supp. 271, 278 (S.D.N.Y. 1996), that burden can be satisfied in two different ways: "either (a) by alleging facts to show that defendant had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996). The gist of CDO Plus's fraud claim is that Wachovia knowingly misled it into believing that, absent a credit default on the part of the reference obligation, CDO Plus would not be required to deposit margin in addition to the Independent Amount. Within weeks, however, Wachovia had squeezed CDO Plus for the full $1,500,000, and later millions more. No more need be alleged to raise an inference of fraud.

## IV.

### WACHOVIA IS NOT ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT

Wachovia is not entitled to judgment on the pleadings as to its counterclaim because, as stated above, CDO Plus is entitled to rescission of the CDS on the ground of Wachovia's material breaches prior to Wachovia's declaring an early termination of the contract and/or pursuant to the equitable doctrine of mistake. Moreover, even if CDO Plus's refusal to post collateral constituted an Event of Default, there remains a live controversy over whether Wachovia's conduct in determining the replacement cost of the CDS (according to Wachovia, the full $10,000,000) was commercially reasonable.

Reasonableness is a highly fact-intensive question. Moreover, it is a well-settled principle of New York law that even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith, and in a manner that comports with commercially reasonable business judgment. *See, e.g.,*

24

*Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994); *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977, 979 (1995).  Here, the complaint alleges that Wachovia's determination of the Settlement Amount could not ***possibly*** have formed a commercially reasonable judgment as to the financial condition of the reference obligation.  Accordingly, CDO Plus is entitled to discovery and an evidentiary hearing to test, among other things, whether Wachovia exercised good faith, reasonable judgment in measuring the replacement value of the swap transaction; whether the market conditions at the time of termination were such that Wachovia actually had an urgent economic need to replace the cash-flows expressed by the swap; or whether Wachovia had an underlying hedged position that was actually exposed to market risk.

## CONCLUSION

For the foregoing reasons, Wachovia's motion must be denied in its entirety and the action should proceed to full discovery and a trial on the merits.  Plaintiff seeks leave, if necessary, to amend the pleadings in the event of any deficiency.

Dated:    New York, New York
       August 28, 2008

                             Respectfully submitted,

                             **MINTZ & GOLD LLP**

                             /s/  Terence W. McCormick
                             Steven G. Mintz (SM 5428)
                             Terence W. McCormick (TM 2713)
                             470 Park Avenue South
                             10th Floor North
                             New York, NY 10016-6819
                             Tel: (212) 696-4848
                             Fax: (212) 696-1231
                             *Attorneys for Plaintiff/Counterclaim-Defendant*
                             *CDO Plus Master Fund Ltd.*